

Jaime A. Davidson, Pro-Se.
Reg. No. 37593-053 (B-4)
USP-Pollock
P.O. Box 2099
Pollock, LA. 71467


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK


JAIME A. DAVIDSON,
    PETITIONER,


    -vs-                           CRIM. NO. 92-CR-35
                                   CIVIL NO. 5:00-CV-869(NPM)
                                   APPEAL NO. 01-2370

UNITED STATES OF AMERICA,
    RESPONDENT.
_____/


        MOTION FOR NEW TRIAL AND/OR ALTER OR AMEND A
        JUDGMENT WITH FINDINGS BY THE COURT PURSUANT
        TO RULES 52(b) AND 59(a)(c)&(e), F.R. CIV. P.,
        TO PREVENT A FUNDAMENTAL MISCARRIAGE OF
        JUSTICE OF A PRISONER WHO'S ACTUALLY (FACTUALLY)
        INNOCENT
        _____


TO THE HONORABLE JUDGE OF SAID COURT;

MAY IT PLEASE THIS COURT:

        Comes Now, Jaime A. Davidson, Petitioner, Pro-Se, (and

referred to herein as Petitioner), in the above styled cause,

humbly praying and respectfully requesting that this Honorable

Court Grant's Mr. Davidson's instant motion.  Petitioner also

requests for this Honorable Court to take "Judicial Notice"

(Pursuant to Rule 201, F.R.E.), of the clear, established and

undisputable fact(s) and/or law(s) in reference to the claims

raised by Mr. Davidson.  In support thereof, to wit, Petitioner

states as follows:

I.                                        **JURISDICTION**

In the case at bar, Petitioner, Pro-Se, humbly seeks the jurisdiction of this Honorable Court to be invoked under Rules 52(b) and 59(a)(c)&(e) of the Federal Rules of Civil Procedures which states in pertinent parts that:

> **"Upon motion of a party made no later than 10 days after entry of judgment the Court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a "Motion For a New Trial' pursuant to Rule 59...."**

**Id.** at Rule 52(b), F.R. Civ. P. (Amendment).   **Lemelson v. Kellog Co,** 440 F.2d 986 (C.A.N.Y. 1971); See, **Rudenko v. Costello**, 286 F.3d 51 (2nd Cir. 2002).

> **"(a) Grounds-.... On a Motion For a New Trial in an action tried without a jury, the Court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusion, and direct the entry of a new judgement."**

> **"(c) Time For Serving Affidavit- When a Motion For New Trial is based upon affidavits they shall be served with the motion. The opposing party has 10 days after such service within which to serve opposing affidavits, which period may be extended for an additional period not exceeding 20 days....The Court may permit reply affidavit."**

> **"(e) Motion To Alter Or Amend A Judgment- A Motion to Alter or Amend the Judgment shall be served not later than 10 days entry of the judgment."**

**Id.** At Rule 59(a)(c)&(e), F.R. Civ. P.

In the case at bar, Mr. Davidson submits that, "A Motion For Reconsideration filed within ten days of entry of the judgment is treated as a Motion To Alter Or Amend The Judgment, which tolls the period for filing a 'Notice of Appeal.'"   **See, Fabian v. Reed,** 707 F.2d 147 (C.A. Miss. 1983).   The record should reflect  where the

-2-

1   District Court's Order being submitted for reconsideration was

2   filed on December 31st, 2002, and Petitioner's present Motion For

3   New Trial..., has been properly prepared with due diligence and

4   in good faith; and, further submitted in a timely manner within

5   this rule's 10 days deadline which would toll Mr. Davidson's

6   Notice of Appeal.

7       In **Mendoza v. City of Rome**, 872 F. Supp. 1110 (N.D.N.Y.

8   1994), this District held that:

9       **"To justify granting new trial based upon newly
        discovered evidence, evidence must have been**
10      **discovered after trial, movant must have used due
        diligence to discover evidence before trial,**
11      **evidence must have been relied upon at trial and
        not merely cumulative or impeaching, evidence**
12      **must be material, and evidence must be such that,
        if produced at trial, outcome would have been**
13      **different."**

14  **Id.**

15      Moreover, "there are grounds pursuant to Rule For Court to

16  Grant New Trial In Action Tried Without Jury: (1) Manifest error

17  of law; (2) Manifest error of fact; and (3) Newly discovered

18  evidence." **See, Wilcher v. City of Wilmington**, 924 F. Supp. 613,

19  Affirmed in Part, Vacated in Part, 139 F.3d 366, on Remand, 60

20  F. Supp. 2d 298.  A decision on a motion for new trial should be

21  based only on evidence by affidavit, deposition, or on sworn

22  testimony in open Court.  **Gordon v. U.S.**, 178 F.2d 896, (C.A.

23  Mich. 1950), Cert Denied 70 S. Ct. 664, 339 U.S. 935, 94 L.Ed.

24  1354.

25      Additionally, on motion for new trial, Court is not

26  constrained to view evidence in light most favorable to

27  nonmovant, but rather conducts its own detailed appraisal of

28  evidence.  **See, Taylor v. National R.R. Passenger Corp.**, 868

F. Supp. 479 (E.D.N.Y. 1994).  Thus, where District Court stated no findings or reasons for denial of Petition For Writ of Habeas Corpus, and petition set forth allegations which might entitle Petitioner to evidentiary hearing, case would be remanded for further consideration.  **Shinall v. Breazeale**, 404 F.2d 785 (C.A. **Miss. 1968)**.  In light of the District Court's failure to hold an evidentiary hearing, Petitioner should be entitled to further consideration of his claims on Remand from the Second Circuit.

Petitioner asserts that the two (2) discrete issues on Remand from the Second Circuit have now evolved totally around Mr. Davidson's Appellate Counsel, Mr. Louis M. Freeman, Esq. The Second Circuit Granted Petitioner a COA on said issues in question based largely on ineffective assistance of counsel claims, well-rooted way outside the trial record.  Mr. Davidson states that the reviewing Court by denying Petitioner an evidentiary hearing to allow the record on ineffective counsel(s) claims to be fully and/or factually developed, proceeded by denying Petitioner a fair and impartial judicial review.  Mr. Freeman and Mr. Laidlaw, should have been both allowed to testify under oath at a hearing, fully detailing their positions which is contrary to the Government and the Court's own.

Mr. Davidson submits where the Second Circuit held that, "our cases require that 'except in highly unusual circumstances,' the assertedly ineffective attorney should be afforded 'an opportunity to be heard and to present evidence, in the form of live testimony, Affidavits, or Briefs.'"  **Sparman v. Edward**, 154 F.3d 51, 52 (2nd Cir. 1998); **See also**, **United States v. Dukes**, 727 F.2d 34, 41 n. (2nd Cir. 1984).

1    In this Court's December 31st, 2002, denial Order of Mr.

2  Davidson's §2255 motion claims and the Second Circuit's two (2)

3  discrete issues on Remand, your Honor has placed **"all"** the blame

4  on Appellate Counsel, Mr. Louis M. Freeman, Esq. for failing to

5  be more diligent.... This Honorable Court's ruling happens to be

6  a clear/manifest and established error of law and fact, based in

7  part, on its failure to afford Mr. Freeman an opportunity to

8  vindicate his name and/or firm, from this Court's ruling finding

9  him to have been ineffective during Petitioner's direct appeal

10  proceedings.

11    In **Bloomer v. U.S.**, 162 F.3d 187, 189 (2nd Cir. 1998), the

12  Court found that, "our cases emphasize that generally an

13  assertedly ineffective attorney should have an opportunity to be

14  heard and to present evidence before being declared ineffective.

15  This issue must therefore be Remanded to the District Court for

16  such a hearing."  This Honorable Court should proceed in the case

17  at bar, likewise, as it was done by the Second Circuit in **Bloomer**

18  **i.e.**, Remanding said case for a hearing, to Grant the attorney

19  found to be ineffective an opportunity to be heard.  Mr. Davidson

20  asserts that the same principles utilized by the Second Circuit

21  in **Bloomer**, should **"not"** be changed in the case at bar; and, it

22  should Grant Petitioner a hearing to afford Mr. Freeman and Mr.

23  Laidlaw, Esq's the sole opportunity to be heard, in order to set

24  up a fair and balanced proceeding.

25  II.          **SECOND CIRCUIT'S DISCRETE ISSUES ON REMAND**

26

27    In the instant matter at hand, Mr. Davidson submits that

28  the District Court is attempting to confuse the record.  On June

12th, 2002, the Second Circuit in Petitioner's case held that:
"upon due consideration, it is Ordered that the Motions For Leave
to Proceed In Forma Pauperis And a Certificate of Appealability
are **GRANTED** for the following limited purpose: The case is
**REMANDED** to the District Court to consider Appellant's claims
that...." This Court failed to acknowledge the fact that the
Second Circuit had already **"GRANTED"** Mr. Davidson a "COA" on
those two discrete issues.  The Circuit Court adhered to
Petitioner's request and Remanded Petitioner's case to the lower
Court to fully develop the facts of Mr. Davidson's claims of
ineffective assistance of counsel on appeal (In light of the
strict standards set out by the AEDPA), where Petitioner cited
**U.S. v. Leone**, 215 F.3d 253 (2nd Cir. 2000) and **U.S. v. Pena**, 233
F.3d 170, 174 (2nd Cir. 2000), which found as follows:

> **"(a) In light of enactment of Antiterrorism And
> Effective Death Penalty Act (AEDPA), which severely
> restricted the ability of a defendant to file more
> than one habeas petition, Court of Appeals faced
> with claims of ineffective assistance on direct
> appeal [As here, a COA], may be more inclined to
> 'REMAND the claim to the District Court for
> necessary fact-finding, rather than declining to
> hear the claim and permitting the Appellant to
> raise the issue as part of a subsequent petition
> for post-conviction relief."**

**Id**. At 256-57.

The District Court, instead of allowing Mr. Davidson the
right to fully develop all the facts of his ineffective counsel
claims via, an evidentiary hearing and thereafter making its
consideration from the conclusion of Petitioner's Remand
(Through the standard of review of Habeas Corpus), the District
Court erred when it utilized the standard of review of Circuit
Courts requests for Certificate of Appealabilities on Mr.

1   Davidson's case.   The District Court even after its consideration

2   and rendering its denial Order, it errroeously went as far as

3   denying Mr. Davidson a request for a COA, alleging that Petitioner

4   was "unable to make a substantial showing of the denial of a

5   constitutional right, as required by 28 U.S.C. § 2253(c)(2)(1).

6   **See, Page 10 (District Court's December 31st, 2002, Denial Order).**

7   Now, for the record sakes, Petitioner, <u>Pro-Se</u>, respectfully

8   submits that this Honorable Court's December 31st, 2002, Denial

9   Order, is in clear violation with its own Rule(s) of Law based on

10   Affidavits/Motions of Recusal against biased and/or Partial

11   Judges-- to protect Mr. Davidson's Constitutional Rights to Due

12   Process and Equal Protection, this Honorable Court must Vacate all

13   its previous Orders retroactively from the point of said biasness

14   was discovered and reassign Petitioner's case to a different

15   Judge that's impartial, to safeguard the appearance of justice.

16   In <u>U.S. v. Hanhardt</u>, **134 F. Supp. 2d 972, 977 (N.D. Ill.**

17   **2001), and under 28 U.S.C. §144,** the District Court held that,

18   "whenever a party to any proceeding in a District makes and files

19   a timely and sufficient Affidavit that the Judge before whom the

20   matter is pending has a personal bias or prejudice either against

21   him or in favor of any adverse party, 'such Judge [As here, Hon.

22   Neal P. McCurn, S.J.], **shall proceed no further therein, another**

23   **Judge shall be assigned'** to hear such proceedings."   The Hon.

24   McCurn has intentionally decided to violate all rules/laws by

25   declining to rule on Petitioner's Affidavit of Recusal filed

26   against him around February 5th, 2002.   Mr. Davidson asserts that

27   the procedures utilized in <u>O'Keefe</u>, should also be enforced in the

28   case at bar, where the Fifth Circuit found:

-7-

1  "Under § 455(a), grounds for a Judge to disqualify
    himself arise whenever his impartiality might
2  reasonably be questioned; and, even if the Judge
    was not aware of the circumstances creating an
3  appearance of partiality when it occurred, once he
    realizes that the impropriety existed he is called
4  upon to take steps necessary to maintain public
    confidence in the impartiality of the judiciary;
5  In a proper case, the Judge may be obliged to
    disqualify himself retroactively and to Vacate any
6  Orders entered during the time that a reasonable
    person would harbor doubts about the Judge's
7  impartiality. Liljeberg, 486 U.S. at 860-61, 108
    S. Ct. 2194."

9  Id. At U.S. v.O'Keefe, 169 F.3d 281, 289 (5th Cir. 1999).

10      In the case at bar, Petitioner has explicitly shown and

11  proven where the Hon. McCurn has become a major player/interested

12  party to the instant proceedings with strong vested interests on

13  the outcome of Mr. Davidson's habeas case.  The Hon. McCurn has

14  created a great impact with all his baseless/unfounded Orders

15  exposing Mr. Davidson to continue suffering from numerous

16  fundamental miscarriages of justice.  And, by the Hon. McCurn

17  declining to respond to the pending Affidavit of Recusal, he can

18  continue to manipulate the present habeas proceedings.

19  III.          **DEFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

21      The following is Petitioner's break-down of the District

22  Court's erroneous consideration and rulings without Granting an

23  evidentiary hearing (To allow Mr. Davidson to fully develop all

24  the facts of his ineffective counsels claims), and they are as

25  follows in relation thereto:

26      1.  Failure to investigate or raise the severance issue on

27  appeal.

28      The District Court's December 31st, 2002, Denial Order

-8-

1 | intentionally omits any/all mention to address and/or comply with
2 | the Second Circuit's Order on Remand, directed towards the issue
3 | of ineffective assistance of appellate counsel for failure to
4 | investigate.  This Honorable Court knows that to respond to said
5 | claim in question which is "inner-twined" with claim No. 2 of the
6 | Second Circuit's Order on Remand (Which is, his trial counsel
7 | hindered his appeal by not turning over records to his new
8 | appellate counsel), it would be left with no other legal/factual
9 | alternative, but being compelled to hold an "evidentiary hearing"
10 | i.e., why the District Court then proceeded by ignoring to
11 | consider said claim on its merits, without issuing its factual
12 | findings and conclusions of law.  See, (Claim No. 2 at infra).

13 | In regards to two (2) sections Mr. Davidson has extracted
14 | from the District Court's present Denial Order to prove where its
15 | consideration without a hearing was totally erroneous and a clear
16 | error of fact and law (Omitting overwhelming evidence outside the
17 | trial record), goes as follows:

18 |
19 | "Petitioner Davidson's trial counsel made a Motion
    | For Severance prior to trial on the basis that
    | written statements given to the police by two of
20 | his co-defendants (Morales and Stewart) implicated
    | Petitioner Davidson in the murder of Officer
21 | Howard."

22 | "The record does not support any factual basis for
    | a severance claim which could have been utilized by
23 | appellate counsel and thus there was no basis to
    | raise the severance issue on appeal and appellate
24 | counsel cannot be faulted for failing to raise
    | same."
25 |

26 | Id. Pages 2-3 (District Court's 12-31-02 Denial Order).

27 | Mr. Davidson submits that, as to the aforementioned quoted
28 | excerpts, the District Court is in clear error of law, especially

-9-

1   without the Grant of a  hearing.  In support of Petitioner's

2   severance, Mr. Davidson had submitted an Affidavit by Mr. Stewart

3   in his initial §2255 petition.  The District Court without a

4   hearing alleged with clear speculation in its November 28th, 2000,

5   Denial Order that, "It is undisputed that Stewart was never on

6   life-support, and a cursory review of the Affidavit strongly

7   suggests that the Affidavit 'did not' come from Stewart."  **Id.** At

8   **page 10.**  Petitioner further submits that those were strong words

9   of speculation with allegedly false information coming from

10  outside the record by the District Court.

11      Afterwards, Mr. Davidson in his initial Motion For

12  Reconsideration submitted a "counter Affidavit by Mr. Gary

13  Stewart," dated November 28th, 2000.  Upon being in receipt of the

14  Government's initial response, Mrs. Marie Y. Watson, Esq. had

15  already contacted Mr. Stewart and the attached counter Affidavit

16  said in pertinent parts (Confirming the contents of Mr. Stewart's

17  initial Affidavit dated July 25th, 2000), which goes as follows:

> **"22.   One of the main reasons that I wanted to see
> Jaime's attorney, was because I needed some serious
> legal advice as to the third statement, the proffer,
> the promise I was given to keep my mouth shut, and
> what to do regarding Ms. Rosenthal threats;"**

> **"23.   If Mr. John R. Laidlaw had came to visit me as
> I wanted, this issue would not have been kept a
> secret and I would have testified on Jaime's behalf
> clarifying the following:**

> **C.   Jaime was not in Syracuse, NY on October 30,
> 1990 at Ms. Gwendolyn Morrows apartment that
> morning;**

> **D.   Juan Morales had told me himself one date at
> the Public Safety Building that he had to
> make up that story against Jaime because they
> (The Officers) had beaten him bad, asking him
> where was Jaime, so he came up with that story;**

-10-

E. My Attorney, Ms. Kate Rosenthal threatened me by saying, 'Gary, if you tell anybody about this, you would not need to worry about the death penalty, I'll kill you myself.'

G. Ms. Rosenthal told me that Mr. Duncan was working with her on the State proceedings making sure nothing went wrong since he was to handle the Federal level, the evidence and testimony would not be too far off and contradictory;

I. Morales was one of the persons that drove Jaime's rented trucks/vans for Dance Time.

"24. I want to make it real clear that until this day, I have kept my mouth shut regarding my third statement and proffer. Mr. Duncan should notice that it was Ms. Rosenthal, for whatever reason's 'I <u>do not</u> know, broke the agreement we all had made in 1991 for them not to seek the Federal Death Penalty;"

<u>Id</u>. At pages 3-4 (Gary Stewart's 7-25-00 Affidavit).

"If I was ever call upon to testified on Mr. Davidson's behalf. I would've tell the truth that Mr. Davidson was not a prime leader in any drug ring or present in the apartment on Elm St. on the morning of October 30, 1990."

"Again, my Affidavit on July 25, 2000, is '<u>true and authentic to the fullest.'</u>"

<u>Id</u>. At page 3. (Gary Stewart's 11-28-00, Counter Affidavit).

"It is my understanding that your client, Anthony Gary Stewart, is meeting with Federal Authorities tomorrow and at that meeting may discuss matters relating to crimes set forth in the above-referenced indictment."

"Relative to that meeting with the Federal Authorities, I will agree not to use any statements your client makes at the meeting in the prosecution of the above referenced indictment proceed to trial against your client, I will agree not to seek to discover any statements made by your client at the meeting."

<u>Id</u>. Letter by District Attorney, Robert E. Wildridge to Ms. Kate

Rosenthal, Esq. (Mr. Stewart's former trial attorney), and carbon

1  copy mailed to AUSA, Mr. John G. Duncan, Esq.

2       "The following is a summary of an interview of Gary
         Anthony Stewart conducted on March 26, 1991 at the
3        Onondage County Sheriff's Department by AUSA John G.
         Duncan. Also present was Kate Rosenthal attorney
4        for Stewart."

5  <u>Id</u>. Page 1. (Summary of Gary Stewart's proffer statement to AUSA,

6  Mr. Duncan, Esq. dated March 26, 1991).

7        "4.  That I requested all of Mr. Davidson's trial
         preparation materials (Discovery Materials) from
8        Mr. Laidlaw, in order to review them thoroughly
         and begin my own independent investigation."

9

10       "5.  That after a number of requests, I conveyed
         to Mr. Laidlaw the importance of acquiring these
11       documents for Mr. Davidson's appeal preparation,
         but I never received them."

12

13       "6.  That I explained to Mr. Davidson that Mr.
         Laidlaw had not sent me the Discovery Materials,
14       and requested Mr. Davidson contact Mr. Laidlaw
         directly because time was running out and I had
15       to prepare his appeal."

16       "7.  That Mr. Davidson was pushing me to get the
         material, but I explained to him that even if I got
17       the material, if his trial counsel failed to preserve
         certain objections for appeal, then he couldn't
18       raise them. (For example, the severance issue and
         antagonistic defenses issue and the issue involving
19       Robert Lawrence taking the stand and testify as to
         self defense, which contradicted Mr. Davidson's
20       alibi defense.)."

21       "9.  That despite my serving as point person, Mr.
         Laidlaw still refused to comply with my request that
22       he turn over all Discovery Material."

23       "10.  That I explained this to Mr. Davidson."

24       "11.  That I also explained to Mr. Davidson how after
         going through his Federal Trial Transcript it appeared
25       that Mr. Laidlaw went to trial without conducting any
         pretrial investigations or hiring his own expert
26       witness (For Example, to re-examine Investigator
         Howard's cause of death.)."

27

28       "14.  That of reasons I agreed to file Mr. Davidson's

                                -12-

Petition For Certiorari, was that I thought Mr. Laidlaw handled the Davidson trial poorly and left no room to raise issues which could have been meritorious.   Also, because § 848(e)(1)(b) convictions are rare (The only one in the Second Circuit that I could find.) I had to research the Congressional Intent."

"24.   That it was extremely frustrating and disheartening to myself and my firm that we had to give up the idea of conducting a separate independent investigation of our own.   I expressed this to Mr. Davidson at the time. This is especially true now that I see there was something lurking out there that we were unable to uncover."

Id. At pages 1, 2 & 4 (Mr. Louis M. Freeman, Esq. Statement of Affirmation).

"Following extensive pre-trial discovery Mr. Davidson's case was tried in our Federal Court before Judge McCurn during January and February of 1993."

"During the fall of 1993 I assisted Mr. Davidson's new counsel by sending them requested portions of my file and by answering all their queries.   I attach copies of three letters to appellate counsel which detail the material I sent them."

"Mr. Davidson alleges that in some fashion I used politically incorrect language during the trial by repeatedly using the expression 'you people.'.... I have never heard anyone until now, assert the phrase 'you people' is a racial epithet'..."

"More troubling is Mr. Davidson's assertion that his father paid me 'around $3,500.00 to retain a private investigator....'"

"I do recall that Mr. Davidson at one point requested I send him my entire file.... None of these requested items are in my possession. You should further be aware that I did send portions of my file (Primarily the trial transcript) to Mr. Davidson's appellate attorneys.... 'I believe' I have made the appropriate responses to any of Mr. Davidson's requests which were reasonable."

Id. At pages 2-3 (Mr. Laidlaw's April 4, 2000 Response to Petitioner's Bar Complaint "Unsigned.").

"Pursuant to 'our phone conversation' to yesterday afternoon, I am mailing out to you by UPS the following items: 4. 11/25/92 'Notes' on Omnibus

-13-

1    Motion Argument." (Please note, those were "Notes",
     as opposed to being the actual hearing transcripts).

2    "If there are other documents you need 'please call'
3    and I will send them down forthwith. I will, of
     course, also make myself available to discuss any
4    aspects of Mr. Davidson's trial you wish."

5    Id. At page 1-2. (Letter From Trial Counsel, Mr. John F. Laidlaw,

6    Esq. To Appellate Counsel, Mr. Louis M. Freeman, Esq. Dated

7    August 28, 1993).

8    "I do not recall if the Government had DMV Records
     showing that the gray station wagon was registered
9    to Davidson. Such records were not part of the trial
     evidence."

10   "I do not know why Gregory made no Courtroom
11   identification of Jaime Davidson. It certainly was
     surprising."

12   "Hope these documents 'clear up' things." (The record
13   reflects where Mr. Callouri & Mr. Freeman were
     searching hard to uncover material flaws to raise the
14   issues Mr. Davidson was telling them about, but the
     proper documents were being withheld).

15

16   Id. (One Page Letter From Mr. Laidlaw, Esq. To Former Appellate

17   Counsel, Mr. Joseph Callouri, Esq. Dated November 2, 1993).

18       The following excerpts are to establish on the record

19   where the intentional withholding of material documents by Mr.

20   Laidlaw hindered Mr. Davidson's Direct Appeal, and can now be

21   seen throughout Petitioner's "Pre-Trial Omnibus Motion Hearing

22   Transcripts," which goes as follows:

23       The Court:  Also Mr. Stewart, Rule 609 material cross-

24   examination material.  What's your position on that, Ms.

25   Rosenthal?

26       Ms. Rosenthal:  That, Your Honor, if such exist we ask

27   the Government to turn it over.

28       Mr. Jaquith:  Your Honor, I think we have turned over

-14-

1  what we're obligated to, the criminal records of the defendants, and

2  then it just, the issue simply is whether those convictions or bad

3  acts are admissible or usable in "cross-examination of the defendants

4  should they take the stand," and that's an issue that has to be

5  resolved in the context of trial.

6      Ms. Rosenthal:  Your Honor,.... Of course, what I'm really

7  interested in is if the Government decides that in the event that

8  "my client testifies," we now have some information regarding vicious

9  acts or immoral acts that occurred two years ago, four years ago,

10 eight years ago, that that information be provided to me in an

11 opportune time....

12 Id. At pages 24-25. (Omnibus Motion Hearing Transcripts Of Nov. 25th,

13 1992). See, (Attached, Mr. Davidson's Pre-Trial Hearing (From Omnibus

14 Motion) Transcripts "Notes").

15     Mr. Brian:  I'll only briefly say that yes, Your Honor, as

16 far as the Defendant Davidson is concerned we have asserted that

17 there is "a likelihood of Antagonistic defenses" here as illustrated

18 by the confessions where the co-defendants basically blame others for

19 the crime.... And also we do not know that our concern is "the

20 Government during the course of the trial will introduce the fact of

21 conviction of the co-defendants before a jury here in Federal Court."

22 So those are additional grounds , Your Honor.

23     The Court:  What about in a last statement he just made,

24 Mr. Jaquith, that "the Government will, he suspects, will try to

25 introduce evidence before the jury of the State court convictions of

26 these people?"

27     Mr. Jaquith:  Your Honor, "he knows more about our

28 intentions than I do."

-15-

**The Court:**  Well, do you say that's admissible?

**Mr. Jaquith:**  Not at this stage, Your Honor. I haven't really researched the issue but it's not my present intention to offer the State Court convictions.

**The Court:**  I want to, that question I don't think is in front of me right now, but it has occurred to me and we've got to make some, I would think it would be advisable to make some pretrial determinations on that. "Is this information going to come out at the time we draw the jury, during the course of trial, Et Cetera?" So I want everybody to be ready to give some consideration to that question. [From the record, **"no"** consideration was ever given to this critical question]. Is there any other reason that you think your case should be severed?

Id. At pages 42-43. (Omnibus Motion Hearing Transcripts Of Nov. 25th, 1992).

**[Mr. Laidlaw]**  And as far as my desire to exercise some of my challenges separately from that of the co-defendants, "I make that request based on my discussions with the other attorneys and my belief that 'my defense is undoubtly going to be antagonistic or at conflict with theirs,'" so I'm going to be looking in seven circumstances for different type of jurors.

Id. At pages 67-68. (Omnibus Motion Hearing Transcripts of Nov. 25th, 1992).

**Ms. Fahey:**  He [Juan Morales] was given his Miranda warnings because he attempted to invoke his right to counsel. Your Honor, I would simply, I will rely on my papers for this, but I will also note that in the Government's response they rely heavily on the Lux case.  Of course in the Lux case the District Court made findings

-16-

1   of fact and therefore you would assume there was a hearing, and all

2   I'm simply asking for here is a hearing on whether or not these

3   confessions should be suppressed because of a violation of his Fifth

4   Amendment Rights.

5               The Court:   You are requesting a hearing?

6               Ms. Fahey:   I would be requesting a hearing, Judge.

7               The Court:   You are saying that an "evidentiary hearing

8   might reveal facts that aren't in front of me now?" [Defense counsels

9   intentionally covered-up the Morales beating].

10  Id. At pages 64-66. (Omnibus Motion Hearing Transcripts Of Nov.

11  25th, 1992).

12          "7.   I saw four white men beating a dark complexion man
            who was sitting in the driver seat of a station wagon."
13
            "8.   Prior to going outside, I thought that this was a
14          fight between four whites and a Puerto Rican I thought
            the white men were going to kill this Puerto Rican."
15
            "9.   Therefore, I left out the front door from my living
16          room onto the porch and on to McClure street. I told the
            four white men, 'if you motherfuckers keep hitting him,
17          I gonna call the goddamn police.'"

18          "10.   One of the four white men pulled a gun on me and
            said, 'get back lady. We are the police, he just killed
19          a cop.'"

20          "16.   Everytime a new officer came, they would take turns
            hitting him with their fist, kicking him and beating him
21          in the head." [And, this material evidence would have
            gotten Morales statements suppressed as involuntary,
22          Fifth Amendment violations].

23  Id. Pages 2-3. (Affidavit Of The Now Deceased, Mrs. Andrea Frances

24  Robinson Kearse Ballard, Dated Nov. 21st, 1999).

25          "5.   The way Pedro kept using Jaime's name so loosely
            between orders and commands stating that Jaime said to do
26          this or that, made me truly believe that Jaime was in on
            the deal and he was working through Morales in sending
27          his orders;"

28          "7.   It wasn't until much later that I found out that
            Jaime really was not even in Syracuse on that day

-17-

(October 30th, 1990) but Morales was talking like he was right around the corner or something;"

"10.  When I asked Morales to tell me the truth if Dooley (Luther Gregory) even knew Jaime or if he really robbed Jaime, he laughed and said, 'hell no, but I had to make up a quick story to get the cops off me, because <u>they were punishing me</u> (Meaning, <u>beating me up bad</u>);'"

"27.  Mr. McGinty had told me to pay close attention to all the prosecutors witnesses' trial testimony and especialy to Jaime's alibi witnesses' trial testimony because I would have to discredit their testimonies by placing Jaime at Ms. Morrows apartment that Oct. 30th, 1990 morning of the alleged meeting in Syracuse, NY, to convince the jury by saying Jaime allegedly gave me the .357 Revolver and told everybody what to do, just in order to exonerate all my co-defendants and help them;"

"31.  Prior to me taking the stand, all of us (Morales, Stewart, Parke and myself) had gotten together and held a meeting set up by Morales to decide who would testify against Jaime without Jaime knowing about it, but our attorneys knew, including Mr. McGinty, that we would get our stories straight and that is where Morales kept stressing to me that my testimony could not be different from what was already said in his two (2) statements and Poppy's two (2) Affidavits, because Morales' attorney told him that that would tend to make the jury think that I am lying; I ended up asking Mr. McGinty for legal advise as to that and he also advised me to keep my testimony in line with both Morales and Stewart's Affidavit statements so that my trial testimony could have weight and credibility;"

"36.  Once I was on the stand realizing that Mr. McGinty had lied to me and set me up and <u>Mr. Laidlaw (Jaime's Lawyer) kept destroying my credibility</u>' I remembered the statement Juan 'Pedro' Morales kept stressing to me over and over, 'man, Bam, look at this shit, after we did everything Jaime asked us to do, the motherf.ck_r is out there living the life without sending us a dollar, nor giving our family anything;"

"39.  I had to end up writing the Honorable Jundge Neal P. McCurn, then Mr. McGinty wrote me back lying to me that he had wrote me because I called to clarify the record on my Direct Appeal but Mr. McGinty submitted it without consulting me trying to hide from wrongly advising me and knowingly lying to me;" <u>See</u>, Letter attached. and dated April 15, 1994. (Had The Honorable McCurn compelled Mr. McGinty to take care of Mr. Lawrence's request to clarify the record, there was still ample time for Mr.

-18-

1  Freeman to supplement the record after acquiring Mr.
   Lawrence's corrected Affidavit. Petitioner's appeal
2  then, was affirmed on July 26th, 1994).

3  "40.   Mr. McGinty knowing that he was the main person
   to blamed for knowingly misleading me, he never wanted
4  the truth to come out that is why Mr. McGinty made
   sure to cut off all means of communication with me;"

5

6  Id. At pages 1,2,5,6 & 7. (Affidavit Of Mr. Robert Lawrence dated

7  July 25th, 2000 And Legally, It's Considered As "Newly Discovered

8  Evidence" In Further Support Of Mr. Davidson's Claim(s) Of Being"

9  Actually (Factually) Innocent).

10     "It is my further assertion that 'misconduct
       occurred on and off the trial record that has already
11     adversely affected my best interest.' Thus, these
       facts will demonstrate a conflict of interest if Mr.
12     James P. McGinty were to continue to represent me
       upon my appeal."

13

14 Id. Letter from Mr. Robert Lawrence to the Hon. Neal P. McCurn,

15 dated April 15, 1994. See, (Mr. Lawrence's Affidavit in order to

16 see the type of misconducts that occurred "on and off the trial

17 record", which was beneficial for Mr. Freeman to raise some

18 potent reversible issues on Mr. Davidson's direct appeal).

19     Petitioner states that, in light of all the aforementioned

20 excerpts detailed for the record, clearly contradicts the District

21 Court's erroneous speculation that, the record does not support

22 any factual basis for a severance claim.  Had, Mr. Laidlaw turned

23 over all of Petitioner's Dicovery Materials requested, then Mr.

24 Freeman would have been able to raise Mr. Davidson's requested

25 severance claim on appeal with substantial evidence/proof in

26 support of same.

27     Moreover, Courts have held that prejudice can result from

28 a failure to sever if any (Or All) of the following factors are

-19-

present: 1. There existed antagonistic or mutually exclusive defenses; [See, Affidavit of Mr. Robert Lawrence] 2. Co-defendant did not give exculpatory testimony because of potential for self-incrimination; [See, Affidavit and Counter Affidavit of Mr. Gary Stewart] 3. A co-defendant's extrajudicial statement was admitted. **[Mr. Morales and Mr. Stewart's extrajudicial statements were erroneously admitted with the Pinkerton theory that by-passed all means of limiting instructions protections via, its vicarious liabilities].**

Additionally, based on the three (3) factors mentioned above, Mr. Davidson overwhelmingly has been prejudiced regarding his guilty verdicts.  In complex cases (As in Petitioner's own), the critical inquiry regarding compartmentalization is whether limiting instructions to the jury were sufficient. **See, U.S. v. Hernandez**, 85 F.3d 1023, 1029 (2nd Cir. 1996).  As evidence of the jury's ability to compartmentalize, an Appellate Court will also consider whether the jury convicted each defendant on all counts. **See, U.S. v. Aulicino**, 44 F.3d 1102, 1117 (2nd Cir. 1995).

In **U.S. v. Montilla-Rivera**, 115 F.3d 1060 (1st Cir. 1997), for means of "Newly Discovered Evidence" submitted in "New Trial Motions" [As here, with Mr. Davidson], the First Circuit found as follows:

> "If motion for new trial is based on new or previously unavailable evidence, defendant has to establish that evidence was 'unknown or unavailable' at 'time of trial' despite due diligence, material, and likely to result in acquittal upon retrial."

> "Exculpatory Affidavits from co-defendants who did not testify at trial because they exercised their Fifth Amendment privileges were 'Newly discovered' evidence for purposes of Motion For New Trial; on its face, proffered testimony in Affidavits was material, could

1  lead to different outcome if believed, and was not
   inherently implausible.

2

3  <u>Id</u>. At page 1064-65.

4      In the case at bar, the District Court erred when it alleged

5  that, "there was no basis to raise the severance issue on appeal and

6  appellate counsel cannot be faulted for failing to raise same." <u>Id</u>.

7  At page 2-3.  The fact is, had appellate counsel acquired a copy of

8  the new uncovered "Proffer Agreement and Statement" of Mr. Stewart,

9  in cahoots with his Defense Counsel, Ms. Kate Rosenthal, Esq. and

10 AUSA, Mr. John G. Duncan, Esq., there is no doubt about it that Mr.

11 Freeman, Esq. would have raised said severance issue in Petitioner's

12 Direct Appeal.  But, one <u>must</u> ask themselves, did Mr. Laidlaw and the

13 remaining 10 trial counsels have knowledge of said meeting and why

14 didn't AUSA, Mr. Duncan, Esq. place this meeting on the record?  Mr.

15 Lawrence's Affidavit clearly confirms that:

16      "20. If I had known that Poppy had a <u>'third Affidavit'</u>
        and also <u>had given a proffer statement to the Federal</u>
17      <u>Prosecutor, Mr. John G. Duncan,'</u> that <u>'definitely would</u>
        <u>have scared me from taking the stand,'</u> because I would
18      not have know what Poppy told Mr. Duncan, that would
        have been used against me to hurt my trial testimony."
19      [It should also be noted that had Mr. Lawrence <u>"not"</u>
        taken the stand, Petitioner would not have been
20      prejudiced with "mutually antagonistic defenses" between
        Mr. Lawrence and Petitioner].

21

22 <u>Id</u>. At pages 3-4. (Affidavit of Mr. Robert Lawrence Also Submitted

23 As Newly Discovered Evidence For A New Trial).

24      Furthermore, had Ms. Rosenthal <u>"not threatened"</u> Mr. Stewart

25 upon notifying her of his desires of wanting to testify on

26 Petitioner's behalf, the District Court would have been compelled to

27 Grant Mr. Davidson a severance; and, the proffer agreement even

28 placed Mr. Stewart under more pressure sitting with all the Co-

                              -21-

defendants living a lie while knowing the secret they [Mr. Stewart, Mr. Duncan and Ms. Rosenthal] all held under tight wraps.  **United States v. Ouimette**, 798 F.2d 47, 51-52 (2nd Cir. 1986) (Ordering Hearing On New Trial Where Witness, While Known of at Trial, Was Unavailable [As Mr. Stewart], After Police Allegedly Pressured Him Not to Testify); See, **Ouimette**, 753 F.2d at 192-93 (Remanding to District Court For Hearing on New Trial Motion Where Affidavit Presented New Testimony Going to Issue of Defendant's Guilt); **Lyles v. United States**, 272 F.2d 910, 913 (5th Cir. 1959) (On New Trial Motion, District Court "Will Be In Better Position to Exercise Its Functions" After Holding Hearing).

Thus, the record does indeed support the factual basis that, had all those documents/informations never been withheld from Mr. Freeman, there would have been some extremely strong factual basis for Mr. Freeman to have raised Petitioner's severance issue on his Direct Appeal.  The District Court should Grant Mr. Davidson, Pro-Se, an "Evidentiary Hearing" to fully develop all the facts of his claims and flesh out all those exculpatory testimonies which are "Newly Discovery Evidences" with live testimonies.

IV.        **FAILURE TO ARGUE TO THE COURT OF APPEALS THAT THIS COURT ERRONEOUSLY GAVE A BLANKET SELF-DEFENSE JURY INSTRUCTION**

In the instant matter at hand, the District Court has intentionally declined to thoroughly review and consider Mr. Robert Lawrence's Affidavit, which is in further support of Mr. Davidson's instant motion for new trial.  The District Court's decision is biasly considering the evidence(s) without being balanced with both parties and impartial, to preserve the appearance of justice. The

-22-

1 .District Court Order quotes that, "Co-defendant Lawrence testified on

2 his behalf admitting that he had shot Officer Howard, but claimed it

3 was in self-defense (JA 1224-1228, Exh. 2), **Id**. At page 3. (District

4 **Court's 12/31/02 Order**) But, the District Court proceeded by omitting

5 from Mr. Lawrence the following excerpts:

6     The Court:  It's cross-examination. If he's not right he

7 can say so.

8     Q.  Isn't that what happened?

9     A.  No, Sir..

10     Q.  What did happen?

11     A.  I seen a hole in the window but I didn't know if he

12 got hit or not.

13     Q.  And then you took off, right?

14     A.  Yes, Sir.

15 **Id**. **See**, (Attached Mr. Lawrence's Trial Transcript Testimony During

16 Cross-Examination).

17     "16.  Had Mr. McGinty hired his own Expert Crime Scene
    Reconstruction, Forensic Pathologist, Ballistics Expert

18     and their conclusions could have been just a bit
    different, <u>'pointing that the alleged bullet traveled</u>

19     <u>from far range and entered from the left side, I would</u>
    <u>have never taken the stand to claim self-defense;</u>"

20     "22.  I had asked my Trial Attorney, Mr. James P. McGinty

21     of what kind of trial defense I could raise that would
    exonerate my co-defendants from the alleged murder

22     counts and Mr. McGinty stated that they (All trial counsels
    had already investigated that legal option and <u>'they all</u>

23     <u>had concluded that self-defense would do'</u>) that is when
    I took my attorney's advise to claim self-defense as I

24     wanted to take the stand;"

25     "24.  When I heard Ms. Kate Rosenthal ask the Hon. Judge
    for this <u>'so call Pinkerton Instruction to apply to all</u>

26     <u>my co-defendants on the murder couns,'</u> I realized that
    Mr. McGinty had set me up by illegally advising me that

27     <u>'both murder counts would be dropped against all my co-</u>
    <u>defendants'</u> and he didn't even try to object against it;"

28

1  **Id**. At pages 3-4. (Affidavit of Mr. R. Lawrence).

2          Mr. Rosenthal:  Well, Your Honor, you indicate first

3  substantive charge exceptions and requests. Actually, I would ask

4  that the Self-Defense Theory be applied to the Pinkerton charge as

5  well, that they understand, you know.... I want it clear to the jury

6  that likewise that **"Self Defense Theory Applies to All The**

7  **Defendants."**

8          The Court:  Well, the charge, I think, was very obvious on

9  that. If they find the Self-Defense applicable to Mr. Lawrence, I

10  charged them that it's also applicable to the others.  And as to the

11  murder Counts **VI** and **VII**, it would call for an acquittal, and there

12  is no way that it would not, the way I charged it.

13  **Id**. At pages 2601-02 (Federal Trial Transcripts).  [It should also be

14  noted for the record that, based on the legal fact where Mr. Laidlaw,

15  Esq. failed to object to said Pinkerton Theory for Petitioner and

16  **"joined in with the rest of attorneys"**  for said prejudicial

17  instructions in question, Mr. Freeman was left with no other

18  alternative, but to defend said blanket Self-Defense with the Pinkerton

19  Theory on Mr. Davidson's Direct Appeal.  Had Mr. Laidlaw objected to

20  it, then Mr. Freeman would've been able to argue said erroneous

21  instructions in question in Petitioner's appeal].

22          **Cross-Examination By Mr. Laidlaw:**

23          Q.  Mr. Lawrence, do you think that you're helping

24  yourself by what you told this jury this afternoon?

25          Mr. McGinty:  I'm going to object to the form.

26          The Court:  Sustained.

27          Mr. Laidlaw:  This is cross-examination.

28          Q.  Mr. Lawrence, are you telling these people that

-24-

1    ,you shot Wallie Howard in some Self-Defense Mode; Is that what you're

2    trying to tell these people?

3              A.  I'm just, I'm just telling them how it really went.

4              Q.  Well, are you -- you're not suggesting in some

5    fashion that you acted of Self-Defense, are you?  You certainly

6    don't mean to imply that to these people, do you?

7              Mr. McGinty:  Your Honor, I'm going to object to that.

8              The Court:  I sustain it, what he thinks or implies.

9              Q.  Are you intending to raise a Self-Defense issue

10   here?

11             Mr. McGinty:  Your Honor, I Object.

12             The Court:  Sustained.

13             Q.  Well, what's the purpose of your testimony?  Are you

14   trying to lessen your involvement in this?

15             Mr. McGinty:  Your Honor, again I object.

16             The Court:  Sustained.

17             Q.  Are you suggesting that Officer Howard was accidentally

18   shot by you?

19   Id. See, (Attached trial testimony transcripts of Mr. Robert

20   Lawrence.  Was this a wise move on Mr. Laidlaw's part?  Please note,

21   analyze with severance issue at supra.).

22             "30.  Mr. McGinty advised me not to testify to 'the closing
             of my eyes and seeing Howard, Jr's face swollen' because
23           as Mr. Stewart Bennett concluded and confirmed that the
             alleged shooter was position right where I was allegedly
24           standing and we only want the jury to get a slight doubt
             that I might not have been the alleged trigger man;"
25
             "33.  Jaime did not know what my trial testimony on
26           Self-Defense was giong to happen because Morales was
             telling us that Jaime's lawyer was not down with the other
27           attorneys entire trial strategy; so after I asked my
             attorney for some legal advise as to that, Mr. McGinty
28           only said that Jaime's lawyer wasn't all that  in accord

                                    -25-

with the pointing of the fingers, therefore, my trial testimony would have to catch them both (Jaime and his lawyer) off guard and by surprise and I just had to be ready to stick to my story;"

"34.  Mr. McGinty said that once I mentioned Jaime's name it would have been too late for Jaime's lawyers to change their trial tactics, but it would give strenght and a lot of credibility to my Self-Defense testimony;"

Id. At pages 5-6. (Affidavit of Mr. Robert Lawrence).

Q.  Doctor, I'll ask you to assume if Officer Howard was seated in the front passenger seat of a Plymouth Horizon vehicle with his body turned to his left, and assume that the bullet was fired, entered the Plymouth Horizon from an area to the passenger's side rear with the bullet passing through a rear passenger window and then striking Officer Howard, would the wound, under those cicumstances, received by Officer Howard, would that be consistent with that path of the bullet?

Mr. Laidlaw:  Objection, Your Honor.

Mr. McGinty:  I'm going to object to the form of that question.

Mr. Laidlaw:  He is assuming things that are not in evidence. Pure speculation.

The Court:  Overruled.

A.  "Yes", with "the position that 'you' described it would be."

Mr. Duncan:  Thank you. Your Honor, I'm going to again offer that exhibit.  There is a myraid of cases that support that. The exhibits is not so inflamatory by any means to warrant its exclusion.

The Court:  No, I'm going to abide by the ruling.  I do not think that that exhibit is necessary in order to prove the

1  Government's point that you offered it for, and it may might well

2  be inflammatory.  "If it develops that there is 'any contradiction

3  of this witness's testimony' in relation to 'where it entered

4  from' and 'how it entered,'" then I'll entertain that proffer.

5  At this point I don't think it's necessary.

6          Mr. Duncan:  Thank you, Judge.

7          The Court:  All right. Cross-examination.

8          Mr. Laidlaw:  None by Defendant Davidson, Your Honor.

9          Q.  But of course this projectile was in three pieces,

10  correct?

11          A.  Yes, Sir.

12          Q.  And there were some of the pieces that, in fact,

13  were not removed from Officer Howard, correct?

14          A.  I do not know that to be fact, sir.

15  <u>Id</u>. At pages 1716-1723 (Mr. David A. Rigle, M.D. Trial Testimony

16  Transcripts).

17          Q.  And where was Investigator Wallie Howard, Jr. at

18  that time?

19          A.  When I arrived back he was in -- still seated inside

20  the vehicle.

21          Q.  He was in the vehicle in the parking lot?

22          A.  Yes, Sir, he was seated inside on the passenger's

23  side, and his head was slumped forward.

24  <u>Id</u>. At page 80. (Onondaga County Grand Jury Transcripts Attached

25  Herein).

26          Q.  I know this may be difficult, but you had indicated,

27  and in response to a question of Mr. Plochocky, as to how Officer

28  Howard appeared to be sitting in the vehicle.  He was sitting sort

-27-

1  of front to back in the vehicle?

2          A.   He was sitting in a normal position of a passenger

3  in vehicle, however his head was slumped forward, that being his

4  chin on his -- somewhat near his chest area.

5          Q.   Okay.

6          A.   In a slumped position.

7  Id. At pages 103-04 (Mr. Lawrence's State Trial Transcripts With

8  Testimony Under Cross-Examination of Agent Joseph Ruggiero).

9          "13.  That during the review of the autopsy of Officer
        Wallie Howard with Dr. Rigle and Dr. Goldberg, I asked
10       a specific question, 'were there still [bullet] fragments
        lodge in his head when he was buried?'"

11       "14.  That Dr. Rigle responded by saying, 'there are
12       always tiny fragments that you can't get out. The Cooper
        Jacket separates from the Lead Core. What I got out was
13       one big piece of what looked like the majority of it
        and a smaller fragment. I don't know what the weight was.'"

14       "18.  That I also asked, 'if the perpetrator was on
15       Howard's right side, which according to the Kel recording
        he was, and assuming based on what the Federal Trial
16       showed, he didn't leave that position, but yet, you're
        saying that the bullet did enter left?'"

17       "19.  That Dr. Rigle responded, 'well, yeah, that's what
18       my report... I mean I testified I think six or seven
        times on this and I'm sure I looked at the photographs
19       before I testified. 'I, don't think, I could have screwed
        that up too,'" As he ends in laughter,

20       "22.  That in a converstion with me, Dr. Jumbelic made
21       clear that 'she did not trust the work of Dr. David A.
        Rigle' and laughingly said, 'the guy would testify to
22       anything he was told,'" [And, by reviewing his testimonies
        as to Howard's seated positions the State/Government gave
23       him and Agent Ruggiero's observations of same, versus his
        own independent research/investigations; Plus, now
24       declining to grant Ms. Angela E. Brown, M. Div. and Mr.
        Robert H. Goldberg, J.D.,M.D. his deposition to prove
25       that Officer Howard, Jr. was shot by friendly fire/
        assassinated, but not by Mr. Lawrence}(Dr. Jumbelic is correct about Rig(e)]

26
        "25.  That the position Officer Howard was found after
27       being shot was crucial to who and how Officer Howard was
        shot, based on one major factor: Whatever position Officer
28       Howard was found in when he was shot, would have been the

position he was in when the bullet entered his head,"

"26.   That Officer Howard's position became a heated point during 'the conversation with Dr. Rigle, who admitted that if Howard's position was in fact the way we described, then the police lied to him about Howard's position,'" [As proven at *Supra*, Mr. Duncan lied to Dr. Rigle as to Howard's seated position after being shot, explicitly "Contradicted" by the trial testimonies of Agent Ruggiero and other Officers on the crime scene].

"27.   That Dr. Rigle had been told by the police [and Mr. Duncan] that Howard was turned in another position and 'not sitting forward the way all the officers [like Agent Ruggiero] testified to in Court,"

"28.   That due to my lack of medical expertise, Dr. Goldberg better described it to me this way, 'when that bullet hit Howard, it was like turning off a light switch. He would have very little motion. He would have clasped like a sack of potatoes. So whatever position he was in when he died, in essence, that would be the last position he was in when he was shot,'"

"30.   That Dr. Rigle stated that he was never made aware of the fact that 'Howard died in the position of sitting in the front passenger seat slopped over,' or that it came up in testimony or in an exhibit,"

"31.   That Dr. Rigle admitted that by the time he arrived at the scene that the police had control of the scene and if Howard was in that position, that was not the position he was given,"

"33.   That Dr. Rigle agreed with him [Dr. Goldberg], but he said that was not the case here. In fact, he stated that he was not even given any reports until several weeks after he had completed his autopsy, and that was unusual,"

"34.   That at the end of the conversation, 'Dr. Goldberg asked Dr. Rigle would he willing be deposed on this matter. Dr. Rigle said that he would not have a problem with it.' That 'he had had his own problems with the officials in Syracuse,'"[And, how Ms. Brown would have known about Dr. Rigle's problem with officials in Syracuse, if Dr. Rigle did not divulge that to her and Dr. Goldberg?].

"43.   That it was only after he found out the testimonies of the Officers that he suddenly became hostile to Dr. Goldberg and I,"

Id. (Affidavit of The Reverend Angela E. Brown, M. Div. Dated July 9th, 2001).

Now, the most impacting facts **"Newly Discovered"** that are "outside the trial record," are the Forensic Science Examination results exonerating Petitioner's Co-Defendant, Mr. Robert "Bam-Bam" Lawrence from being the alleged triggerman that murdered Officer, Wallie Howard, Jr., uncovered by the renown Forensic Scientist, Mr. Robert H. Goldberg, J.D., M.D.; and, said Forensic Science factual findings to prove Petitioner's claim of being "Actually (Factually) Innocent" for at a minimum, acquire an **"Evidentiary Hearing"** to fully develop all the facts of Mr. Davidson's claims also on Remand from the Second Circuit via, the **"Pinkerton Doctrine"** and they are as follows:

"9.   As a result of my thorough review of the records available in this case, and my interview with David Rigle, M.D., it is my expert opinion that to a reasonable degree of medical probability Wallie Howard was shot by friendly fire and 'not' Robert Lawrence."

"10.   I base this opinion on the following analysis:"
(a)   No glass was found on Mr. Howard's skin, in the wound or on the bullet.

(b)   It was testified to that Howard's gun was found in his right hand between the right passenger side door and the seat. Again suggesting that his body was in a front to back orientation. Confirming the possibility of friendly fire.

(c)   The entrance wound in this case appears to be atypical in that appears to have entered from the left eccentrically at an acute angle.

(d)   An abrasion collar is noted to be associated with low velocity intermediate or long distance wound. Abrasion collar is rarely found in full power, short range, .357 Magnum wounds; Therefore the trajectory noted by Dr. Rigle and confirmed by Dr. Jumbelic i.e. left to right, back to front, and slightly downward and its associated findings also suggest friendly fire.

(e)   A .357 Magnum round, based on my experience, exits the muzzle of a 4 inch barrel approximately 1100-1500 feet per second. In this case traveled less

1   than two feet before breaking glass penetrating
    sking, muscle, then skull, separating and
2   penetrating skull once again, before stopping in
    soft tissue. Given the power of a .357 Magnum
3   round this presentation is atypical, as one would
    expect much more damage at close range from this
4   type of bullet.

5       (f)   Given Mr. Howard's final position as he was found
              in death vehicle and the trajectory described by
6             Dr. Rigle and confirmed by Dr. Jumbelic I find
              the probability that Mr. Lawrence fired this
7             bullet from his right rear position to be remote.

8       (g).  After my review of Mr. W. Stewart Bennett I must
              conclude that the defense was not present an
9             adequate or appropriate opportunity for a
              ballistics review of this case as per the Affidavit
10            from Mr. Herbert Leon MacDonell, Mr. Bennett
              committed perjury and fraud on the Court thereby
11            depriving the defense of an appropriate ballistics
              review.

12
        (h)   I have contacted Mr..Robert Hathaway, an expert of
13            note in the Dr. Martin Luther King case, who
              stands ready to review the ballistics should the
14            Court deem it necessary.

15      (i)   As a result of my thorough investigation, I would
              implore the Court to Order an appropriate
16            ballistics review of this case.

17  Id. At page 2. (Affidavit of Mr. Robert H. Goldberg, J.D., M.D.

18  Dated June 26th, 2001). [Please Note, the District Court on the

19  record, has continuously declined to review the full merits of this

20  Affidavit and all its facts, especially convene a hearing to acquire

21  the live testimonies of Dr. Rigle, Dr. Junbellic, Dr. Goldberg, Mr.

22  MacDonell and Ms. Brown, Etc. in regard to this critical issue in

23  dispute. And, it should/must be also noted that, Dr. Goldberg's

24  "Forensic Science Specialty" is to solve very old "Unsolved Mystery

25  Murder Cases"].

26      Petitioner, Pro-Se, asserts that, based on the fact that the

27  District Court did grant Mr. Lawrence a "Blanket Self-Defense Jury

28  Instruction" with the "Pinkerton Theory" embedded therein and issued

-31-

1  it to **"ALL"** of Mr. Lawrence's Co-Defendants via, the Pinkerton

2  Instruction; Now that Mr. Davidson has proffered overwhelming proof

3  of **"Newly Discovered Evidence"** that Mr. Lawrence is truly "Actually

4  (Factually) Innocent," the same goes for Petitioner.

5      Thus, under the Pinkerton Theory, Mr. Davidson is also

6  **"Factually Innocent"** of the alleged murder of Officer Howard, Jr.

7  even though, "the Court of Appeals has specifically rejected this

8  claim holding that the defendants were not entitled to a Self-Defense

9  Instruction as a matter of law...." **Id.** At page 3. (District Court's

10  12/31/02 Order).

11      In the District Court's Order in question, the Hon. Neal P.

12  McCurn, S.J. alleges that, "this evidence was contrary to the United

13  States' proof on its direct case that Defendant Davidson was, in

14  fact, in an apartment close to the scene and participated in planning

15  the incident which resulted shortly thereafter in the occurrence

16  which led to the death of Officer Howard." ("23. They never asked me

17  about specific names. Stringer nor Anthony were at my house. I have

18  never seen nor do I know them to this day. I do not know where their

19  names came from. They were not at my house on the morning of October

20  30, 1990.") **See**, Affidavit of Ms. Gwendolyn Morrow as a whole, dated

21  November 21, 1999.  In the Hon. McCurn's initial Denial Order of Mr.

22  Davidson's § 2255 Petition (Prior to acquiring Mr. Lawrence's

23  stunning Affidavit divulging numerous unprofessional/unethical

24  illicit activities used to manipulate Mr. Lawrence behind the scenes

25  and "off the record"), it states as follows:

26      "Putting aside Morrow's contrary trial testimony, and
        assuming that the issue of whether Davidson's whereabouts
27      the morning of the shooting is revelant to his actual
        innocence, 'the jury credited other direct trial
28      testimony' that Davidson was in Morrow's apartment the

-32-

1   morning in question."

2       "In sum, Davidson offers no credible 'Newly Discovered'
        evidence which supports his claims of actual innocence."

3

4   Id. At page 10. (District Court's November 28th, 2000 Memorandum-

5   Decision And Order). [Please Note, that the "only two (2)" direct

6   trial testimonies alleging that Mr. Davidson on Oct. 30th, 1990,

7   was in Ms. Morrow's apartment, came from Mr. Lawrence and Ms. Morrow

8   herself. And, it wasn't until months after this Order was handed down,

9   that Petitioner acquired the Newly Discovered Affidavit of Mr.

10  Lawrence via, the legal service of Mrs. Marie Y. Watson, Esq., in

11  support of Mr. Davidson's claim of actual (factual) innocence].

12          In the case at bar, Mr. Davidson submits that, it is very rare

13  in a lot of cases to find out exactly what certain jurors comments

14  regarding a case were; But, in Petitioner's trial/case the following

15  statements will show/prove for the sakes of the record that, it is

16  more likely than not that no reasonable juror would have convicted

17  Mr. Davidson in the present trial (Without the testimonies of Ms.

18  Morrow and Mr. Lawrence himself, which the jurors requested for

19  "Read-Backs" of both their trial testimonies during their deliberation's

20  process), and the statements   some juror(s) made to reporters [and

21  also to Mr. John F. Laidlaw, Esq.], are as follows:

22      1.  Jurors said the last witness, Lawrence, had the
            most impact.

23

24      2.  "For him to get on the stand and say that (Davidson
            set up the caper and gave Lawrence the weapon) made
            it a lot easier for us," said one juror, who asked

25          not to be identified. "If he hadn't taken the stand,
            it would have been really confusing for us [whereas,

26          jurors have established the "Reasonable Doubt" by
            their own word(s)], to decide a lot of things."

27

28      3.  Lawrence testifed for nearly 90 minutes Feb. 19.
            jurors said his testimony wiped out four witnesses
            for Davidson--- his father, sister, fiance and a

-33-

family friend.

4.  The <u>juror</u> who requested <u>anonymity</u> said that <u>Lawrence</u>
    <u>tried to protect other defendants</u> in <u>the killing,</u>
    <u>notably Parke,</u> and <u>clearly hurt Davidson.</u> One of
    Davidson's lawyer' Bruce Bryan, agreed. Lawrence
    said incredibly damaging things" that stuck with
    jurors, Bryan said.

5.  Without Lawrence's testimony, jurors would have had
    to rely more upon recountings of the drug ring from
    Gibbs, 24, and Kenneth Shelton, 37, both of Syracuse.

<u>Id</u>. At Herald-Journal, Friday, Feb. 26, 1993.

1.  <u>DAMAGING EVIDENCE.</u>
    But in the most dramatic testimony of the month-long
    trial, Lawrence told the jury that Davidson gave him
    the murder weapon, a .357 Magnum Revolver, just hours
    before the slaying and asked him to collect some money
    for him.

2.  Lawrence was 16 when he pulled the trigger.

3.  "It was incredibly damaging", said one of Davidson's
    attorneys, Bruce Bryan, of Lawrence's testimony.

4.  Juror Margaret Crinnin <u>agreed.</u> "I certainly think it
    made an impact."

<u>Id</u>. At post-standard, Friday, Feb. 26, 1993. [In light of the

aforementioned and now, Mr. Lawrence's Affidavit, this Honorable

Court should Grant an Evidentiary Hearing and "Canvas the Jury" in

regards to this "New Trial Motion."].

In <u>Bousley,</u> the Supreme Court had held that:  The District

Court failed to address Petitioner's  actual innocence, perhaps

because Petitioner failed to raise it initially in his § 2255 motion.

However, the Government does not contend that Petitioner waived this

claim by failing to raise it below.  Accordingly, we believe it

appropriate to remand this case to permit Petitioner to attempt to

make a showing of actual innocence.  <u>See, Bousley v. United States</u>,

523 U.S. at 623, 140 L.Ed. 2d at 840.  Mr. Davidson asserts that that

was and to date, is not the case with Petitioner, Pro-Se.  In Mr.

Davidson's initial § 2255 Petition, Mr. Davidson has been raising

that he is actually (factually) innocent and "not" mere legal

insufficiency.  Id.

Moreover, the Supreme Court found and reasoned that, "New

Evidence" was to be evaluated, of course, along with the "Old

Evidence", consisting of the transcripts of the trial.  Bousley, 523

U.S. at 630, 140 L.Ed. 2d at 845 (Justice Scalia and Thomas

Dissenting).  Denying Petitioner's present "Motion For New Trial...,"

will further expose Mr. Davidson to a fundamental miscarriage of

justice.  See, Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct.

2546, 115 L.Ed. 2d 640 (1991).  The fundamental miscarriage of

justice exception "seeks to balance the societal interests in

finality, comity, and conservation of scarce judicial resources with

the individual interest in justice that arises in the extraordinary

case [As in Mr. Davidson's situation]."  See, Schlup v. Delo, 115 S.

Ct. at 865 (1995).

In addition, Petition states that, under the fundamental

miscarriage of justice exception, Mr. Davidson must show through "New

reliable Evidence-whether it be Exculpatory Scientific Evidence [As

Dr. Goldberg's Newly Discovered Evidence  solving the mystery behind

Officer Howard, Jr's death, after Petitioner's trial], Trustworthy

Eyewitness Accounts, or Critical Physical Evidence-that was not

presented at trial" that "it is more likely than not that no

reasonable juror would have convicted him in light of the new evidence

[As here, the Affidavits Proffered: Dr. Goldberg, Ms. Brown, Ms.

Rosenthal, Esq., Dr. MacDonell, Mr. Stewart, Ms. Morrow, Mrs. Ballard,

Dr. Jumbelic, Mr. Lawrence and the DEA Task Force Deputization

-35-

procedures, Etc.]." **Schlup**, 115 S. Ct. at 865-66. **See Also**, **Kuhlman v. Wilson**, 477 U.S. 436, 454 n.17, 106 S. Ct. 2616, 91 L.Ed. 2d 364 (1986) (Petitioner required to establish by a 'fair proability that ... the trier of the facts [As quoted at **Supra**, **via the Herald Journal And Post-Standard Newspaper**] would have entertained a reasonable doubt of his guilty'); **Murray v. Carier**, 477 U.S. at 495-96 (A fundamental miscarriage of justice occurs "in an extraordinary case, where a Constitutional violation has probably resulted in the conviction of one who is actually innocent."). **See**, **Lucidore v. New York State Div. of Parole**, 209 F.3d 107 (2nd Cir. 2000). In light of this New Trial Motion as a whole, an Evidentiary Hearing date and time should be held, to acquire live testimonies from Attorneys, Officers, Forensic Scientists, Co-Defendant and Government Witnesses Etc., in the "presence of all 12 former trial jurors (In the canvasing process of the jury panel);" to allow Mr. Davidson the Constitutional right to prove his claim(s) of actual innocence, that Petitioner was diligent through his investigation, that all the evidences acquired were indeed material and acquired after Petitioner's trial, and if they were not withheld from appellate counsel by trial counsel (Exposing Petitioner to an **"Unfair"** Direct Appeal Process), the outcome of Mr. Davidson's Direct Appeal would have been totally different. _SEE_, (EXHIBITS A-K).

In the case at bar, had Mr. Lawrence been apprised on all the material facts which were withheld from him to make a just/conscious decision as to testify and raise "Self-Defense", Mr. Lawrence would have raised an "Alternative Perpetrator Defense" as trial counsels attempted to raise without proffering any convincing evidence to support their theory of defense (That Officer Howard, Jr. was shot

-36-

1  by his own fellow Officers/Partners, raising the major discrepancy

2  between the Smith and Wesson .357 Revolver (Allegedly possessed by

3  Mr. Lawrence) and the surveillance officers service weapons which are

4  Smith and Wessons .38 Caliber Revolver, similar in nature).  **See,**

5  **(Mr. Lawrence Affidavit).**  The record reflects heavily where the

6  Fraud on the Court committed by Mr. Warren Stewart Benneth has

7  extremely prejudiced Mr. Lawrence's Self-Defense Theory and via, the

8  Pinkerton Theory has also prejudiced Mr. Davidson's entire Alibi

9  Defense and severance issue Etc.

10      In **Boyette v. Lefevre, 246 F.3d 76 (2nd Cir. 2001)**, the Second

11  Circuit ruled that:

12          "Determination by State Court that Petitioner was not
             prejudiced during Robbery prosecution by State's
13          failure to turn over exculpatory material, which could
             have helped defense suggest an alternative perpetrator
14          or impeach victim, so that no Brady violation resulted,
             was an unreasonable application of Supreme Court
15          precedent, warranting Grant of Habeas Corpus Relief
             under Antiterrorism and Effective Death Penalty Act
16          (AEDPA); Only evidence against Petitioner was victim's
             testimony, Petitioner's Alibi witnesses were quite
17          convincing, and materials in question, combined with
             long delay in arresting victim, could well have
18          persuaded jury to acquit."

19  **Id.** At page 79. **See, Mendez v. Artuz, 303 F.3d 411 (2nd Cir. 2002).**

20      Therefore, as highlighted in full details at **Supra,** and

21  through Mr. Freeman's own "Statement of Affirmation" that, "had trial

22  counsel objected once the Trial Court erroneously gave a Blanket Self

23  -Defense Jury Instruction (Preserving Said Issue for Appellate

24  Purposes), then appellate counsel would have been able to raise such

25  viable argument for Mr. Davidson on appeal and Mr. Freeman's

26  assertions are truthful and direct...should **not** be viewed as

27  "speculations."  Trial counsel's joint concession with the rest of

28  trial attorneys to seek "the Pinkerton Theory within the Self-

-37-

1  Defense Instruction" (While Petitioner was raising an Alibi Defense

2  with the Government's evidence being weak at best), prejudiced Mr.

3  Davidson in the worst fashion..., causing a serious miscarriage of

4  justice, WITH "MUTUALLY ANTAGONISTIC DEFENSES."

5      In the instant csae, Petitioner, Pro-Se, has been faced with

6  a similar type of prejudicial effect as the Third Circuit was faced

7  with, in **Marshall v. Hendricks,** 307 F.3d 36 (3rd Cir. 2002), where

8  the Court found:

9          **"Record was inadequate to permit Court of Appeals to**
           **determine if counsel's alleged lack of consultation,**
10         **preparation, and investigation for, or failure to**
           **take adversarial position or ask for mercy at, penalty**
11         **phase of Petitioner's Capital Trial for hiring someone**
           **to murder his wife was objectively unreasonably on**
12         **Petitioner's appeal from District Court's Denial of**
           **his Petition For Writ of Habeas Corpus based on**
13         **"Ineffective Assistance of Counsel, necessitating Remand**
           **to the District Court for Evidentiary Hearing;' There**
14         **was no evidence as to what preparation or investigation**
           **counsel performed [As here, like Mr. Laidlaw and**
15         **withholding Petitioner's Discovery Materials from Mr.**
           **Freeman], nor as to why counsel chose not to contact**
16         **defendant's proffered mitigating witnesses, nor as to**
           **choices counsel made in conducting penalty phsae as**
17         **he did."**

18  **Id**. At page 43.

19      Therefore, Petitioner states that in light of the overall

20  presentation of Newly Discovered Evidences in conjunction with the

21  FOIA's (DEA Deputization Procedures **"Explicitly Contradicting"**

22  Agent, William R. Nelson and Agent, Joseph Ruggiero's trial

23  testimonies that, "Dea Deputized Agents as Officer Howard, Jr., were

24  deputized for life with full authority as Dea Agents..." which is

25  far from the truth), this Honorable Court should Grant an Evidentiary

26  Hearing and/or Grant Mr. Davidson a New Trial.

27  **V.**                    **FAILURE TO RAISE CHANGE OF VENUE**

28      In the instant matter at hand, Petitioner, Pro-Se,  due to

-38-

1  the present circumstances beyond Mr. Davidson's control at USP-Pollock

2  with their continuous periodical lockdowns, due to various stabbings,

3  has hindered/prejudiced Petitioner's ability to properly research,

4  investigate and litigate the present issue *i.e.*, within Rules 59,

5  F.R. Civ. P's 10 days limitations.  Petitioner does submit that, in

6  light of the aforementioned facts highlighted herein, said facts can

7  be **"confirmed"** by contacting USP-Pollock's Law Library Supervisor,

8  Mr. Martinez...; Petitioner would like to refer this Honorable Court

9  to Mr. Davidson's § 2255 Motion-Amendment, submitted under Rule 15(a),

10 F.R. Civ. P., where the issue in question was initially raised, then

11 supplemented with a stack of prejudicial newspaper articles submitted

12 in Mr. Davidson's initial Motion For Reconsideration with voluminous

13 exhibits.  Mr. Davidson would like this Honorable Court to review the

14 present facts proffered within this motion and issue in question,

15 with those motions previously filed (Arguing Mr. Davidson's

16 prejudicial Pre-Trial Media effect and counsel's failure to re-submit

17 his requested change of venue upon listening to the jury's knowledge

18 of the alleged murder of Officer, Wallie Howard, Jr.

19     Mr. Davidson states that, upon the Second Circuit Granting

20 Petitioner's COA for "failure to raise change of venue" on appeal,

21 the record reflects that the three (3) Justices panel had already

22 **"Certified"** that under Title 28 U.S.C. § 753 (f), Mr. Davidson's

23 request for a COA was **not** frivolous and the transcripts are needed

24 to decide the issue presented in the COA.  Thus, based on Petitioner

25 being Granted permission to proceed in Forma Pauperis, the United

26 States **must** pay the money appropriated for that  specific purpose.

27     The District Court is in clear error to allege that Petitioner

28 has made a blad assertion that,""the transcript will reveal 'from the

jurors own mouths, [they] were also flooded with Media Coverage' and

that **'ALL'** the jury panel had prior knowledge of the murder of Officer

Wallie Howard, Jr.,;...." <u>Id</u>. At page 5. (12-31-02 District Court

**Denial Order)**.   Petitioner submits that the Government and the

District Court's own recollections are in crystal clear error.   The

reproduction of said jury Voir Dire transcripts will prove where Mr.

Davidson's claim's were indeed correct.   The District Court is also

in error by alleging that, "Davidson, however, does **'not'** make **'any**

**specific allegation'** regarding ineffective assistance of his

appellate counsel that would be addressed by the requested

transcripts."   <u>Id</u>. At pages 5-6. (District Court's Dec. 31st. 2002

**Denial Order)**.

        In the case at bar, Petitioner submits that, the District

Court fails to acknowledge the fact that Mr. Laidlaw's withholding of

Mr. Davidson's Discovery Materials surely hindered appellate counsel's

investigation which would have uncovered the issue in question.   Mr.

Laidlaw failed to turn over to Mr. Freeman, Petitioner's Pre-Trial

Omnibus Motion Hearing transcripts which would have shedded light on

the present contraversial issue (With jurors knowledge of the case at

bar).   <u>See</u>, **(Mr. Laidlaw's letter to Mr. Freeman, Esq. Dated August**

**28, 1993, at No. 4 (11-25-92 "Notes" on Omnibus Motion Argument).**

The record highlights that Mr. Laidlaw <u>never</u> turned over the actual

hearing transcripts, because had appellate counsel read various areas

of said proceedings, Mr. Freeman would have raised the present issue

and, said excerpts of pertinent parts of Mr. Davidson's Omnibus

Motion Hearing transcripts are as follows:

            **The Court:**  I'm going to follow the Second Circuit rules.

            I have a motion for venue. Anybody want to say anything

-40-

1  further on that?  I assume you're not talking about changing--

2  Morales and Thomas made a motion to transfer it to another venue.

3  You don't mean out of the district?

4         Ms. Fahey:  No, Your Honor.  It wouldn't be necessary to

5  change the venue.

6         The Court:  You mean to transfer to Albany and out or Utica

7  on the basis that the publicity unduly prejudices your client.

8         Ms. Fahey:  Yes, Sir.  In addition, not only has there been

9  a tremendous amount of publicity, but on top of that my client is

10  already convicted once of the murder of Officer Howard and also was

11  convicted in a separate state trial of the drug transactions that are

12  also alleged in this indictment, so there is a greater amount of

13  prejudice because not only has there been tremendous publicity but my

14  client has been convicted in state court of many of the acts that are

15  alleged in this indictment, so it is on that basis that I would say

16  that it warrants a change of venue within the district, Judge.

17         The Court:  Does the Government oppose that?

18         Mr. Jaquith:  Yes, Your Honor.  We think that's a

19  determination that can await the jury selection process, especially

20  in light of the fact that fair impartial juries were obtained for

21  those trials from a much narrower jury pool than we would generally

22  employ in selecting a jury panel here.

23         Ms. Rosenthal:  Judge, this is really an inquiry more than

24  an argument.  With respect to when we get to that point where we're

25  about to start trial and make jury selections, I am in the process of

26  putting together a questionaire that would be-- I would ask the Court

27  to give to prospective jurors.  At some point would we be able to

28  discuss that kind of process?

1  **The Court:** Yes, we'll get you out a pretrial order which

2  among other things will direct you to file your request for voir dire

3  and of course I'll rule on all that before we start. I'm going to

4  deny the motion for a change of venue. That's a matter that the

5  location of trial can be canged but the jurors are unduly prejudiced

6  of course, but it's going to be up to the Court and counsel to make

7  sure that we don't get any jurors in this pool that we draw from,

8  etcetera, and that the jury will be selected from and if it does

9  appear on the time of trial of drawing the jury that we can't do that,

10 then we'll have to stop and go to another location, but I'm sure that

11 we can do it. As Mr. Jaquith points out, our jurors come from a

12 three or four county area, a lot of them probably don't know anything

13 about this. So anyway I deny the motion for a change of venue.

14 <u>Id</u>. At pages 62-64. (Omnibus Motion Hearing Transcripts Held

15 November 25th, 1992).

16  Now as explicitly highlighted at <u>Supra</u>, Mr. Davidson, <u>Pro-Se</u>,

17 has shown/proven, where the Government and the District Court's

18 recollection erred and/or overlooked that said issue in question was

19 timely raised, when it alleged that:

20  "1.  To the Court's best recollection a Motion For a
       Change of Venue was 'Never Made' by 'any
21     defendant' either 'Before', during, or after the
       jury was empaneled, nor does the record indicate
22     such."

23  "2.  As to the failure of the appellate counsel to
       raise a change of venue argument, the Court can
24     find no basis for counsel on appeal in this case
       to adopt or made same. The jury panel was questioned
25     extensively as to any knowledge they may have had
       about the case and their ability to be fair and
26     impartial. No difficulties were reported, to the
       Court's recollection, in respect to pretrial
27     publicity in seating jurors satisfactorily to all
       parties."

28

-42-

Id. At pages 7-8. (District Court's December 31st, 2002, Denial Order).

Petitioner hereby asserts in good-faith that, the above excerpts in relation to the present issue in question, has clearly belied the Government's allegation that **"NO"** Motion For Change of Venue was ever filed by any of the Defendant's; and, it further confirms that the District Court's **"Recollection"** is truly in error. Further, if this Honorable Court decides to proceed by denying Petitioner's request for the transcription of the present jury voir dire transcripts, a serious Constitutional violation will be done against Mr. Davidson, hindering his ability to prove the facts of Petitioner's change of venue claim, due to extensive prejudicial Pre-Trial Media Publicity. The District Court at this juncture, is in **"NO"** position to speculate from the absence of the jury voir dire records and especially, trial counsel's intentional withholding of vital documents from appellate counsel; Only appellate counsel should be given the opportunity to be heard as to the present issue in question and what would be his [Mr. Freeman's] position regarding the instant meritorious/colorable claims.

Therefore, to prevent any further miscarriage of jsutice of a pro-se, litigant who   is actually (factually) innocent, this Honorable Court viewing that its recollection is very off, Orders the Clerk of the Court and/or the Government, to contact the "Federal Records Center" in request of the Report's **"Stenotype Tape"**, to be transcribed to allow Mr. Davidson's Due Process and Equal Protection of Rights to be safeguarded. In light of the above mentioned facts, this Honorable Court should Grant the present request and/or Grant whatever other relief it deems just and necessary.

-43-

**VI.**   TRIAL COUNSEL HINDERED HIS APPEAL BY NOT TURNING OVER RECORDS TO HIS NEW APPELLATE COUNSEL

IN THE INSTANT MATTER AT HAND, THE DISTRICT COURT HAS PROCEEDED BY ERRONEOUSLY "CONFUSING/THWARTING" THE PRESENT RECORD. PETITIONER SUBMITS THAT, THOSE ARE THE TYPES OF CRUCIAL ERRORS A DISTRICT COURT COMMITS WHEN IT FAILS TO HOLD A REQUIRED EVIDENTIARY HEARING IN A SITUATION THAT WARRANTS IT, INSTEAD OF PROCEEDING BY COMBINING NUMEROUS "ASSUMPTIONS AND SPECULATIONS" ON BEHALF OF ALL THE INTERESTED PARTIES. IN REGARDS TO THE PRESENT ISSUE AT HAND, IN ORDER NOT TO BE REDUNDANT, MR. DAVIDSON REFERS THIS HONORABLE COURT TO CONSIDER ALL THE AFOREMENTIONED CLAIMS (NOS. I - V), WITH CLAIM NO. VI.

FIRST AND FOREMOST, WHEN IT COMES TO THE PRESENT ISSUE, THE DISTRICT COURT IN A BIASED POSITION HAS ERRONEOUSLY STATED THAT, "IT APPEARS FROM MR. FREEMAN'S AFFIDAVIT THAT HE FAULTS DAVIDSON'S TRIAL COUNSEL FOR NOT HAVING HIS OWN EXPERT WITNESS OR TO CONDUCT A PRETRIAL INVESTIGATION ON HIS OWN RATHER THAN RELYING ON JOINT EFFORTS OF ALL DEFENSE COUNSEL TO ACCOMPLISH SAME." Id. AT PAGE 8. (DISTRICT COURT'S 12/31/02 DENIAL ORDER). PETITIONER ASSERTS THAT, IN ORDER FOR TRIAL COUNSEL TO SAFEGUARD HIS CLIENT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION, MR. LAIDLAW, ESQ. HAD A DUTY NOT TO ABANDON HIS CLIENT'S OWN INDEPENDENT PRETRIAL INVESTIGATION, TO FOLLOW A JOINT VENTURE WITH CODEFENDANTS TRIAL ATTORNEYS.

IN PAVEL v. HOLLINS, 261 F.3d 210, 223 (2ND

Cir. 2001), the Second Circuit Found:

"Finally, we believe that Meltzer's performance was deficient to the extent that he did not call a medical expert to testify as to the significance of the physical evidence presented by the Prosecution. This decision might well have been beyond reproach if it had been based on appropriate strategic considerations, or if it had been made by Meltzer following a sufficient investigation. But that was not the case."

Id.

Moreover, in Lindstadt v. Keane, 239 F.3d 191 (2nd Cir. 2001), the court held that, "Defense Counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by Dr. Gordon contributed significantly to his ineffectiveness." See, Holsomback v. White, 133 F.3d 1382, 1387-89 (11th Cir. 1998) (holding that failure to conduct adequate investigation into medical evidence of sexual abuse was ineffective); Knott v. Mabry, 671 F.2d 1208, 1212-13 (8th Cir. 1982) (noting that counsel may be found to be ineffective for failing to consult an expert where "there is substantial contradiction in a given area of expertise," or where counsel is not sufficiently "versed in a technical subject matter . . . to conduct effective cross-examination."); Pavel, 261 F.3d at 223 (Meltzer's decision not

TO CALL A MEDICAL EXPERT [AS HERE, WITH MR. DAVIDSON] WAS DEFICIENT BECAUSE IT WAS NOT BASED ON PRE-TRIAL CONSULTATION WITH SUCH AN EXPERT).

NOW, THE DISTRICT COURT IN AN ATTEMPT TO MISREPRESENT THE RECORD HAS CLEARLY AND ERRONEOUSLY ALLEGED THAT, "AN EXPERT WAS RETAINED BY DEFENSE COUNSEL JOINTLY AND ITS TO THE CREDENTIALS OF THAT EXPERT AND HIS ALLEGED INCORRECT CONCLUSIONS THAT PETITIONER DAVIDSON NOW SEEKS TO ATTACK IN HIS NUMEROUS POST-TRIAL AND POST-APPEAL MOTIONS." IN AN ATTEMPT TO DEFEND MR. LAIDLAW, ESQ., THE HON. NEAL P. McCURN, S.J. WITHOUT ORDERING A HEARING FOR TRIAL COUNSEL TO SPEAK FOR HIMSELF TO ALLOW THE RECORD TO BE FULLY DEVELOPED, CONTINUES TO FLOOD THE RECORD WITH ERRONEOUS SPECULATIONS AND/OR ASSUMPTIONS.

IN MR. DAVIDSON'S FEDERAL TRIAL PROCEEDINGS, THERE WERE "NO" EXPERTS AND/OR PRIVATE INVESTIGATORS RETAINED BY DEFENSE COUNSEL "JOINTLY," ONLY DURING THE STATE TRIAL PROCEEDINGS. MR. STEWART'S FORMER TRIAL COUNSEL, MS. KATE ROSENTHAL, ESQ. "CONFIRMED" SAID ERRONEOUS ALLEGATION BEING SPECULATED AND MISREPRESENTED BY THE HON. McCURN, S.J. WHEN MS. ROSENTHAL ASSERTED IN HER AFFIDAVIT THE FOLLOWING:

"4.    IN CONNECTION WITH THE STATE PROSECUTION, THE DEFENSE LAWYERS, MYSELF INCLUDED, HIRED A FORENSIC EXPERT, STEWART BENNETT OF MONTROSE, PENNSYLVANIA. I WAS THE ONE TO SUGGEST MR. BENNETT AS HE HAD BEEN RETAINED BY OTHER DEFENSE LAWYERS AND USED SUCCESSFULLY IN THEIR CASES. THE ASSIGNED COUNSEL PROGRAM OF ONONDAGA COUNTY ACTUALLY RETAINED MR. BENNETT AS I WAS AN ASSIGNED COUNSEL."

46.

"6.   ULTIMATELY MR. BENNETT RENDERED HIS OPINION WHICH WAS THAT HIS SCENE RECONSTRUCTION CORROBORATED THAT OF THE POLICE VERSION OF EVENTS. I DO NOT RECALL WHETHER OR NOT THAT OPINION WAS EVER GIVEN TO US IN WRITING. AS ALMOST A DECADE HAS PASSED AND I HAVE TURNED OVER MY FILE TO ANGELA BROWN OF THE YOUTH TASK FORCE IN ATLANTA, GEORGIA, I DO NOT HAVE ANY DOCUMENTS TO SUGGEST THAT HE SUBMITTED A WRITTEN OPINION. NEVERTHELESS, I CERTAINLY RELIED UPON HIS OPINION AND DID NOT CHALLENGE THE FORENSICS AS A RESULT OF HIS FINDINGS."

Id. AT PAGES 1-2. (AFFIDAVIT OF MS. KATE ROSENTHAL, ESQ., DATED FEBRUARY 24, 2000).

THE RECORD IS CRYSTAL CLEAR THAT, HAD MR. LAIDLAW TURNED OVER TO MR. FREEMAN THE WRITTEN OPINION OF MR. WARREN STEWART BENNETT (WHO MISREPRESENTED HIS QUALIFICATIONS/CREDENTIALS FRAUDULENTLY, TO PASS AS AN EXPERT FORENSIC SCIENTIST), THEN MR. FREEMAN WOULD HAVE BEEN ABLE TO CONTACT MR. BENNETT HIMSELF, CHECK-OUT HIS CREDENTIALS AND MAKE A CONSCIOUS DECISION AS TO WHICH ROUTE TO TAKE; ANYTHING SHORT OF THAT, THE WITHHOLDING OF ALL THESE CRUCIAL DISCOVERY MATERIALS CONTINUES TO HINDER MR. DAVIDSON FROM THE OUTSET OF THE FEDERAL PROCEEDINGS, DIRECT APPEAL PROCESS TO DATE. PLUS, AS STATED IN STATE COURT, BY MR. BENNETT EXAMINING THE FORENSIC SCIENCE EVIDENCE IN PETITIONER'S CASE, NOW MR. BENNETT BECOMES PART OF THE "CHAIN OF CUSTODY" AND MUST BE "SUBPOENAD" TO INQUIRE AND DECIPHER IF THE "INTEGRITY

OF THE EVIDENCE WAS PRESERVED" WHILE IN HIS POSSESSION; AND, WITHOUT A HEARING TO CROSS-EXAMINE MR. BENNETT IN PERSON, ONE WILL NEVER KNOW THE EXTENT OF PREJUDICE MR. DAVIDSON HAS SUFFERED, BY MR. FREEMAN BEING WITHHELD ALL THOSE MATERIAL AND, IN SUPPORT OF THE ABOVE MENTIONED ARGUMENT REGARDING MR. BENNETT, IN STATE COURT A HEARING IN PERTINENT PARTS WENT AND HIGHLIGHTED AS FOLLOWS:

MR. McGINTY:

MR. BENNETT HAS INDICATED THAT HE WILL REQUIRE SOME OF THE ITEMS TO REMAIN WITH HIM THREE OR FOUR DAYS. NOW, IT SEEMS TO ME THAT "THIS SIMPLY MAKES MR. BENNETT PART OF THE CHAIN OF CUSTODY" AND "CLEARLY MAKES HIM SUBJECT TO SUBPOENA" BY THE PROSECUTION "SHOULD ANY QUESTION EVER ARISE." Id. AT PAGE 5.

MR. PLOCHOCKI: MY CONCERN JUDGE, IS THAT THE "INTEGRITY OF THE EVIDENCE AND THE CHAIN OF CUSTODY BE PRESERVED," AND IN ORDER TO HAVE THAT DONE, AND OF COURSE, ANY PRETRIAL DISCOVERY AND TESTING SHOULD BE DONE UNDER THE SUPERVISION OF THE COURT WITH SAFEGUARDS. .... Id. AT PAGE 7.

THE COURT: OKAY. NOW, I THINK THERE'S A PARAFFINE TEST, OKAY, AND I THINK THAT THAT'S GOT TO BE TESTED SOMEHOW. I'VE GOT NO IDEA HOW IT'S TESTED, BUT IT LOOKS TO ME LIKE THAT'S A FUNGIBLE ITEM THAT SOMEONE COULD MAKE A MISTAKE AND THAT'S GONE FOREVER. FOR SOME REASON, I THINK THAT

MAY HAPPEN, OR THAT'S POSSIBLE TO HAPPEN. I DON'T CARE ABOUT A BULLET FRAGMENT. BUT — — AND I DON'T KNOW WHAT YOU'RE GOING TO RECONSTRUCT. ALL I KNOW IS, I KNOW THERE'S A PARAFFINE TEST. YOU TOLD ME THERE'S A PARAFFINE TEST.

MR. McGINTY: UHM-HMM.

THE COURT: I SUSPECT THAT'S AN ITEM YOU COULD LOSE, YOU CAN SCREW IT UP SOMEHOW WHEN YOU FOOL WITH IT. I DON'T KNOW. Id. AT PAGES 9-10.

MR. PLOCHOCKI: WELL, JUDGE, WITH RESPECT TO THE EXAMINATION OF CASINGS, AS YOU KNOW, THE FIREARMS EXPERT IN THIS CASE WILL TESTIFY AS TO HIS EXAMINATION OF MARKS ON CASINGS. IF THERE IS SOME TEST OR PROCEDURE THAT "THIS EXPERT," WHO I UNDERSTAND "ISN'T LISTED ANYWHERE AS A FORENSIC EXPERT WITH RESPECT TO FIREARMS," AND I DOUBT — — "I HAVE SOME DOUBTS ABOUT HIS QUALIFICATIONS IN THAT REGARD" — — IF HE HAS SOME ABRESIVE TEST THAT HE GOES THROUGH, OR "SOMEHOW MAKES OTHER MARKINGS ON THOSE CASINGS," I'D LIKE TO HAVE SOMEONE THERE TO SUPERVISE THAT, AS WELL.

THE COURT: CERTAINLY.

Id. AT PAGES 10-11. (PRETRIAL HEARING AT THE ONONDAGA COUNTY COURT HOUSE, BEFORE THE HON. WILLIAM J. BURKE AND MR. ROBERT E. WILDRIDGE, ESQ. (DISTRICT ATTORNEY, REPRESENTED BY MR. RICHARD PLOCHOCKI), MS. KATE ROSENTHAL, ESQ., MR. JAMES A. RESTI, ESQ. AND MR. JAMES McGINTY [AND "NO" MR. JOHN F. LAIDLAW, ESQ.] AROUND MARCH OF 1991).

49.

MOREOVER, IN FURTHER ATTEMPT TO SAFEGUARD MR. LAIDLAW, ESQ. AND "DO NOT" HOLD AN EVIDENTIARY HEARING TO ALLOW MR. DAVIDSON TO PROVE HIS CLAIM(S) OF ACTUAL INNOCENCE, THE HON. McCURN ERRONEOUSLY HOLDS THAT, "THE RECORD DOES REFLECT THAT APPELLATE COUNSEL FREEMAN AND HIS ASSOCIATE CALLOURI DID RECEIVE EXTENSIVE PRETRIAL AND TRIAL MATERIALS FROM DAVIDSON'S TRIAL COUNSEL LAIDLAW. SEE EXH. 7 OF U.S. MEMO IN RESPONSE." Id. AT PAGES 8-9. (DISTRICT COURT'S DENIAL ORDER DATED DEC 31ST, 2002). BASED ON THE DISTRICT COURT'S POSITION WHICH HAS DECIDED TO PROTECT MR. LAIDLAW AND SPEAK FOR TRIAL COUNSEL, THEN PETITIONER WOULD LIKE TO POSE A QUESTION TO THE HON. McCURN ("THE GATEKEEPER" FOR THE GOVERNMENT AND ALL TRIAL COUNSELS AND GOVERNMENT WITNESSES (e.g., MR. DAVID A. RIGLE, M.D.). IF YOUR HONOR ALLEGES THAT MR. LAIDLAW DID TURN OVER EXTENSIVE PRETRIAL AND TRIAL MATERIALS TO MR. FREEMAN AND MR. CALLOURI (PETITIONER'S FORMER APPELLATE COUNSELS), THEN WHY WEREN'T THESE DOCUMENTS INCLUDED FOR APPELLATE COUNSELS TO MAKE A JUST/CONSCIOUS DECISION AS TO WHAT ISSUES TO RAISE AND/OR WHAT TYPE OF INVESTIGATION (LEVELS) TO EXECUTE, WHICH OMITTED/WITHHELD DISCOVERY MATERIALS ARE AS FOLLOWS?: 1. OFFICER, WALLIE HOWARD, JR. AUTOPSY REPORT; 2. MR. JOHN G. DUNCAN, ESQ. PROFFER AGREEMENT AND STATEMENT BY MR. GARY STEWART IN THE PRESENCE OF MS. KATE ROSENTHAL, ESQ.; 3. MR. DAVIDSON'S OMNIBUS MOTION HEARING TRANSCRIPTS (AND "NOT" MR. LAIDLAW'S "NOTES" AS REFLECTED IN HIS LETTER); 4. MATERIALS IN SUPPORT OF OFFICER HOWARD, JR'S "LIFETIME" DEA DEPUTIZATION TASK FORCE PROCEDURES; CO-DEFENDANT'S PRE-TRIAL (AS QUOTED AT SUPRA,) AND TRIAL TRANSCRIPTS WITH HEARINGS; AND 5. MR. WARREN STEWART BENNETT ALLEGED FORENSIC RECONSTRUCTION REPORT/

50.

MEMO WITH SUPPORTING OPINION. TO ALLOW THE RECORD TO
REFLECT THAT MR. BENNETT IS A PART OF THE EVIDENCES "CHAIN
OF CUSTODY" TO "PRESERVE ITS INTEGRITY" ETC.? WHY NOT!?

      IN THE CASE AT BAR, PETITIONER SUBMITS AGAIN,
THAT THE HON. McCURN IN CONTINUOUS DEFENSE OF
MR. LAIDLAW WHICH THE RECORD REFLECTS IS "CRYSTAL
CLEAR," NOW ALLEGES THE FOLLOWING:

    "FREEMAN SPECULATES, BUT FAILS TO SET FORTH
    WHAT INVESTIGATION HE MAY HAVE PURSUED
    HAD HE BEEN IN POSSESSION OF ADDITIONAL
    DISCOVERY MATERIALS AND MEDICAL RECORDS.
    FURTHER, IT APPEARS THAT APPELLATE COUNSEL
    FREEMAN WHO NOW FAULTS TRIAL COUNSEL LAIDLAW
    MADE NO EFFORT TO SEEK THE SAME FROM HIS
    FELLOW APPELLATE COUNSEL DESPITE THE FACT THAT
    HE WAS SERVING AS 'POINT PERSON' FOR ALL
    APPELLATE COUNSEL ON THE APPEAL. NOR DID HE
    SEEK APPELLATE COURT INTERVENTION FOR AN EXTENSION
    OF TIME TO FILE HIS BRIEF ON BEHALF OF DAVIDSON
    ON THE BASIS HE NOW FAULTS TRIAL COUNSEL FOR."

Id. AT PAGE 9. (DISTRICT COURT'S DEC. 31ST, 2002 DENIAL
ORDER).

    "
    THE OVERALL GIST OF MR. DAVIDSON'S COMPLAINTS IS
    THAT HE WAS DENIED THE EFFECTIVE ASSISTANCE OF
    COUNSEL AT HIS TRIAL. SURELY IF MR. DAVIDSON
    SINCERELY BELIEVED THAT HE WOULD HAVE RAISED THIS
    AS A KEY ISSUE IN HIS APPEAL. HOWEVER, THIS WAS

51.

NOT DONE."

Id. AT PAGE 3. (MR. LAIDLAW'S RESPONSE TO PETITIONER'S BAR COMPLAINT "UNSIGNED AND 'NOT' NOTARIZED UNDER PENALTY OF PERJURY," DATED APRIL 4TH, 2000, THAT THIS HONORABLE COURT DECLINES TO "ORDER" MR. LAIDLAW AND ALL REMAINING 10 TRIAL COUNSELS TO REPLY TO SAID "BAR COMPLAINT AND QUESTIONNAIRE" IN ITS ENTIRETY).

NEVERTHELESS, CONTRARY TO THE HON. MCCURN'S ALLEGATION THAT MR. FREEMAN IS SPECULATING AS QUOTED AT SUPRA, THE FOLLOWING IS A FACTUAL ASSERTION BY MR. FREEMAN AS TO WHAT STEPS HE WOULD HAVE TAKEN HAD MR. LAIDLAW "NOT WITHHELD" A NUMBER OF VITAL DISCOVERY MATERIALS MR. DAVIDSON HAS SINCE PROFFERED ON THE RECORD AND THE FACTUAL ASSERTION(S), BASED ON RECENTLY "UNCOVERED NEWLY DISCOVERED EVIDENCES" ARE AS FOLLOWS:

"16.    THAT 'HAD' MR. LAIDLAW TURNED OVER MR. DAVIDSON'S DISCOVERY MATERIALS INCLUDING INVESTIGATOR HOWARD'S MEDICAL FILES AS I HAD REQUESTED, I WOULD HAVE HIRED MY OWN FORENSIC PATHOLOGIST TO CONDUCT AN INDEPENDENT INVESTIGATION. THEN, I MIGHT HAVE BEEN ABLE TO DISCOVER FROM THE AUTOPSY FINDINGS THAT INVESTIGATOR HOWARD WAS 'NOT' SHOT FROM CLOSE RANGE."

"21.    THAT I WANTED TO PURSUE THE ALLEGED 'DEPUTIZATION OF INVESTIGATOR HOWARD,' BUT MR. LAIDLAW HAMPERED ME WITH HIS FAILURE TO PROVIDE DISCOVERY AND MR. DAVIDSON'S FAMILY

WAS HAVING FINANCIAL DIFFICULTY.  A DECISION BY
THE FAMILY HAD TO BE MADE AS TO HOW TO SPEND
THE MONEY, ON THE APPEAL OR ON THE INVESTIGATOR."

"23.   THAT HAD MR. LAIDLAW TURNED OVER
INVESTIGATOR HOWARD'S MEDICAL FILES AND WE HAD
SEEN THAT THE AUTOPSY FINDINGS STATED: 'NO EVIDENCE
OF CLOSE RANGE FIRING OF SKIN SURROUNDING GUN SHOT
WOUND OF ENTRANCE,' FIRM WOULD HAVE LIKELY
MOVED TO HAVE THIS INVESTIGATION FINANCED, BY
OUTSIDE OR THIRD PARTIES, IF POSSIBLE."

Id. AT PAGES 3-4. (MR. FREEMAN'S "STATEMENT OF
AFFIRMATION). SEE ALSO, PAGES 12-13 AT SUPRA, IN
FURTHER SUPPORT OF THE SAME.

FURTHER, MR. DAVIDSON, PRO-SE, HEREBY SUBMITS THAT
THE HON. McCURN, S.J. KNOWS BETTER THAN ANYONE ELSE THAT
"APPEAL COURTS 'DISFAVOR' THE GRANTS OF EXTENSIONS OF
TIME 'UNLESS,' DUE TO EXTRAORDINARY CIRCUMSTANCES."
FOR MR. FREEMAN TO SEEK SUCH IN THE DISTRICT COURT'S
OPINION, MR. LAIDLAW WOULD HAVE HAD TO TURN OVER SOME
TYPE OF DISCOVERY MATERIAL(S) WHICH WOULD PERSUADE AN
ATTORNEY [AS HERE, MR. FREEMAN], TO PURSUE/FOLLOW CERTAIN
LEAD, BECAUSE OF THE POTENTIAL TO FIND SOMETHING OF
SUBSTANCE (TO RAISE A MERITORIOUS ISSUE), FOR PETITIONER'S
APPEAL; WITHOUT THE ABOVE MENTIONED, THE HON. McCURN
IS ERRONEOUSLY SUGGESTING THAT MR. FREEMAN (IN 1993),
SHOULD HAVE GONE ON A "FISHING EXPEDITION" AFTER SEEING
MR. LAWRENCE'S TESTIMONY ON SELF-DEFENSE (TO SEARCH FOR

REVERSIBLE ERRORS). THE QUESTION THE HON. McCURN SINCE THE OUTSET OF MR. DAVIDSON'S HABEAS CORPUS PROCEEDINGS TO DATE FAILS TO ANSWER AND/OR ALLOW MR. LAIDLAW TO RESPOND TO, IS, "WHAT TYPE OF 'PRE-TRIAL INVESTIGATION OF FACTS AND LAW' IF ANY, DID MR. LAIDLAW RENDER TO MR. DAVIDSON TO ALLEGE THAT TRIAL COUNSEL WAS EFFECTIVE IN HIS CLIENT'S REPRESENTATION MANDATED BY THE SIXTH AMENDMENT?"

HOWEVER, IN PAVEL, THE SECOND CIRCUIT REASONED: (BUT IN THE FACE OF THIS GLARING MISMATCH A REASONABLY PROFESSIONAL ATTORNEY WOULD NOT HAVE SAT ON HIS HANDS, CONFIDENT THAT HIS CLIENT WOULD BE ACQUITTED [AS MR. LAIDLAW DONE, STATING TO MR. DAVIDSON THAT VARIOUS WITNESSES WERE GOING TO "BLOW HIM OUT OF THE WATER", e.g., MS. FELICIA STEWART AND MR. LUTHER GREGORY ETC.]. HE WOULD HAVE CONSULTED AND BEEN PREPARED TO CALL AN EXPERT TO DRIVE THIS DISPARITY HOME). SEE, GENERALLY HOLLADAY v. HALEY, 209 F.3d 1243, 1251-52 (11TH CIR. 2000)(HOLDING THAT AN ATTORNEY'S INVESTIGATION IS NOT "REASONABLE" WITHIN THE MEANING OF STRICKLAND WHEN THE FACTS OF A CASE SUPPLY HIM [MR. LAIDLAW] WITH "NOTICE" THAT A PARTICULAR LINE OF PRE-TRIAL INVESTIGATION MAY SUBSTANTIALLY BENEFIT HIS CLIENT [AS HERE, MR. DAVIDSON], AND HE DOES NOT PURSUE IT). Id. AT 224-25. THE QUESTION IS, "WITH ALL THE EVIDENCES WITHHELD FROM MR. FREEMAN, IN MR. LAIDLAW'S POSSESSION, THEN WHY DIDN'T MR. LAIDLAW PURSUE THOSE LEADS?" OR, "DID MR. LAIDLAW KNOW THOSE DISCOVERY MATERIALS EXISTED? AND/OR, DID MR. LAIDLAW HAVE ALL/SOME OF THOSE DISCOVERY MATERIALS IN HIS POSSESSION?" IN LIGHT OF THE AFOREMENTIONED, MR. LAIDLAW SHOULD BE SUBJECT FOR

"EXTENSIVE AND RIGOROUS" CROSS-EXAMINATION.

In the case at bar, Petitioner is in the process of concluding breaking apart the District Court's Denial Order, which is in clear violation of well established law. In the Hon. McCurn's final defense of Mr. Laidlaw (being compared to the remaining 10 trial counsels), the District Court's order which is in error (contradicting Mr. Laidlaw's own assertions to Mrs. Cilda Howard (not a kin to Officer Howard, Jr.) and Mr. Isaac Davidson, Jr.), clearly alleges with no substance the following:

"This Court observes that from its recollection [which Petitioner has shown/proven that is 'OFF AND TOTALLY INCORRECT'] all defendants in this lengthy jury trial held in the matter almost ten years ago were experienced and capable criminal defense attorneys who ably represented their clients therein. Petitioner's trial attorney Laidlaw falls into that category and from the Court's observations well and adequately represented Petitioner at the jury trial. Petitioner Davidson's post-appeal attempts to raise post-factual arguments are to this Court's observation frivolous in nature and substance. The proof as to his guilt on the counts charged against him in the indictment was overwhelming."

Id. at page 9. (District Court's Dec. 31st, 2002 Denial Order).

In support of Petitioner's position Proving Where the Hon. McCurn's allegation In defense of Mr. Laidlaw and all 10 remaining trial counsels is again in error (giving Mr. Laidlaw credit for a job well done allegedly representing Mr. Davidson), where the record "CONTRADICTS" such FALSE commendations and said affidavits excerpts in pertinent parts goes as follows:

"4.   That on or around February 26, 1993 when Jaime A. Davidson was found guilty at trial, I contacted Mr. John F. Laidlaw and asked him, 'How did you allow my son to be convicted after being paid so much money to help him?';"

"5.   Mr. Laidlaw responded, 'I have already informed Jaime's brother (Isaac Davidson, Jr.), that I was concerned about being unfamiliar with Federal Law;'"

"6.   Mr. Laidlaw tried to deny the fact that Mr. Isaac Davidson, Sr. had also paid him separately from the courts."

"7.   Mr. Laidlaw was surprised to hear that I knew about the money paid to him by Isaac Davidson, Sr. which I was suppose to keep confidential based on the conversation I had with Isaac, Sr."

"8.   THAT MY INQUIRY TO LAIDLAW SURROUNDING THE EXTRA FUNDS HE WAS PAID, UNBEKNOWN TO ME, HAD CREATED A BIG SCANDAL BECAUSE I DID NOT KNOW THAT IT WAS 'ILLEGAL FOR AN ATTORNEY TO ACCEPT FUNDS FROM CLIENTS OR THEIR FAMILY MEMBERS WHILE BEING PAID BY THE UNITED STATES DISTRICT COURT;'"

Id. AT PAGES 1-2. (AFFIDAVIT OF MRS. CILDA HOWARD DATED NOVEMBER 14TH, 2000).

"5.   MR. JOHN F. LAIDLAW EXPRESSED HIS CONCERNS TO ME OF BEING 'UNFAMILIAR WITH FEDERAL LAW' WHILE I WAS IN SYRACUSE, NEW YORK DURING THE TRIAL PROCEEDINGS. 'I TOLD LAIDLAW TO TELL JAIME ABOUT HIS UNFAMILIARITY WITH FEDERAL LAW TO SEE WHAT HE WOULD SAY;'" [WHICH MR. LAIDLAW "NEVER" TOLD ME].

"6.   . MR. LAIDLAW KEPT COMPLAINING TO ME ABOUT DISPUTES HE WAS HAVING WITH JAIME. HE ASKED ME TO TALK WITH JAIME ABOUT INTERRUPTING HIM DURING THE TRIAL. HE WANTED ME TO EXPRESS TO JAIME TO LEAVE HIM ALONE ABOUT TESTIFYING AND ABOUT THE TRIAL SO HE COULD DO HIS JOB;"

"8.   MR. LAIDLAW HAD CONVINCED US (MY FAMILY AND I) THAT HE HAD DONE A THOROUGH INVESTIGATION ON MY BROTHER'S CASE;"

57.

"9.   WHEN I ASKED MR. LAIDLAW ABOUT THE FACTUAL FINDINGS INTO OFFICER HOWARD'S CAUSE OF DEATH BASED ON HIS OWN INDEPENDENT INVESTIGATION, MR. LAIDLAW RESPONDED, 'THAT WILL BE A WASTE OF TIME AND MONEY.' THE OTHER TRIAL ATTORNEYS HAD ALREADY HIRED AN EXPERT [WHO HAPPENED TO BE MR. WARREN STEWART BENNETT], TO REVIEW EVERYTHING — THE CRIME SCENE AND REVIEW THE GOVERNMENT'S EVIDENCE DURING THE STATE TRIAL PROCEEDINGS;"

"10.   MR. LAIDLAW CHOSE NOT TO USE ANY OF THE THOUSANDS OF DOLLARS ALLOCATED TO INVESTIGATE THE CASE, ALTHOUGH HE STATED THAT THE 'GOVERNMENT WAS SPENDING ABOUT TWO (2) MILLION DOLLARS TO BRING THE CASE TO TRIAL AGAINST JAIME. THEREFORE, MY BROTHER MUST HAVE DONE SOMETHING ACCORDING TO MR. LAIDLAW.' [THAT IS WHY MR. LAIDLAW SAT DOWN WITH HIS HANDS AND LEGS CROSSED WITHOUT DOING ANY WORK].

Id. AT PAGES 2-3. (AFFIDAVIT OF MR. ISAAC DAVIDSON, JR., DATED OCTOBER 19TH, 2000).

"THIS STATEMENT IS TO LET MY SON AND THE 'STATE COURT TO BE AWARE OF THE ULTIMATUM THAT MR. LAIDLAW GAVE ME, REGARDING THIS MONEY."

"I, MR. ISAAC DAVIDSON, SR., AFTER HEARING FROM MY SON AND HIS COMPLAINT REGARDING MR. LAIDLAW,

WAY OF DEFENSE. I, MR. ISAAC DAVIDSON, I TOOK A SMALL PLANE AND WENT TO SEE MR. LAIDLAW, HE SAID TO ME, MR. LAIDLAW, HE SAID TO ME MR. DAVIDSON ISAAC. THIS CASE IS A BIG ONE, I NEED A PRIVATE INVESTIGATOR URGENT, AND IF YOU CAN BRING ME $5,000.°° DOLLARS WE COULD START RIGHT-AWAY."

"THIS INVESTIGATOR WILL BE TRAVELING TO MY AND BROOKLYN VERY OFTEN, SO I NEED THE MONEY AS SOON AS POSSIBLE. I RETURN TO BROOKLYN AND I TOLD MY WIFE WHAT MR. LAIDLAW TOLD ME, SO SHE AND I AND OTHERS, GATHERED $3,500.°° DOLLARS AND I MR. ISAAC DAVIDSON SR., I RETURNED TO MR. LAIDLAW OFFICE IN SYRACUSE, AND GAVE HIM THE TOTAL OF $3,500.°° DOLLARS AS THE DOWN PAYMENT FEES TO PAY THE PRIVATE INVESTIGATOR, FOR MY SON JAIME DAVIDSON."

Id. (AFFIDAVIT OF MR. ISAAC DAVIDSON, SR., DATED DECEMBER 21ST, 2000). [PLEASE NOTE, PETITIONER HAS MADE NUMEROUS CORRECTIONS OF MISSPELLED WORDS FOR THE COURT'S SAKE, OF MR. ISAAC DAVIDSON, SR's AFFIDAVIT ACQUIRED IN PANAMA CITY, PANAMA].

"5.   MY SON (JAIME A. DAVIDSON) CALLED ME (AFFIANT), ON OR AROUND MARCH-APRIL OF 1992 REQUESTING THAT I GIVE HIS FATHER $5,000.00, TO GIVE HIS TRIAL ATTORNEY, MR. JOHN F. LAIDLAW, IN ORDER TO RETAIN A PRIVATE INVESTIGATOR;"

"6.   ONCE MY HUSBAND, MR. ISAAC DAVIDSON,SR., EXPLAINED MY SON'S SITUATION TO ME I GAVE MY HUSBAND $3,000.00 TO BEGIN WITH TO GIVE MR. JOHN F. LAIDLAW, MY SON'S TRIAL ATTORNEY;"

"7.   THAT MY HUSBAND TOLD ME THE DAY THAT I GAVE HIM THE $3,000.00, THAT HE (MR. ISAAC DAVIDSON, SR.) WAS GOING TO ADD ON $500.00 TO IT AND PAY MR. JOHN F. LAIDLAW $3,500.00, IN ORDER TO ASSIST HIM IN PREPARING MY SON'S CASE BY HIRING A PRIVATE INVESTIGATOR;"

"8.   THAT AFTER MY HUSBAND PAID MR. LAIDLAW THE $3,500.00, I BEGAN TO GIVE MY HUSBAND $1,000 OR $2,000 AT A TIME IN SMALL QUANTITY UNTIL WE COVERED THE ENTIRE $8,000. IF I'M NOT MISTAKING. BUT, WE (AFFIANT AND HUSBAND — ISAAC DAVIDSON, SR.) DID END UP PAYING MR. LAIDLAW ALL WHAT HE ASKED FOR."

Id. AT PAGES 1-2. (AFFIDAVIT OF MRS. SHIRLEY DAVIDSON, DATED OCTOBER 6TH, 2000. [IT SHOULD BE NOTED THAT MR. LAIDLAW,ESQ. STILL DID NOT HIRE A PRIVATE INVESTIGATOR, THAT PETITIONER'S BROTHER MR. ISAAC DAVIDSON, JR. HAD TO BE THE ONE TO HIRE A P.I.].

IN THE CASE AT BAR, PETITIONER, PRO-SE HAS PROFFERED TWO (2) AFFIDAVITS CONTRADICTING THE DISTRICT COURT'S DENIAL ORDER OF DECEMBER 31ST, 2002, WHERE MR. LAIDLAW HIMSELF ASSERTED TO MRS. CILDA HOWARD AND MR. ISAAC

DAVIDSON, JR. THAT "HE WASN'T FAMILIAR WITH FEDERAL LAW" AND THE RECORD "FACTUALLY CONFIRMS" HIS STATEMENT. SEE, MASK v. McGINNIS, 233 F.3d 132, 138 (2ND CIR. 2000) (JUDGE CHIN ACKNOWLEDGED THAT WHILE MASK'S TRIAL COUNSEL MAY HAVE BEEN A FINE COURTROOM ATTORNEY, HIS FAILURE TO DETERMINE ACCURATELY MASK'S POTENTIAL SENTENCING EXPOSURE WAS AN EGREGIOUS ERROR).

THUS, PETITIONER SUBMITS THAT, MR. LAIDLAW'S UNPROFESSIONAL/UNETHICAL ACTIONS IN WITHHOLDING MR. DAVIDSON'S DISCOVERY MATERIALS FROM MR. FREEMAN TO HINDER PETITIONER'S DIRECT APPEAL, STEMS FROM MR. LAIDLAW'S DISSATISFACTION ONCE MR. DAVIDSON, SR. DECLINED IN PAYING HIM ANY MORE MONEY (SEEING THAT PETITIONER CONTINUED TO COMPLAIN THAT MR. LAIDLAW STILL WAS FAILING TO INVESTIGATE MY CASE....). MR. LAIDLAW IN OTHER WORDS, CALLED HIMSELF TAKING "REVENGE" AGAINST PETITIONER BY NOT INVESTIGATING MY REQUESTED LEADS, PRESERVING ISSUES FOR APPEAL, OBJECTING TO VARIOUS PREJUDICIAL EVENTS (e.g., DURING MR. LAWRENCE'S TESTIMONY FOR MUTUALLY ANTICIPATED ANTAGONISTIC DEFENSES), WITHHOLDING PETITIONER'S DISCOVERY MATERIALS; AND, TO MAKE MATTERS WORST IN SUPPORT OF MR. LAIDLAW'S ILL ACTIONS, USING "RACIAL SLURS" AGAINST PETITIONER IN AN UPSET FASHION AND ONCE BEING CAUGHT ON THE RECORD, ALLEGING OF HAVING "NO KNOWLEDGE" THAT "YOU PEOPLE" IS A RACIAL EPITHET, WHICH IS ABSURD COMING FROM AN ATTORNEY IN CORPORATE AMERICA AND FAR FROM THE TRUTH. THE PRESENT RECORD SUPPORTS PETITIONER'S POSITION, THAT THERE WAS A SERIOUS "CONFLICT OF INTEREST" BETWEEN MR. LAIDLAW AND MR. DAVIDSON, THAT SPILLED

OVER TO THE APPELLATE LEVEL PREJUDICING/HINDERING MR. DAVIDSON'S DIRECT APPEAL.

IN ARMIENTI v. U.S., 234 F.3d 820 (2ND CIR. 2000), THE SECOND CIRCUIT HELD THAT, "REVERSAL MAY BE REQUIRED IF THE DEFENDANT ESTABLISHES THE EXISTENCE OF 'ACTUAL CONFLICT OF INTEREST' BETWEEN HIMSELF AND COUNSEL, WHICH EXISTS WHEN, DURING THE COURSE OF THE REPRESENTATION, THE ATTORNEY'S AND DEFENDANT'S INTERESTS DIVERGE WITH RESPECT TO A 'MATERIAL FACTUAL OR LEGAL ISSUE OR TO A COURSE OF ACTION.'" AS STATED IN MR. ISAAC DAVIDSON, JR'S AFFIDAVIT, MR. LAIDLAW AND PETITIONER STAYED FEUDING...; DANIELS v. U.S., 54 F.3d 290 (7TH CIR. 1995)(FOR PURPOSES OF INEFFECTIVE ASSISTANCE CLAIM, CLASSIC CONFLICT OF INTEREST SITUATION ARISES WHEN LAWYER REPRESENTS TWO OR MORE CODEFENDANTS, OR TWO CLIENTS WITH OPPOSING INTERESTS, "BUT CONFLICT MAY ALSO ARISE WHEN CLIENT'S INTERESTS ARE ADVERSE TO LAWYER'S PECUNIARY INTERESTS).

IN MR. DAVIDSON'S CASE, AS IN DANIELS, HE (DANIELS) ARGUES THAT HIS INABILITY TO PAY REILLEY CAUSED REILLEY'S FINANCIAL INTEREST TO CONFLICT WITH HIS INTEREST IN PROVIDING DANIELS WITH THE BEST POSSIBLE REPRESENTATION." Id. AT 294. PETITIONER ASSERTS THAT SINCE THE HON. MCCURN'S INITIAL DENIAL ORDER HANDED DOWN ON NOV. 28TH, 2000 TO DATE (DEC. 31ST, 2002), THE HON. MCCURN HAS BEEN EXECUTING CREDIBILITY DETERMINATIONS ON THE BASIS OF AFFIDAVITS WITHOUT GRANTING MR. DAVIDSON THE APPROPRIATE AVENUE WARRANTED, WHICH IS AN EVIDENTIARY HEARING. THE DANIELS COURT RULED IN THOSE TYPES OF SITUATIONS THAT PETITIONER HAS BEEN ERRONEOUSLY PREJUDICED

BY, AS FOLLOWS:

"THE ONLY EVIDENCE BEFORE THE DISTRICT COURT, HOWEVER, CONSISTED OF THE CONFLICTING, SWORN AFFIDAVITS OF REILLEY AND DANIELS [AS WITH MR. LAIDLAW'S UNSIGNED BAR COMPLAINT LETTER OF REPLY AND MR. DAVIDSON'S AFFIDAVIT]. THE DISTRICT COURT ATTEMPTED TO JUDGE THE CREDIBILITY OF DANIELS' CLAIM BASED ON THE AFFIDAVITS ALONE [AS THE HON. McCURN HAS BEEN ERRONEOUSLY DOING FOR YEARS IN PETITIONER'S CASE], AND WE ARE COMPELLED TO CONCLUDE THAT THIS APPROACH WAS IN ERROR. '[A] DETERMINATION OF CREDIBILITY CANNOT BE MADE ON THE BASIS OF AN AFFIDAVIT. CASTILLO V. UNITED STATES, 34 F.3d 443, 445 (7TH CIR. 1994). THEREFORE, DANIELS IS ENTITLED TO AN EVIDENTIARY HEARING WHERE HE MAY ATTEMPT TO SUBSTANTIATE HIS CLAIM AND THE GOVERNMENT MAY ATTEMPT TO SHOW THAT REILLEY PROVIDED DANIELS WITH COMPETENT REPRESENTATION. . . . . "

Id. AT 295. SEE, FRIEDMAN V. UNITED STATES, 588 F.2d 1010 (5TH CIR. 1979); MONTGOMERY V. UNITED STATES, 469 F.2d 148 (5TH CIR. 1972). SEE ALSO, (EXHIBITS B-D AS A WHOLE).

IN SCHELL V. WITEK, 218 F.3d 1017 (9TH CIR. 2000), THE NINTH CIRCUIT [AS IN MR. DAVIDSON'S CASE] HELD THAT, "EVIDENTIARY HEARINGS ARE PARTICULARLY APPROPRIATE IN HABEAS PROCEEDINGS WHEN CLAIMS RAISE FACTS THAT OCCURRED OUT OF THE COURTROOM AND OFF THE

RECORD." (PETITIONER RELIED ON EVIDENCE OUTSIDE ORIGINAL RECORD IN PURSUING INEFFECTIVE ASSISTANCE CLAIM, AND THUS HIS FAILURE TO RAISE ISSUE ON DIRECT APPEAL DID NOT PREVENT HIM FROM RAISING IT IN PETITION TO SET ASIDE GUILTY PLEA). SEE, DANIELS AT 293 n5. AS IN MR. DAVIDSON'S PRESENT SITUATION, "A PETITION FOR HABEAS CORPUS 'REQUIRES A HEARING TO RESOLVE DISPUTED ISSUES OF FACT' UNLESS THE RECORD SHOWS THAT THE PETITIONER IS NOT ENTITLED TO RELIEF." SEE, AHMAD v. WIGEN, 726 F. SUPP. 389, 397 (E.D. N.Y. 1989).

IN SUPPORT OF PETITIONER'S INSTANT CLAIM, ALLOWING THE RECORD TO REFLECT HOW MR. LAIDLAW'S "RACIST" COMMENTS AND EXPRESSIONS, COUPLED WITH HIS BELIEFS COMPELLED HIM TO INTENTIONALLY RENDER INEFFECTIVE ASSISTANCE AT MR. DAVIDSON'S TRIAL AND HINDER PETITIONER'S DIRECT APPEAL BY WITHHOLDING CRUCIAL DISCOVERY MATERIALS. IN REQUEST FOR A HEARING TO FULLY DEVELOP THE FACTS OF THE ISSUE AT HAND, MR. DAVIDSON ASSERTS THAT THE NINTH CIRCUIT FOUND THAT:

"FAILURE TO HOLD EVIDENTIARY HEARING FOLLOWING MOTION TO VACATE ON WHETHER DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL AT TRIAL WAS VIOLATED BY APPOINTED COUNSEL'S ALLEGED 'VERBAL ASSAULT' OF DEFENDANT MANIFESTING 'EXPLICIT RACIAL PREJUDICE' AND 'THREATENING TO COMPROMISE DEFENDANT'S RIGHTS' WAS ABUSE OF DISCRETION WHERE, IF PROVED [AND MR. LAIDLAW CONCEEDED TO RACIALLY ASSAULTING PETITIONER BY CONTINUOUSLY ASSERTING THAT 'YOU PEOPLE'...], SUCH ASSAULT WOULD RENDER SO DEFECTIVE RELATIONSHIP INHERENT IN RIGHT TO COUNSEL THAT

DEFENDANT WOULD BE ENTITLED TO NEW TRIAL WITH DIFFERENT ATTORNEY."

Id. FRAZER V. U.S., 18 F.3d 778 (9TH CIR. 1994).

MOREOVER, PETITIONER STATES THAT IN FRIEDMAN, THAT DEFENDANT WAS FACED WITH A CLOSE/SIMILAR SITUATION AS MR. DAVIDSON AND THE COURT RULED THAT:

"IF PETITIONER'S CLAIM THAT HIS COURT-APPOINTED ATTORNEY DEMANDED COMPENSATION IN ADDITION TO THAT AVAILABLE UNDER CRIMINAL JUSTICE ACT AND TOLD THE PETITIONER THAT THE 'COURT-AWARDED FEE WOULD BE TOO MEAGER TO JUSTIFY' MORE THAN A 'PERFUNCTORY EFFORT' ON THE PETITIONER'S BEHALF WERE TRUE, ALONG WITH A SHOWING THAT HE WAS ONLY ABLE TO SATISFY PART OF HIS ATTORNEY'S DEMAND [AS MR. LAIDLAW DONE IN PETITIONER'S CASE], THERE WOULD BE AN INCREASED LIKELIHOOD THAT THE ATTORNEY'S EFFORTS WERE IN FACT PERFUNCTORY AND THAT THE PETITIONER DID NOT RECEIVE THE REASONABLY EFFECTIVE ASSISTANCE OF A DILIGENT AND DEVOTED ADVOCATE."

Id. FRIEDMAN, 588 F.2d AT 1011.

THEREFORE, PETITIONER, PRO-SE, SUBMITS THAT, "THE COLLECTIVE PRESENCE OF THESE ERRORS IS DEVASTATING TO ONE'S CONFIDENCE IN THE RELIABILITY OF THIS VERDICT AND THEREFORE REQUIRES, AT THE VERY LEAST, A NEW TRIAL. FOR

Even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F. 3d 1204, 1211 (9th Cir. 2002); Mak v. Blodgett, 970 F. 2d 614, 622 (9th Cir. 1992); see, U.S. v. Wood, 207 F. 3d 1222, 1237 (10th Cir. 2000); see also, Lindstadt v. Keane, 239 F. 3d 191, 193 (2nd Cir. 2001)(Four errors of defense counsel in prosecution for sexual abuse of defendant's minor daughter, which amounted to ineffective of assistance of counsel and warranted federal habeas relief on all but one count, had spillover effect on remaining count, requiring that count to be vacated also).

## Conclusion

In Moore v. Gibson, 195 F. 3d 1152, 1165 (10th Cir. 1999), and in support of Petitioner's issues highlighted herein as a whole, the court held: "Where specific allegations before federal habeas court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." See, Bracey v. Gramley, 520 U.S. 899, 908-09, 117 S. Ct. 1793 (1997)(quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L.Ed.2d 281 (1969)). Mr. Davidson, pro-se, has met this burden here.

PETITIONER SUBMITS THAT, IN LIGHT OF THE HON. McCURN'S BIASNESS AGAINST MR. DAVIDSON AND CONTINUOUSLY DECLINING TO RULE ON THE MERITS OF PETITIONER'S "AFFIDAVIT OF RECUSAL AGAINST SAID JUDGE," THE HON. McCURN FAILS TO MAKE JUST RULINGS IN PETITIONER'S HABEAS CORPUS PROCEEDINGS UPHOLDING THE U.S. CONSTITUTION'S "BADGE OF HONOR", BY BEING THE IMPARTIAL JUDGE HE WAS ASSIGNED TO BE. FURTHERMORE, "[E]VERY PROCEDURE WHICH WOULD OFFER A POSSIBLE TEMPTATION TO THE AVERAGE MAN AS A JUDGE . . . NOT TO HOLD THE BALANCE NICE, CLEAR AND TRUE BETWEEN THE STATE AND THE ACCUSED, DENIES THE LATTER DUE PROCESS OF LAW." IN RE MURCHISON, 349 U.S. 133, 136, 75 S. CT. 623, 625 (1955) (QUOTING TUMEY V. OHIO, 273 U.S. 510, 532, 47 S. CT. 437, 444, 71 L. Ed. 749 (1927).

THUS, THE SEVENTH CIRCUIT RECENTLY CONSIDERED WHEN THE APPEARANCE OF BIAS RISES TO THE LEVEL OF A DUE PROCESS VIOLATION. DEL VECCHIO V. ILLINOIS DEPT. OF CORRECTIONS, 31 F.3d 1363 (7TH CIR. 1994) (EN BANC):

> "WHEN THE SUPREME COURT TALKS ABOUT THE 'APPEARANCE OF JUSTICE' IT IS NOT SAYING THAT BAD APPEARANCES ALONE REQUIRE DISQUALIFICATION; RATHER, IT IS SAYING THAT WHEN A JUDGE IS FACED WITH CIRCUMSTANCES THAT PRESENT 'SOME [ACTUAL] INCENTIVE TO FIND ONE WAY OR THE OTHER' OR 'A REAL POSSIBILITY OF BIAS,' A COURT NEED NOT EXAMINE WHETHER THE JUDGE ACTUALLY WAS 'BIASED.' "

ID. AT 1372 (CITATIONS OMITTED). SEE, (EXHIBITS-A&B).

67.

IN THE INSTANT MATTER IN QUESTION WHERE MR. DAVIDSON PLACED THE GOVERNMENT, THE HON. McCURN AND ALL OTHER INTERESTED PARTIES REGARDING THE FRAUD THAT WAS COMMITTED UPON THE COURT, PETITIONER'S "NOTICE" FELL ON "DEAF EARS/BLIND EYES." THE GOVERNMENT DECLINED TO INVESTIGATE DR. RIGLE'S CONCESSIONS .... THAT HE WAS LIED TO BY THE POLICE (WHICH WOULD SUBSTANTIATE PETITIONER'S CLAIM OF ACTUAL INNOCENCE), ALONG WITH THE HON. McCURN, WHERE MR. DAVIDSON FILED NUMEROUS REQUESTS SEEKING AN ORDER TO DEPOSE DR. RIGLE, TO PROVE THAT OFFICER HOWARD, JR. WAS KILLED BY FRIENDLY FIRE AND/OR "ASSASSINATED" BY MEMBERS OF HIS OWN POLICE DEPARTMENT; BUT, THEY WERE ALL TO NO AVAIL. SEE, (EXHIBIT-I).

IN COM. OF NORTHERN MARIANA ISLANDS V. BOWIE, 236 F.3d 1083 (9TH CIR. 2001), THE NINTH CIRCUIT FOUND:

"WITHOUT A DOUBT, THE RECORD IN THIS CASE [AS IN MR. DAVIDSON'S CASE] ESTABLISHES BAD FAITH AS A MATTER OF LAW ON THE PART OF THE ATTORNEY GENERAL'S OFFICE [AS HERE, THE N.D.N.Y. UNITED STATES ATTORNEY'S OFFICE] IN REFUSING TO INVESTIGATE THE POTENTIALLY EXONERATING EVIDENCE THAT ITS OWN WITNESSES WERE CONSPIRING TO COMMIT PERJURY. WHAT EMERGES FROM THIS RECORD IS AN INTENT TO SECURE A CONVICTION OF MURDER EVEN AT THE COST OF CONDONING PERJURY. THIS RECORD [AS MR. DAVIDSON'S HABEAS RECORD] EMITS CLEAR OVERTONES OF THE MACHIAVELLIAN MAXIM: 'THE END JUSTIFIES THE MEANS,' AN IDEA THAT IS PLAINLY INCOMPATIBLE WITH OUR CONSTITUTIONAL CONCEPT OF ORDERED

LIBERTY. SEE, ROCHIN V. CALIFORNIA, 342 U.S. 165, 169, 72 S.CT. 205, 96 L.Ed. 183 (1952).

Id. AT 1091. SEE, UNITED STATES V. WALLACH, 935 F.2d 445 (2ND CIR. 1991) ("INDEED, IF IT IS ESTABLISHED THAT THE GOVERNMENT KNOWINGLY PERMITTED THE INTRODUCTION OF FALSE TESTIMONY [WHICH 'DR. RIGLE HOLDS' UNTIL A HEARING IS GRANTED TO SUBPOENA HIM AND ELLICIT THOSE FACTS THAT ARE 'NEWLY DISCOVERED'] 'REVERSAL IS VIRTUALLY AUTOMATIC.'") (CITATIONS OMITTED). SEE ALSO, (EXHIBITS, G-J IN ITS ENTIRITY AND THOROUGHLY, TO SEE THE GOVERNMENT'S ACTS OF BAD FAITH, IN FAILING TO INVESTIGATE PETITIONER'S CLAIMS AND BEGIN BY INTERVIEWING MR. DAVID A. RIGLE, M.D.).

NONETHELESS, MR. DAVIDSON ASSERTS THAT THE DISTRICT COURT HAS BIASLY TAKEN A PARTIAL POSITION FAVORING THE GOVERNMENT TO INTENTIONALLY IMPEDE ON ANY/ALL AVENUES PETITIONER TAKES, TO DEVELOP THE FACTUAL CLAIMS OF HIS CONSTITUTIONAL RIGHTS WHICH ARE BEING VIOLATED. IN SUPPORT OF SAID JUDICIAL/GOVERNMENTAL INTERFERENCE, MR. DAVIDSON, PRO-SE, SEEKS AUTHORITIVE ENFORCEMENT FROM THE SUPREME COURT IN WILLIAMS V. TAYLOR, 529 U.S. 420, 146 L.Ed. 2d 435, 120 S.CT. 1479 (2000), WHERE THE "HIGHEST COURT IN THIS LAND" FOUND:

"THE QUESTION IS NOT WHETHER THE FACTS COULD HAVE BEEN DISCOVERED BUT INSTEAD WHETHER THE PRISONER WAS DILIGENT IN HIS EFFORTS. THE PURPOSE OF THE FAULT COMPONENT OF 'FAILED' IS TO ENSURE THE PRISONER UNDERTAKES HIS OWN DILIGENT SEARCH FOR EVIDENCE. DILIGENCE FOR PURPOSES OF THE OPENING CLAUSE DEPENDS UPON WHETHER THE PRISONER MADE A

REASONABLE ATTEMPT, IN LIGHT OF THE INFORMATION
AVAILABLE AT THE TIME, TO INVESTIGATE AND PURSUE
CLAIMS IN STATE COURT; IT DOES NOT DEPEND, AS THE
COMMONWEALTH WOULD HAVE IT, UPON WHETHER THOSE
EFFORTS COULD HAVE BEEN SUCCESSFUL. THOUGH LACK OF
DILIGENCE WILL NOT BAR AN EVIDENTIARY HEARING IF
EFFORTS TO DISCOVER THE FACTS WOULD HAVE BEEN IN VAIN,
SEE, §2254(e)(2)(ii), AND THERE IS A CONVINCING
CLAIM OF INNOCENCE . . . . "

Id. AT PAGE 454. SEE, (EXHIBITS, A-K PAGE-BY-PAGE AND
WORD-FOR-WORD AND THE RECORD WILL REFLECT MR. DAVIDSON'S
DILIGENCE SINCE THE OUTSET OF THE CASE AT BAR).

THUS, PETITIONER FURTHER ASSERTS THAT, POSED WITH
SIMILAR CIRCUMSTANCES AS IN MILLER V. CHAMPION, 161 F.3d
1249, 1253 (10TH CIR. 1998), THE TENTH CIRCUIT HELD THAT:
("RESTRICTIONS ON AN EVIDENTIARY HEARING 'DO NOT APPLY'
WHEN THE PETITIONER [LIKE MR. DAVIDSON, PRO-SE, IN THE
INSTANT MATTER AT HAND], 'DILIGENTLY SOUGHT TO DEVELOP
THE FACTUAL BASIS UNDERLYING HIS HABEAS PETITION, BUT A
STATE COURT [AS HERE, THE DISTRICT COURT] 'PREVENTED HIM FROM
DOING SO.' ' "); SEE ALSO, LOVE V. MORTON, 112 F.3d 131 (3RD CIR.
1997), THAT IS ALSO EQUALLY APPLICABLE TO MR. DAVIDSON'S CASE,
WHERE THE THIRD CIRCUIT FOUND: ("AFFIRMING THE DISTRICT
COURT'S DECISION TO HOLD AN EVIDENTIARY HEARING BECAUSE THE
STATE COURT JUDGE [AS HERE, THE FEDERAL HON. NEAL P. McCURN, S.J.]
MADE IT IMPOSSIBLE FOR PETITIONER TO DEVELOP THE FACTUAL
RECORD). BUT, THE ONLY DIFFERENCE IN PETITIONER'S CASE, THE
DISTRICT COURT CONTINUES TO DENY MR. DAVIDSON A HEARING.

IN THE CASE AT BAR, THIS HONORABLE COURT NEEDS TO ALTER OR AMEND ITS ERRONEOUS JUDGMENT/ORDER RENDERED DECEMBER 31st, 2002, LACKING ANY LEGAL AND/OR FACTUAL AUTHORITIVE SUPPORT TO PASS JUDICIAL MUSTER/REVIEW, CREATING A "MANIFEST ERROR OF FACT AND LAW;" WHICH MOTION FOR NEW TRIAL SHOULD BE "GRANTED," IN LIGHT OF ALL THE OVERWHELMING "NEWLY DISCOVERED EVIDENCES" SUBMITTED HEREIN BY MR. DAVIDSON. SEE, (EXHIBITS, A-K). IN SUPPORT OF PETITIONER'S ACTUAL INNOCENCE CLAIM, PROVING WHERE THE SYRACUSE POLICE DEPARTMENT KNEW THAT CO-DEFENDANT, MR. JUAN "PEDRO" MORALES WAS LYING AGAINST PETITIONER AND FAILED TO VINDICATE MR. DAVIDSON'S NAME, IS EXPLICITLY REFLECTED AS FOLLOWS:

"CITY POLICE HAVE SAID THEY SUSPECT MORALES LIED TO MINIMIZE HIS OWN ROLE IN THE SLAYING."

Id. AT (POST-STANDARD NEWSPAPER, "SLAIN OFFICER'S CASE MOVES TO U.S. COURT," DATED OCTOBER 17, 1991). SEE, (EXHIBIT, E. 9½, No. 49). SEE ALSO, ARGUMENTS AT SUPRA, (P. 10 §D AND P. 18 NO. 10, AFFIDAVITS OF MR. STEWART AND MR. LAWRENCE).

"BUT NOW POLICE SAY THEY DON'T BELIEVE DAVIDSON WAS INVOLVED IN THE KILLING OR THE CONSPIRACY TO ROB HOWARD. 'WE DON'T THINK HE HAD ANY INVOLVEMENT IN THE MURDER,' DEPUTY CHIEF FRANK SARDINO SAID LAST WEEK. POLICE BELIEVE 'MORALES LIED ABOUT DAVIDSON TO DIMINISH HIS OWN RESPONSIBILITY' FOR HOWARD'S DEATH,' SARDINO SAID. DAVIDSON HAS NEVER

71.

BEEN CHARGED BY STATE OFFICIALS."

Id. AT (POST-STANDARD NEWSPAPER, DATED APRIL 8, 1971).
SEE, (EXHIBIT, E. 9½, No. 50). SEE ALSO, EXCERPTS OF
MR. STEWART AND MR. LAWRENCE'S AFFIDAVITS AT SUPRA,
(P. 10, §D AND P. 18, No. 10).

PETITIONER SUBMITS THAT THE DISTRICT COURT'S
MANIFEST ERROR OF FACT AND LAW CAN BE SEEN CRYSTAL
CLEAR VIA, ITS BASELESS AND/OR UNFOUNDED ALLEGATION THAT,
"THE PROOF AS TO HIS GUILT ON THE COUNTS CHARGED AGAINST
HIM IN THE INDICTMENT WAS OVERWHELMING;" Id. AT
PAGE 9 (12/31/02 ORDER BY DISTRICT COURT), AND FURTHER
ALLEGING THAT, "IN THE EVENT OF AN APPEAL HEREFROM, THIS
COURT DECLINES TO ISSUE A CERTIFICATE OF APPEALABILITY PURSUANT
TO RULE 22(b)(1) OF THE FEDERAL RULES OF APPELLATE PROCEDURE,
THE PETITIONER BEING UNABLE TO MAKE A SUBSTANTIAL SHOWING
OF THE DENIAL OF A CONSTITUTIONAL RIGHT, AS REQUIRED BY
28 U.S.C. §2253(c)(2)(1)." Id. AT PAGE 11. (12/31/02 ORDER).
MR. DAVIDSON, PRO-SE, FURTHER SUBMITS THAT
THE ALLEGED EVIDENCE IN THE CASE AT BAR, IN LIGHT OF ALL
THE NEWLY DISCOVERED EVIDENCES PRESENTED AT EXHIBITS A-K
IN ITS ENTIRITY, PROVES PETITIONER'S CLAIM(S) OF FACTUAL
INNOCENCE. SEE, BOUSLEY AT SUPRA. AND, PETITIONER HAS
PLACED ON THE RECORD SUFFICIENT PROOF TO SUBSTANTIATE THE
FACT THAT HIS COA SHOULD BE GRANTED ON ITS FACE,
VIEWING THE EVIDENCE, ISSUES AND ARGUMENTS FACTUALLY
PRESENTED AS A WHOLE, HIGHLIGHTING WHERE MR. DAVIDSON WAS
ABLE TO MAKE/PROVE A SUBSTANTIAL SHOWING OF THE DENIAL A/HIS
CONSTITUTIONAL RIGHTS, AS REQUIRED BY 28 U.S.C. §2253(c).

72.

IN FURTHER SUPPORT TO PROVE WHERE THE DISTRICT COURT SHOULD HAVE GRANTED PETITIONER'S REQUEST FOR A COA, MR. DAVIDSON HAD SATISFIED ALL THE REQUIREMENTS ENUNCIATED BY THE SUPREME COURT THAT, "TO OBTAIN A COA UNDER §2253(c), A HABEAS PRISONER MUST MAKE A SUBSTANTIAL SHOWING OF THE DENIAL OF A CONSTITUTIONAL RIGHT, A DEMONSTRATION THAT, UNDER BAREFOOT, INCLUDES SHOWING THAT REASONABLE JURISTS COULD DEBATE WHETHER (OR, FOR THAT MATTER, AGREE THAT) THE PETITION SHOULD HAVE BEEN RESOLVED IN A DIFFERENT MANNER OR THAT THE ISSUES PRESENTED WERE 'ADEQUATE TO DESERVE ENCOURAGEMENT TO PROCEED FURTHER.'" SEE, SLACK V. MCDANIEL, 120 S.CT. 1595 (2000)(QUOTING BAREFOOT V. ESTELLE, 463 U.S. AT 893 n9, 77 L. Ed.2d 1090, 103 S. CT. 3383 (1983)("SUM[MING] UP 'SUBSTANTIAL SHOWING'" STANDARD.)). AND, PETITIONER HAD ALREADY MET SAID SUBSTANTIAL SHOWING STANDARD AT THE APPELLATE LEVEL AND THE REMAND WAS TO ALLOW THE FACTS TO BE FULLY DEVELOPED, IN LIGHT OF WILLIAM V. TYLER AT SUPRA.

WHEREFORE, MR. DAVIDSON, PRO-SE, ASSERTS THAT, IN LIGHT OF THE AFOREMENTIONED FACTS HIGHLIGHTED HEREIN AS A WHOLE WITH THE VOLUMINOUS EXHIBITS EXTENSIVELY LITIGATED HEREIN, PETITIONER HUMBLY PRAYS THAT THIS HONORABLE COURT ISSUES THE GOVERNMENT A "SHOW CAUSE ORDER" (PURSUANT TO RULES 52(b) AND 59(a)(c)(e), F. R.CIV.P.), AND GRANTS THE INSTANT "MOTION FOR NEW TRIAL...," IN LIGHT OF SAID RULES, F.R.CIV.P., GRANT PETITIONER'S "AFFIDAVIT OF RECUSAL...," GRANT PETITIONER AN EVIDENTIARY HEARING, GRANT PETITIONER HIS HABEAS

73.

RELIEF REQUESTED BY ALTERING/AMENDING THE INSTANT JUDGMENT IN QUESTION AND/OR GRANT MR. DAVIDSON WHATEVER RELIEF THIS HONORABLE COURT DEEMS JUST, PROPER AND/OR NECESSARY AS THE LAW DEMANDS TO PREVENT ANY FURTHER MISCARRIAGE OF JUSTICE (OF A PRISONER WHO'S ACTUALLY (FACTUALLY) INNOCENT).

I, JAIME A. DAVIDSON, PETITIONER, PRO-SE, SWEAR UNDER THE PENALTY OF PERJURY (PURSUANT TO TITLE 28 U.S.C. § 1746), THAT ALL THE CONTENTS/FACTS FOUND HEREIN WITH ATTACHED VOLUMINOUS EXHIBITS A-K, ARE ALL TRUE AND/OR CORRECT TO THE BEST OF PETITIONER'S CLEAR RECOLLECTION AND PERSONAL KNOWLEDGE. PLUS, AFFIANT/ PETITIONER, IS WILLING AND ABLE TO TESTIFY TO THE FACTS OF THIS CASE AT ANY HEARING AND/OR DISTRICT COURT OF THE UNITED STATES.

EXECUTED ON THIS __9__ DAY OF __JANUARY__ , 2003.

RESPECTFULLY SUBMITTED,

_Jaime A. Davidson_
SIGNATURE OF AFFIANT
JAIME A. DAVIDSON, PRO-SE.
REG. NO. 37593-053 (B-4)
USP-POLLOCK
P.O. BOX- 2099
POLLOCK, LA. 71467

74.

# *CERTIFICATE OF SERVICE*

I,  Jaime A. Davidson, pro-se,  , hereby certify that I have served a true and correct copy of the foregoing:

**MOTION FOE NEW TRIAL AND/OR ALTER OR AMEND A
JUDGMENT WITH FINDINGS BY THE COURT PURSUANT
TO RULES 52(b) AND 59(a)(c)&(e), F.R. CIV. P.,
TO PREVENT A FUNDAMENTAL MISCARRIAGE OF
JUSTICE OF A PRISONER WHO'S ACTUALLY (FACTUALLY)
INNOCENT, WITH ATTACHED AFFIDAVIT IN SUPPORT OF
SAME AND VOLUMINOUS EXHIBITS IN SUPPORT OF SAME**

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the court, Houston vs. Lack, 101 L.Ed.2d 245 (1988), upon the court and parties to litigation and/or his/her attorney(s) of record, by placing same in a sealed, postage prepaid envelope addressed to:

**EXECUTIVE ASSISTANT U.S. ATTORNEY
MR. JOHN G. DUNCAN, ESQ.
900 FEDERAL BUILDING
P.O. BOX 7198
SYRACUSE, NEW YORK 13261-7198**

and deposited same in the United States Postal Mail at the United States Penitentiary, Pollock, Louisiana.
Signed on this _____9_____ day of JANUARY , 2003.

Respectfully Submitted,

*Jaime A Davidson*

**JAIME A. DAVIDSON**

REG. NO. 37593-053 (B-4)
USP-Pollock
PO BOX-2099
Pollock, LA 71467

75.