Strucken
2/19/03



U.S. DISTRICT COURT — N.D. OF N.Y.
FILED
JAN 21 2003
AT _____ O'CLOCK
Lawrence K. Baerman, Clerk — Syracuse

U.S. DISTRICT COURT — N.D. OF N.Y.
FILED
MAR 13 2003
AT _____ O'CLOCK
Lawrence K. Baerman, Clerk — Syracuse

EXHIBIT - H

5:00 CV 869

Jaime A. Davidson
Reg. No. 37593-053 (B-4)
U.S.P. Pollock
P.O. Box - 2099
Pollock, LA 71467

November 14, 2002

Mr. David A. Rigle,M.D
530 Oak Street
Syracuse, New York 13203

Tel. No. (315)426-1250
Fax. No. (315)426-1240

Office Of The Medical Examiner
Onondaga County Health Department
CENTER FOR FORENSIC SCIENCES
Attn: Ms. Mary I. Jumbellic,M.D.
Chief Medical Examiner
100 Elizabeth Blackwall Street
Syracuse, New York 13210

Tel. No. (315)435-3161
Fax. No. (315)415-3319


RE: UNITED STATES V. JAIME A. DAVIDSON
    CRIM. NO. 92-CR-35 / CIVIL NO. 5:00-CV-869 / APPEAL NO. 01-2370

    URGENT NOTICE REQUESTING RESPONSE IN AFFIDAVIT FORMAT, REGARDING
    QUESTIONS STEMMING FROM ASSASSINATION OF SYRACUSE POLICE OFFICER
    WALLIE HOWARD, JR. AND AUTOPSY REPORT


Dear Dr. Jumbellic and Dr. Rigle:

     Please be advised that, the present letter with voluminous
attachments is concerning my pending case remanded from the Second
Circuit Court of Appeals to the District Court in Syracuse (presently
pending), before the Hon. Neal P. McCurn,S.J.  I am presently writing
this letter and proceeding as pro-se, litigant and as counsel of
record (based on the fact that I do not have an attorney appointed
to represent in court; only attorneys assisting the Youth Task Force
in executing my factual investigation, retrieving facts outside the
record).  The attachments that I would humbly seek your assistance
in reviewing and submitting a notarized affidavit to the Hon. McCurn
with carbon copy to yours truly are as follows:

     A.  A self explanatory letter to Dr. Rigle dated March 29, 2001,
         which to date, has been unanswered;

     B.  The Second Circuit ORDER of REMAND, dated June 12th, 2002,
         concerning the present critical issue in question;

     C.  A "STATEMENT OF AFFIRMATION AND AFFIDAVIT IN SUPPORT OF
         SAME BY, MR. LOUIS M. FREEMAN, ESQ." in regards to the
         issues presently in dispute (which Mr. John G. Duncan, Esq.
         AUSA, alleges is "BIZARRE" without any medical Forensic
         Experts examinations and/or Reports);

*EX. H*

D. A letter from the Youth Task Force to the Hon. McCurn dated March 27, 2001; letter from Mrs. Marie Y. Watson, Esq. to Dr. Rigle dated January 17th, 2001; letter from Dr. Rigle to Mr. Robert H. Goldberg, J.D.,M.D. dated January 23, 2001 and Affidavit from the Reverend Angela E. Brown, M.Div., all in support of the fact that Officer Howard, Jr. was <u>not</u> killed by my co-defendant, Mr. Robert Lawrence (which said documentations in support of same, were not placed on the trial record and/or turned over to my Appellate Counsel, Mr. Louis M. Freeman, Esq.);

E. A letter/memo from Dr. Jumbellic to Ms. Angela E. Brown (who during that time, was Mrs. Watson's Legal Assistant), confirming that the information on Officer Howard's Autopsy Report by Dr. Rigle was truly correct, substantiating Dr. Goldberg's medical findings stemming from his examination;

F. Affidavit by Dr. Goldberg dated June 26, 2001; letter from Dr. Goldberg to Mrs. Watson dated October 3, 2000, with a documentation in support of Dr. Goldberg's Vidoc Society (crime solving organization); which he is a member of, to support his credentials;

G. Two (2) part affidavit by the LABORATORY OF FORENSIC SCIENCE, DIRECTOR, Mr. Herbert Leon MacDonell, in support of the fact that the defense attorneys forensic expert, Mr. Warren Stuart Bennett, is actually an imposter which affected my entire trial and allowed the fraud on the record to be kept a secret since then to date;

H. A letter from the Onondaga County Bar Association dated January 22, 1991 to Mr. Warren Stuart Bennett; an affidavit from Mr. W. Stuart Bennett/Ms. Kate Rosenthal captioned, **"SWORN STATEMENT REGARDING EXPERT SERVICES PERFORMED,"** and an affidavit from Ms. Rosenthal (who is presently a Judge), in support of said fraud committed upon the court, concerning Mr. Bennett's expert services; and

I. Three (3) press releases from the YOUTH TASK FORCE titled: **"DR. RIGLE ADMITS PROBLEMS IN WALLIE HOWARD INVESTIGATION; JUDGE McCURN STILL DENIES SYRACUSE 5 ACCESS TO COURTS; JUDGE ROSENTHAL THREATENS TO KILL CLIENT IF HE TELLS OF SECRET MEETING: LEGAL ISSUES STILL PENDING SURROUNDING THE DEATH OF <u>WALLIE HOWARD</u>; and NATIONAL BLACK YOUTH ORGANIZATION SETS PRECEDENT IN SEEKING "FRIEND OF COURT" STATUS WITH US APPEALS COURT."**

Therefore, Doctors, please note, that I am coming to both of you in good faith and with extreme due diligence, seeking at a minimum, a written response from both of you after your thorough review and analyzation of "<u>ALL</u>" the attached exhibits <u>i.e.</u>, if none of you wish to submit an affidavit to the U.S. District Court (forwarding me a copy ASAP). As an innocent pro-se, litigant striving very hard to regain my freedom! I am hereby submitting (to both of you), a heartfelt quote from Mr. MacDonell's affidavit directed to Mr. W. Stuart Bennett which states as follows:

"I regret having to prepare an affidavit which is so critical of a former student.  Nevertheless I feel that when a person's life or liberty is at stake the loyalty to anyone is superseded by the necessity to present the truth.  I read in a Chinese Fortune Cookie a few years ago that, 'time is precious, but truth is more precious than time.'  This, undoubtedly, has special meaning for those who are serving time or those who are facing incarceration."

**Id. at Page 5. (Affidavit of Mr. MacDonell – First Part).**

Dr. Jumbellic, Dr. Rigle, I humbly pray that the two (2) of you would proceed likewise, as Dr. Goldberg and Dr. MacDonell has done, by doing a good Civic duty and/or a good-faith gesture as members of the forensic science community, to "FREE" a man that has been wrongfully convicted for the "MURDER/ASSASSINATION" of Officer Howard, Jr. and presently has served over 10 years to date.

In closing, the sole reason why I have never filed any Civil Suit in the past as stated in Dr. Rigle's letter, was based on Ms. Brown's advice to allow the two (2) of you to come forth on your own and allow the truth to be told, "once and for all."  I pray that this letter touches both your hearts and you decide to do the right thing.  For more information, you can feel free to contact the office of the YOUTH TASK FORCE and ask for: Ms. Angela E. Brown,M.Div. (Executive Director)at: (404)314-4949; (404)752-8275, or e-mail at: youthtaskforce@msn.com.

Thanks for your time, assistance and earnest consideration in this most critical matter in question.  Your most rapid reply with an affidavit to the Hon. Neal P. McCurn,S.J. and/or a letter addressed to me in full details (after reviewing all the attachments), and placing your declaration if you (Dr. Jumbellic and/or Dr. Rigle), do hereby **"CONCUR/AGREE"** with the factual findings contained in the affidavit of Dr. Robert H. Goldberg,J.D.,M.D. (as to if, the proffered evidences/testimonies at this late date, raises some critical questions as to who really shot Officer Howard, Jr.).

Again, Doctors, your most rapid response(s) **(within 24 hours via, telephone to Ms. Brown and/or 5 working days in writing via, certified mail),** will be highly appreciated. Your **"SILENCE(S)"** to the instant request, will be taken as explicit **"CONCESSIONS"** to Dr. Goldberg's affidavit and attached letter, that Officer Wallie Howard, Jr. was actually killed by **"FRIENDLY FIRE"** and without another **"REAL BALLISTICS TEST DONE,"** the truth will forever be hidden; and (you/both of you), are actually **"FEARFULL/AFRAID"** to get involved by coming forward and face extreme measures of law enforcement/Governmental bad faith acts of **"RETALIATION."**  But, you would only come forth with the truth via, pressure of a Court Order and/or any  legal channels directing both of you to follow.

I, Jaime A. Davidson, pro-se, swear under the penalty or perjury (pursuant to Title 28 U.S.C. §1746), that the aforementione letter/ legal document was dine in good faith and all the contents (with attached exhibits), found herein, are true and/or correct to the

**LETTERS TO DOCTORS JUMBELLIC AND RIGLE**
                    **PAGE 4.**

best of my personal knowledge and/or clear recollection.

                                    Respectfully submitted,

                                    _____
                                    Signature of Affiant
                                    JAIME A. DAVIDSON, PRO/SE.

JAD/jad

cc: Hon. Neal P. McCurn,S.J.
    AUSA, John G. Duncan, Esq.
    Rev. Angela E. Brown,M.Div.
    File

ENCLOSURES

"ATTACHMENTS"

EX. A

Jaime A. Davidson
Reg. No. 37593-053
FCI Edgefield
P.O. Box - 724
Edgefield, S.C. 29824

March 29, 2001

Mr. David A. Rigle, M.D.
530 Oak Street
Syracuse, New York  13203

Tel. No. (315) 426-1250
Fax. No. (315) 426-1240

RE: UNITED STATES V. JAIME A. DAVIDSON
CRIM. NO. 92-CR-35 / CIVIL NO. 5:00-CV-869(NPM)

NOTICE OF ACTION FOR FUTURE CRIMINAL CHARGES
AND/OR CIVIL LAW SUIT.

Dear Dr. Rigle:

Please be advised that the present letter should be taken as a formal Notice of Action, based on the aforementioned caption. I was in receipt of your letter dated January 23rd, 2001 and since then to date, the Office of the Onondaga District Attorney, neither Investigator Henry Brown has contacted the defense (which is me, Petitioner, proceeding pro-se, as counsel of record investigating the instant "**FRAUD PERPETRATED UPON THE HONORABLE COURT** " of Senior Judge Neal P. McCurn).

Dr. Rigle, from receipt of this letter I am humbly requesting that you contact the Chambers of the Honorable Neal P. McCurn, S.J. and convey to him, all the concessions that you made to Ms. Angela Brown and Mr. Robert H. Goldberg, J.D., M.D.. If within 24 hours of receipt of this notice, I am not carbon copied and mailed a letter addressed by you to the Hon. McCurn, it will only "**CONFIRM**" to me, that you also voluntarily entered this conspiracy corruption cover-up (surrounding the assassination of Officer Wallie Howard, Jr.).

Therefore, not trying to be redundant, but is your recollection better ten years later than three years after this incident? I say that to say this on the record, at my trial in 1993 you were asked if Officer Howard was buried with bullet fragments still lodged in his head and you responded, "**NOT TO MY KNOWLEDGE!**" Nevertheless, when posed with the same exact question by Ms. Brown on Dec. 5, 2000, you explicitly elaborated your response stating, "**YES, SMALL METALLIC FRAGMENTS AND I DID NOT WEIGH THEM.**" See, (Attached my FEDERAL CRIMINAL COMPLAINT, TO THE HON. JOHN ASHCROFT).

1

33

EX. A

CERTIFIED MAIL 7099 3400 0015 2024 5360

In other words, it was your "FALSE AND/OR MISLEADING" answers that convicted me of the assassination of Officer Wallie Howard,Jr. My entire music career was thrown to the dumpster, following your trial testimony.  Now, going to the Onondaga District Attorneys Office, c/o Investigator Henry Brown is "ONLY" going back to the same entity/agency that created this alleged cover-up.  Plus, you confirmed that the government lied to you regarding the position Officer Howard died, to Dr. Goldberg and Ms. Brown.  This type of information is too critical for you to hide behind the problem.

In closing, again, within 24 hours of receipt of this letter, I expect that you move diligently and under good faith as I am doing today, by placing a written "NOTARIZED UNDER THE PENALTY OF PERJURY STATEMENT/COMPLAINT," to the local office of the "FEDERAL BUREAU OF INVESTIGATION" and forwarding a copy to the Honorable Neal P. McCurn,S.J. and yours truly (Petitioner, pro-se.), ASAP!!! Any delay and/or disregard to this notice will be taken in a Civil matter with drastic measures under "FRAUD!"  As you can see, you have went to Inv. Henry Brown over two months now and nothing has been done.  I expect your full cooperation in this matter.  Oh, for the record, your past actions have also been confirmed with a statement that Dr. Mary I jumbellic relayed to Ms. Brown, "that Dr. Rigle  was also fired, because he usually testified to whatever the government told him to say under oath!"  Yes, you can check my initial §2255 motion, to see how your previous actions have been proven on their own.

Thank you in advance for executing your professional Civic duties as a member of the Forensic Science Field.  Your most rapid response with a copy of your Notarized Federal Complaint/Statement being lodged with the Local FBI's Syracuse Branch Office and forwarded to the Chambers of the Hon. McCurn and yours truly, will be highly appreciated.

Respectfully submitted,

Jaime A. Davidson
Petitioner, pro-se.

Sworn and Subscribed before me the undersigned Authority, on this 29th day of March, 2001.

Signature of Notary

My Commission Expires: _____

My Commission Expires
September 17, 2008

2.

34

Ex. B

EX. B

# United States Court of Appeals
#### FOR THE
### SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the   12th   day of   June   two thousand two,

Present:

>　Hon. Roger J. Miner,
>　Hon. José A. Cabranes,
>　Hon. Rosemary S. Pooler,
>　　*Circuit Judges.*

---

Jaime A. Davidson,

　　　　　　Petitioner-Appellant,

　　　　v.　　　　　　　　　　　　　　　　01-2370

United States of America,

　　　　　　Respondent-Appellee.

---

Appellant has filed, *pro se,* motions for a certificate of appealability, to proceed *in forma pauperis,* and for other relief. Upon due consideration, it is ORDERED that the motions for leave to proceed *in forma pauperis* and a certificate of appealability are granted for the following limited purpose: the case is remanded to the district court to consider Appellant's claims that (1) he was denied the effective assistance of appellate counsel when counsel failed to investigate or raise the severance issue on appeal, failed to argue that the trial court erroneously gave a blanket self-defense jury instruction, and failed to raise the change of venue argument, and (2) his trial counsel hindered his appeal by not turning over records to his new appellate counsel. It is further ORDERED that a certificate of appealability is denied with respect to his remaining claims and, as to those remaining claims, the appeal is dismissed. Appellant's remaining motions are denied as moot.

FOR THE COURT:
Roseann B. MacKechnie, Clerk

BY: *Lucille Carr*

EX. B

1

Ex. C

EX.C

16

## AFFIRMATION

## IN THE MATTER OF JAIME DAVIDSON

LOUIS M. FREEMAN, an attorney duly admitted to practice law in the Courts of the State of New York and for the Southern and Eastern Districts of New York, affirms to the truth of the following under the penalties of perjury:

1. That I was originally contacted by Isaac Davidson, to appeal the conviction of his brother, Jaime A. Davidson.

2. That Mrs. Shirley Davidson retained me to appeal her son's case.

3. That upon being retained, I contacted the office of John F. Laidlaw, Esq., in Syracuse, New York, and introduced myself as Mr. Davidson's appellate counsel.

4. That I requested all of Mr. Davidson's trial preparation materials (Discovery Materials) from Mr. Laidlaw, in order to review them thoroughly and begin my own independent investigation.

5. That after a number of requests, I conveyed to Mr. Laidlaw the importance of acquiring these documents for Mr. Davidson's appeal preparation, but I never received them.

6. That I explained to Mr. Davidson that Mr. Laidlaw had not sent me the discovery materials, and requested Mr. Davidson contact Mr. Laidlaw directly because time was running out and I had to prepare his appeal.

7. That Mr. Davidson was pushing me to get the material, but I explained to him that even if I got the material, if his trial counsel failed to preserve certain objections for appeal, then

EX. C

20

he couldn't raise them. (For example, the severance issue and antagonistic defenses issue and the issue involving Robert Lawrence taking the stand and testifying as to self defense, which contradicted Mr. Davidson's alibi defense.)

8. That once I began to prepare Mr. Davidson's appeal, all the other appellate lawyers began calling me from Syracuse, New York, and wanted me to take the lead on the appeal.

9. That despite my serving as point person, Mr. Laidlaw still refused to comply with my request that he turn over all discovery materials.

10. That I explained this to Mr. Davidson.

11. That I also explained to Mr. Davidson how after going through his federal trial transcript it appeared that Mr. Laidlaw went to trial without conducting any pretrial investigations or hiring his own expert witnesses (for example, to re-examine Investigator Howard's cause of death.)

12. That when Mr. Davidson's appeal was affirmed, I was the first person to tell him about that decision. When I told him he sounded very sad, and he also sought my assistance to file his writ of certiorari.

13. That Mr. Davidson kept calling me and asking me to please file his writ to the Supreme Court, because I knew his case well and I had already written the appeal to the Second Circuit.

14. That one of reasons I agreed to file Mr. Davidson's petition for certiorari, was that I thought Mr. Laidlaw handled the Davidson trial poorly and left no room to raise issues which could have been meritorious. Also, because §848(e)(1)(B) convictions are rare (the only one in

18

the Second Circuit that I could find,) I had to research the Congressional intent.

15.   That Mr. Davidson kept telling me that something was wrong with the government testimony that said Investigator Howard was killed.   Davidson told me he did not believe Robert Lawrence actually committed the murder.

16.   That had Mr. Laidlaw turned over Mr. Davidson's discovery materials including Investigator Howard's medical files as I had requested, I would have hired my own forensic pathologist to conduct an independent investigation.  Then, I might have been able to discover from the autopsy findings that Investigator Howard was "not" shot from close range.

6

17.   That this was a death penalty eligible case and a high profile case involving the death of a police investigator.  Therefore, I gave this case extreme priority, because the appeal had to be filed timely.  However, because trial counsel withheld documentation which might have demonstrated that Investigator Howard, was shot from long range,  I was limited as to what I could do.

18.   That I retained the services of a private investigator, Mr. Irwin Blye, from Queens, New York but, Mr. Blye's services had to be terminated for lack of finances.

19.   That the record will reflect all my earnest attempts to appeal Mr. Davidson's conviction and to vindicate Mr. Davidson from those charges, if possible.

20.   That I can confirm that Mr. Davidson has always been raising the issue that Investigator Howard could not have been shot from so close of a range, with a bullet wound the size of a quarter, being shot with a .357 revolver and the bullet staying in his head.

22



21. That I wanted to pursue the alleged deputization of Investigator Howard, but Mr. Laidlaw hampered me with his failure to provide discovery and Mr. Davidson's family was having financial difficulty.   A decision by the family had to be made as to how to spend the money, on the appeal or on the investigator.

22. That Mr. Davidson kept calling Mr. Blye to have the investigation started, but Mr. Blye did not want to get started until he was sure he would be paid.  The situation was frustrating and unfortunate because Mr. Davidson kept talking about issues he wanted to raise.

23. That had Mr. Laidlaw turned over Investigator Howard's medical files and we had seen that the autopsy findings stated: "No evidence of close range firing on skin surrounding gun shot wound of entrance," my firm would have likely moved to have this investigation financed, by outside or third parties, if possible.

24. That is was extremely frustrating and disheartening to myself and my firm that we had to give up the idea of conducting a separate independent investigation of our own. I expressed this to Mr. Davidson at the time.  This is especially true now that we see there was something lurking out there that we were unable to uncover.

LOUIS M. FREEMAN

Affidavit of Mr. Louis M. Freeman, Esq.

Personally appeared before me, the undersigned notary duly authorized by law to administer oath, LOUIS M. FREEMAN, ESQ., being duly sworn, and states that he has personal knowledge of the following facts and they are true and correct.

1.   That my name is LOUIS M. FREEMAN, ESQ. I am over the age of 18 years old and under no disability that would make me incompetent to testify.

2.   That I, Louis M. Freeman, Esq., was appellant, Jaime A. Davidson's former appellate attorney;

3.   That I am attorney-at-law located at 30 Vesey Street, Suite-100, New York, NY 10007.

4.   That on or around January 10th, 2001 my office was contacted by the Chambers of the Honorale Neal P.McCurn, Senior Judge through his law clerk, inquiring if my signature found on my Statement of Affirmation contained in Mr. Davidson's Habeas Corpus Pleadings was authentic;

5.   That I expressed to the honorable Judge McCurn's law clerk that my signature on that (my) Statement of Affirmation was indeed authentic;

Sworn to and subscribed this __26th__ day of __June__ 2001

_Louis Freeman_
Louis M. Freeman

_[signature]_
Notary Public
Commission Expires:

MICHAEL LEWIS ALPERSTEIN
Notary Public, State of New York
No. 01AL0052360
Qualified in Kings County
Commission Expires April 30, 2003

24

Ex. D

EX. D

L7



**OUTH TASK FORCE**

March 27, 2001

Via Fax – 843-651-0136
US Mail

Judge Neal P. McCurn
PO Box 7365
100 South Clinton Street
Syracuse, NY 13261-7365

Re:   United States vs. Jaime Davidson

Dear Honorable Judge McCurn:

Please be advised that this letter is to request an emergency meeting with your Honorable court due to the miscarriage of justice in the above referenced case.

In January 2001, Dr. Robert Goldberg and I met with Dr. David Rigle to discuss the autopsy of Officer Wallie Howard. Based on that conversation, we feel that it is imperative that your Honorable Court grant us a meeting to present to you evidence that Dr. Rigle was lied to by authorities (police) investigating the case. As a result of such lies, Dr. Rigle was deceived into testifying falsely regarding Officer Howard's death.

Prior to me submitting the trail testimonies to Dr. Rigle, he had agreed to be deposed. However, after being sent the trial testimonies of the position Officer Howard died, Dr. Rigle not only declined his original offer, he in fact went to the authorities lambasting our efforts (see attached).

Your Honorable Judge, we have done nothing wrong, unless seeking justice in the above referenced matter is wrong, then we must stand accused.   However, if seeking justice is not wrong, then we enjoin your Honor to grant a meeting with Dr. Goldberg, myself, and any all other parties to discuss this matter. Since no counsel of record has been granted in this matter, we are coming to your Honor directly with the new evidence we have been able to discover. We look forward to you response. You can contact me directly at 404-314-4949.

Sincerely,

Angela Brown
Co-Director

**Youth Task Force**
P.O. Box 11078
Atlanta, GA 30310
04.752.TASK (8275)
404.752.8276 fax
TF@mindspring.com

*EX. D*

41

# MARIE Y. WATSON & ASSOCIATES, P.C.
### Attorney

**Main Office**
41 Marietta Street, NW
Suite 410
Atlanta, Georgia 30303
Telephone (404) 522-4101
Fax (404) 522-4108

**Satellite Office**
945 South Hairston Road
Stone Mountain, Georgia 30088
Telephone (404) 501-9115
Fax (404) 501-9116
MARK A. SCOTT
of Counsel

January 17, 2001


Dr. David Rigle
530 Oak Street
Syracuse, New York 13202

Re:     Deposition

Dear Dr. Rigle:

Pursuant to the above, please find attached documents for your review. We will arrange with your office later this week the date and time most convenient to you for the deposition.

Please be advised that Dr. Goldberg and myself will handle the deposition. I have researched the web and located a number of court reporters. If your office has a particular service that you use, we will be open to securing them. If you have any questions, please feel free to contact Dr. Goldberg (770) 424-5515 or myself at the above satellite address or on my cellular phone (404) 314-4949.

Sincerely,

Angela Brown
Legal Assistant
MARIE Y. WATSON & ASSOCIATES

*10*

*207*

*David A. Rigle, M.D.*

*930 Oak Street*

*Syracuse, New York 19203*

*315-426-1250*

*fax: 315-426-1240*

January 23, 2001

**via fax only 770-424-8515**

Robert H. Goldberg, M.D., J.D.
1800 Suite D, Oakpointe Dr. S.W.
Marietta, Ga 30008

Dear Dr. Goldberg:

Please be advised that as a professional courtesy to you, as a fellow physician, I initially addressed some basic questions you raised in connection with the autopsy I performed on Wallie Howard, Jr., on October 31, 1990. I found no issues of concern in this regard as the only information we discussed, was what I had testified to in the past, in open court. Accordingly, there was no breach of confidentiality that concerned me. Subsequently, I have received from Angela Brown for review a binder of materials regarding the investigation of Officer Howard's death. Also, you and Ms. Brown have contacted my secretary repeatedly in an attempt to reach me to schedule a deposition regarding this matter.

When I handled the autopsy of Officer Howard in 1990, I was acting as an official of Onondaga County and the Onondaga County Medical Examiner's Office. I am no longer with that office. Accordingly, please be advised that I cannot be of assistance to you in this regard.

If there is a valid need for my expert assistance, I should be advised of such through proper legal channels.

Very truly yours,

David A. Rigle, MD, BCFE, BCFM
Medical Director
Chief Forensic Consultant

DAR/mas

cc:  Investigator Henry Brown
     Onondaga County District Attorney's Office
     Via fax only 315-435-3969

*11*

*208*

## Affidavit of The Reverend Angela E. Brown, MDiv.

Personally appear before me, the undersigned notary duly authorized by law to administer oath, The Reverend Angela E. Brown, M.Div., being duly sworn, and states that she has personal knowledge of the following facts and they are true and correct.

1.

My name is Angela E. Brown. I am over the age of 18 years old and under no disability that would make me incompetent to testify,

2.

That I have personal knowledge of the facts set forth in this affidavit and that they are true and correct,

3.

That I am a member in good standing and/or serve or have served on the Board of Directors in the following professional organizations and/or Non-Governmental Organizations: International Society of Theta Phi, Youth Task Force, Southern Organizing Committee for Economic and Social Justice, Southern Association of Black Educators, 21st Century Youth Leadership Movement, Fund for Southern Communities, The Franklinton Center, United Church of Christ – Board for Homeland Ministries, Southern Partners Fund, The Samaritan Project, Freedom Summer Project,

4.

That I have received the following awards/recognition:

| | |
|---|---|
| *Freedom Flame Award, 2000* | 21st Century Youth Leadership |
| *Ashe Youth Leadership Award*, 1998 | Youth Task Force |
| *Trail Blazer Award*, 1996 | Southern Organizing Committee |
| *Next Generation Leadership*, 1997 | The Rockefeller Foundation |
| *The Reebok Human Rights Award*, 1995 | Reebok, Intl. |

*Distinguish Young Woman Award*, 1995

*Sharing the Torch Award*, 1995

*Who's Who Among Students in American Universities and Colleges*

*Who's Who Among Executives*

*Who's Who Among Female Executives*.

Essence Magazine

National Voting Rights Museum

5.

That I can be reached at Post Office Box 11078, Atlanta, Georgia 30310, (404) 752-8275,

6.

That I am the co-founder and co-director of the Youth Task Force (hereafter referred to as Youth Task Force, YTF or the Organization),

7.

*13*

That the Youth Task Force is one of the oldest national African American youth founded and led organizations of its kind in the country. Although international in its scope, YTF concentrates primarily in the Southern part of the United States of America.  Originally called the SOC Youth Task Force, YTF began as the youth program of the Southern Organizing Committee—one of the primer civil rights organizations in the South.  From 1992 to present, YTF has addressed a myriad of issues, including the unjust targeting and criminalization of African American young people. With nearly 5,000 volunteers dedicated to preserving the principles of liberty and equality embodied in the Constitution, YTF has testified before the United States Congress, organized for the right-to-vote, and spent years organizing and fighting for basic human rights for all,

*43*

8.

That I, Angela E. Brown, as Co-Director of YTF, with full authority bestowed upon me by the Organization's Board of Directors, do speak with same authority as representing the Organization in dealing with the case of Jaime A. Davidson,

9.

That on or about December 1996, Mr. Jaime Davidson made contact with the office of the Youth Task Force,

10.

That after an approximately six month preliminary investigation, YTF moved forward with a full investigation that lead to our organizing around the claims of Mr. Davidson's actual innocents,

*14*

11.

That after four years of investigating/organizing, we would like to preserve the record on all of our findings, suffice what issues that must be dealt with immediately and contained within this affidavit in light of pro se litigant's (acting as his own attorney and under who's direction we are bound to follow until such time as the courts deem necessary to appoint an officer of the court) request for my conversation with David A. Rigle, M.D. and Robert Goldberg, J.D., M.D. to be placed on the record,

12.

That on or about December 5, 2000, upon my return from Syracuse, New York after holding YTF's first press conference regarding the facts discovered in this case, I had the privilege to be asked to join a pre-scheduled telephone conference between Dr. Goldberg and Dr. Rigle—pathologist of record for the case of Wallie Howard Jr., Syracuse Medical Examiner's Case File #90-0785,

13.

*44*

That during the review of the autopsy of Officer Wallie Howard with Dr. Rigle and Dr. Goldberg, I asked a specific question, "Where there still [bullet] fragments lodge in his head when he was buried?"

14.

That Dr. Rigle responded by saying, "There are always tiny fragments that you can't get out. The cooper jacket separates from the lead core. What I got out was one big piece of what looked like the majority of it and a smaller fragment. I don't know what the weight was."

15.

That I was shocked by his response because based on my reading and review of the trial transcripts, Dr. Rigle testified to the following:

> Q. But of course this projectile was in three pieces, correct?
>
> A. Yes, sir
>
> Q. And there were some of the pieces that, in fact were not removed from Officer Howard, correct?
>
> A. I do not know that to be fact, sir.[1]

16.

That during our telephone conference, Dr. Rigle's telephone rang, and Dr. Goldberg and I had a sidebar conversation wherein I was less than respondent to Dr. Goldberg due to the fact that Dr. Rigle had contradicted his trial testimony.

17.

That upon Dr. Rigle's return to the telephone, my next question was to bring clarity to the position of Robert Lawrence, (the alleged shooter and referred herein as the perpetrator), the vicinity to

---

[1] See Federal Trial Transcript, p. 1722.



where the perpetrator was standing, and Dr. Rigle's autopsy report that the bullet entered the left side.

18.

That I also asked, "If the perpetrator was on Howard's right side, which according to the kel recording he was, and assuming based on what the federal trial showed, he didn't leave that position, but yet, you're saying that the bullet did enter left?"

19.

That Dr. Rigle responded, "Well, yeah, that's what my report... I mean I testified I think six or seven times on this and I'm sure I looked at the photographs before I testified. I, don't think, I could have screwed that up too," as he ends in laughter,

*16*

20.

That again I am shocked at the response I am receiving. My mind races back to my conversation with Dr. Mary Jumbelic, current Chief Medical Examiner, Onondaga County, Syracuse, New York.

21.

That on or around March 18, 2000, I met with Dr. Mary Jumbelic who reviewed the files of Officer Howard with me at the Center for Forensic Sciences—her office and later renamed The Wallie Howard Center for Forensic Sciences,

22.

That in conversation with me, Dr. Jumbelic made clear that she did not trust the work of Dr. David A. Rigle and laughingly said, "The guy would testify to anything he was told,"

23.

That Dr. Jumbelic offered to exhume the body of Officer Howard if there was any indication that the autopsy was not handled properly,

*46*

24.

That after his laughter, Dr. Rigle and Dr. Goldberg carry on an additional conversation about the position Officer Howard's body was found,

25.

That the position Officer Howard was found after being shot was crucial to who and how Officer Howard was shot, based on one major factor:  Whatever position Officer Howard was found in when he was shot, would have been the position he was in when the bullet entered his head,

26.

That Officer Howard's position became a heated point during the conversation with Dr. Rigle, who admitted that if Howard's position was in fact the way we described, then the police lied to him about Howard's position.

27.

That Dr. Rigle had been told by the police that Howard was turned in another position and not sitting forward the way all the officers testified to in court.

28.

That due to my lack of medical expertise, Dr. Goldberg better described it to me this way, "When that bullet hit Howard, it was like turning off a light switch.  He would have had very little motion.  He would have clasped like a sack of potatoes.  So whatever position he was in when he died, in essence, that would be the last position he was in when he was shot,'"

29.

That it was clear during this conversation with Dr. Rigle, that he too was agreeing with Dr. Goldberg, but wanted to see the crime scene photo wherein Goldberg had described the position of Howard,

30.

That Dr. Rigle stated that he was never made aware of the fact that Howard died in the position of sitting in the front passenger seat, slopped over, or that it came up in testimony or in an exhibit.

31.

That Dr. Rigle admitted that by the time he arrived at the scene that the police had control of the scene and if Howard was in that position, that was not the position he was given,

32.

That Dr. Goldberg asked if that was the standard practice where he was, because every place that he had been, the Medical Examiner's Office always took charge of the crime scenes once they arrived.

33.

That Dr. Rigle agreed with him, but he said that was not the case here.  In fact, he stated that he was not even given any reports until several weeks after he had completed his autopsy, and that was unusual,



34.

That at the end of the conversation, Dr. Goldberg asked Dr. Rigle would he willing be deposed on this matter.  Dr. Rigle said that he would not have a problem with it.   That he had had his own problems with the officials in Syracuse,

35.

That the officials in Syracuse had set him up one time by calling him to do a scene when he told them that he had been drinking since he was at a cocktail party when they called him, but they said for him to do the scene anyway,

36.

That when he got to the scene, although he was not suppose to be working, that he was accused and arrested had to spend thousands of dollars in a legal battle to defend himself. So he understood the need to pursue justice, and would not be afraid to be deposed.

37.

That I was asked to forward a copy of our records showing the position Officer Howard to Dr. Rigle.

38.

That on or around January 17, 2001, I sent the following documents to Dr. Rigle:

**I.  Position of Officer Wallie Howard – State Testimonies**

1. J. Ruggiero – Direct & Cross
2. R. Thompson – Direct & Cross
3. C. Paolini – Direct
4. L. Baxter – Direct & Cross (removes the gun from Howard's hand)
5. D. Dougherty – Direct (was in the car when Tillary broke the window out to reach Howard)
6. J. Reidy – Direct
7. R. Tillary – Direct
8. J. Tierney – Direct (Rigle is given the position of Howard)
9. L. Baxter –Direct (gun in hand between the seat & door)
10. J. Reidy – Direct
11. J. Ruggiero – Direct

**II. Position of Officer Wallie Howard – Federal Testimony**

12. R. Tillery – Direct
13. J. Ruggiero – Direct
14. D. Dougherty – Direct
15. J. Reidy – Direct
16. Summation – McGinty
17. Summation Rebuttal – Duncan (position of Howard)

19

49



### III. Testimony of David Rigle, M.D.

18. State Grand Jury
19. State vs. Lawrence
20. State vs. Stewart
21. USA vs. Thomas et al.

### IV. Medicals Of Officer Wallie Howard

22. University Hospital Medical Records
23. Autopsy Report

39.

That on or around January 23, 2001, Dr. Rigle faxes a response back to Dr. Goldberg and me

lambasting our actions.

40.

That it is my opinion that Dr. Rigle was afraid that the court records I forwarded to him had revealed

the probability that Officer Howard was killed by friendly firer and not the gun used by the accused

perpetrator,

41.

That upon this realization, Dr. Rigle had an obligation as former Assistant Medical Examiner to

inform the authorizes about this new evidence and try to get to the bottom of it,

42.

That Dr. Rigle's detailed conversation with Dr. Goldberg and I showed that he was acting as a

friend—one colleague to another—when he voluntarily entered the conversation with Dr. Goldberg

and I,

43.

That it was only after he found out the testimonies of the officers that he suddenly became hostile to

Dr. Goldberg and I,



37

44.

That again, as representative of YTF and as Angela Brown, we/I would like to reserve the record on the four years of our investigation which was lead to us beginning to organize around Jaime Davidson—individually and collectively as a part of the Syracuse 5[2]

45.

That after a one-month petition drive, I submit as record along with this affidavit copies of over 1,000 signatures from around, wherein the originals were submitted to the District Court.

46.

That we enjoin the United States Appeals Courts to **Remand This Case Back to the Northern District of New York–Syracuse, New York Division- With Specific Instructions to Hold an Evidentiary Hearing,** to decide the contradictory testimony raised within this affidavit

47.

21

**FURTHER AFFIANT SAITH NAUGHT**

This _9th_ day of _Jul_ , 2001.

Sworn to and subscribed this

_9th_ day of _Jul_ , 2001

The Reverend Angela E. Brown, MDiv.

Notary Public
Commission Expires:

Notary Public, Clayton County, Georgia
My Commission Expires Sept. 22, 2001

Notary Public, Clayton County,
My Commission Expires Sept. 22, 2001

---

[2]  The Syracuse 5 includes those co-defendants who are apart of our on-going work in addition to Jaime Davidson.

51

38

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing affidavit as been made by first class United States postage upon all parties this the 9th day of July, 2001, by US mailing five copies to US Court of Appeals 40 Foley Square, New York, New York 10007—one self-stamped copy for US District Court, Judge Neal P. McCurn, PO Box 7365, 100 South Clinton Street, Syracuse, New York 13261, and one copy as follows:

Jaime A. Davidson
(Pro Se Counsel)
37593-053
PO Box 724-FCI
Edgefield, South Carolina 29824

And

John G. Duncan, Esquire
Executive A.U.S.A.
PO Box 7198
100 Clinton Street
Syracuse, New York 13261-7198

22

Executed on this _9th_ day of _July_, 2001.

Angela E. Brown
917 Oglethorpe Avenue, SW
Atlanta, Georgia 30310
(404) 752-8275

Co-Director for Youth Task Force

52

Ex. E

EX. E

NICHOLAS J. PIRRO
County Executive

OFFICE OF THE MEDICAL EXAMINER
ONONDAGA COUNTY HEALTH DEPARTMENT
CENTER FOR FORENSIC SCIENCES
100 Elizabeth Blackwell Street
Syracuse, New York 13210
Telephone (315) 435-3165
Fax (315) 435-3319

LLOYD F. NOVICK, MD, MPH
Commissioner of Health

MARY I. JUMBELIC, MD
Chief Medical Examiner

TIMOTHY P. ROURKE, PhD, DABT
Director of Laboratories

May 15, 2000

Angela Brown
Legal Assistant
Marie Y. Watson & Associates, P.C.
41 Marietta Street, NW
Suite 410
Atlanta, Georgia 30303

RE: Wallie Howard, Medical Examiner's Case #90-0785        *23*

Dear Ms. Brown

At the request of defense expert, Dr. Robert Goldberg on February 25, 2000, I have reviewed the Medical Examiner's Case File including photographs and x-rays. In addition I have met with you on March 18, 2000 at which time you presented me with a binder of material including much of the information present in the Medical Examiner's Case File as well as crime scene photographs, and certain testimonies from the grand jury, criminal and federal trials I subsequently received an additional package of material from your office consisting of ballistics reports from the Syracuse Police Department Crime Lab. Dr. Goldberg, you, and I have had a telephone conference on April 6, 2000 at which time you requested a written opinion

I confirm the original conclusion as written on the autopsy report as gunshot wound of the head and the manner of death as homicide. The photographs and x-rays corroborate the written description of the wound and the retrieval of the bullet listed in the original autopsy report. Ballistics tests confirm the source of the projectile. If you have any further questions, please do not hesitate to call.

Sincerely,

*Mary I. Jumbelic*

Mary I. Jumbelic, MD
Chief Medical Examiner

*EX. E*        *183*

Ex. F

EX. F

24

21

# Affidavit of Robert Goldberg, J.D., M.D.

Personally appear before me, the undersigned officer duly authorized by law to administer oath, ROBERT GOLDBERG, being duly sworn, and states that he has personal knowledge of the following facts and they are true and correct.

1.  My name is Robert Goldberg.  I am over the age of 18 years old and under no disability that would make me incompetent to testify.

2.  I have personal knowledge of the facts set forth in this affidavit.

3.  I am a member in good standing in the following professional organizations:   American Academy of Forensic Sciences, Fellow Royal Society Medicine, Diplomate American Board of Forensic Medicine, Diplomate American Board of Forensic Examiners, Vidocq Society.

4.  I can be reached at 1600 Suite D Oakpointe Drive, SW, Marietta, Georgia 30008

5.  On May 24, 2000, I submitted to Marie Y. Watson & Associates, P.C. a report of my findings after reviewing the case of Wallie Howard Jr., Syracuse Medical Examiner's Case File #90-0785

6.  Pathologist of record for the case of Wallie Howard, Jr. was David A. Rigle, M.D.

24

7.  Records reviewed at the time said report was submitted included the following:
    (a)   Mr. Howard's medical records
    (b)    Dr. Rigle's autopsy
    (c)   Dr. Rigle's courtroom testimony
    (d)   Ballistics expert Gary Pratt's report and trial testimony
    (e)   Ballistics report from Ernest R. Peele
    (f)   Dr. Mary Jumbelic's autopsy review note
    (g)   Crime scene photographs
    (h)   Newspaper articles
    (i)   The résumé of W. Stewart Bennett
    (j)   Selected entries from Vincent J.M. Di Maio's book, "Gunshot Wounds"
    (k)   Personal conversation with Martin Fackler, M.D., Army expert on terminal wounds
    (l)   Personal conversation with famed ballistics expert Mr. Robert Hathaway who recently tested the rifle that killed Dr. Martin Luther King
    (m)   Dr. Deforest of John Jay College of Criminal Justice, New York

8.  Subsequent to submission of said report and prior to this affidavit, I have spoken with the following:

    (a) Mary Jembelic, M.D., Chief Medical Examiner, Syracuse, New York

*EX. F*

174

(b) David A. Rigle, M.D., examiner of Wallie Howard Case # 90-0785

(c) Dr. Vincent J. M. Di Maio,

9.  As a result of my thorough review of the records available in this case, and my interview with David Rigle, M.D., it is my expert opinion that to a reasonable degree of medical probability Wallie Howard was shot by friendly fire and not Robert Lawrence.

10.  I base this opinion on the follow analysis:

(a)  No glass was found on Mr. Howard's skin, in the wound or on the bullet.

(b)  It was testified to that Mr. Howard's gun was found in his right hand between the right passenger side door and the seat. Again suggesting that his body was in a front to back orientation. Confirming the possibility of friendly fire.

(c)  The entrance wound in this case appears to be atypical in that appears to have entered from the left eccentrically at an acute angle.

(d)  An abrasion collar is noted to be associated with a low velocity intermediate or long distance wound. Abrasion collar is rarely found in full power, short range, .357 magnum wounds; therefore the trajectory noted by Dr. Rigle and confirmed by Dr. Jembelic i.e. left to right, back to front, and slightly downward and its associated findings also suggest friendly fire.

(e)  A .357 magnum round, based on my experience, exists the muzzle of a 4 inch barrel approximately 1100-1500 feet per second. In this case traveled less than two feet before breaking glass penetrating skin, muscle, then skull, separating and penetrating skull once again, before stopping in soft tissue. Given the power of a .357 magnum round this presentation is atypical, as one would expect much more damage at close range from this type of bullet.

(f)  Given Mr. Howard's final position as he was found in death vehicle and the trajectory described by Dr. Rigle and confirmed by Dr. Jembelic I find the probability that Mr. Lawrence fired this bullet from his right rear position to be remote.

(g)  After my review of Mr. W. Stewart Bennett I must conclude that the defense was not present an adequate or appropriate opportunity for a ballistics review of this case as per the affidavit from Mr. Herbert Leon MacDonell, Mr. Bennett committed perjury and fraud on the court thereby depriving the defense of an appropriate ballistics review.

(h)  I have contacted Mr. Robert Hathaway, an expert of note in the Dr. Martin Luther King case, who stands ready to review the ballistics should the court deem it necessary.

(i)  As a result of my thorough investigation, I would implore the court to order an appropriate ballistics review of this case.

23

FURTHER AFFIANT SAITH NAUGHT

This 26 day of June, 2001.

Sworn to and subscribed this

26 day of June, 2001                    _Robert B. Goldberg, J.D., M.D._
                                         Robert Goldberg, J.D., M.D.


_Jean Pate_
Notary Public
Commission Expires:

JEAN PATE
NOTARY PUBLIC, COBB COUNTY, GEORGIA
MY COMMISSION EXPIRES FEBRUARY 12 2005

26

176

# Robert H. Goldberg, J.D., M.D.

American Academy of Forensic Sciences
Fellow Royal Society Medicine
Diplomate American Board of Forensic Medicine
Diplomate American Board of Forensic Examiner
Advisory Board, American College of Forensic Examiners
VIDOCQ Society
1600 Suite D Oakpointe Dr., SW
Marietta, Georgia 30008
(770) 424-5515

October 3, 2000

Ms. Marie Y. Watson
MARIE Y. WATSON & ASSOCIATES
945 South Hairston Road
Stone Mountain, GA 30088

Re:  United States vs. Jaime Davidson

27

Dear Ms. Watson:

Please be informed that with regard to the Jaime Davidson case, Dr. Peter Forest of John Jay College of Criminal Justice and Mr. Hathaway of the Rhode Island State Crime Laboratory, the ballistics specialist who so prominently figured in the Martin Luther King case recently in Memphis, TN are required to review Jaime Davidson's case.   Therefore, any and all necessary documents including but not limited to the following should be requested from the courts immediately: (1) bullet(s), fragment(s) and/or jacket(s) taken from Wallie Howard's skull, (2) bullets(s) shot for comparison from all guns involved, (3) all gun(s) found/fired at the scene, (4) all bullets fired at the scene (i.e. including Wallie Howard's bullets), (5) all crime scene photos, video recordings, notes, charts, diagrams, etc. taken at and subsequent to the crime, (6) access to all vehicles involved, (7) review of medial examiners files (including photos), (8) exhumation of the body of Wallie Howard if any of the above and other pertinent data is missing.

In light of the perjury of Mr. Stewart Bennett in this case, the proper review of the above requested items will cure the defect created by Mr. Stewart Bennett. Without such review, any question into the death of Wallie Howard cannot be answered appropriately.

As you know, Dr. Jumbellic, the Chief Medical Examiner of Syracuse, New York has reviewed the forensics in  the case and confirm that the bullet came from the left in the death of Wallie Howard which already begs the question, "How was Wallie Howard killed?"

If I can be of any further assistance to you or Mr. Davidson please do not hesitate to contact in the future.

Sincerely,

Robert H. Goldberg, J.D., M.D.

EX D

182





**Public Ledger Building**

### CRIME & CUISINE

One of the world's most unusual crime-solving organizations meets on the top floor of the historic Public Ledger Building in Philadelphia, Pennsylvania. In a famed walnut-paneled meeting room, members of The Vidocq Society honor Eugène François Vidocq, the brilliant 18th century French detective who founded the Sûreté, by applying their collective forensic skills and experience to "cold" cases, particularly murders. At Vidocq luncheons, Vidocq Society Members (VSM's) evaluate, investigate, and often solve the unsolved crimes presented to them.



VSMs are forensic professionals, motivated by public service, who eagerly donate centuries of deductive and scientific talent for the common good. A long-unsolved homicide or disappearance is usually the centerpiece of each Vidocq Society meeting. The crime and its evidence are disclosed to members and invited guests, with an eye toward rekindling or refocusing the investigation. When requested, VSMs participate in the investigation and also the prosecution of the person or persons eventually charged with the crime.



The Rotunda

**Welcome to all our valued visitors**
Please bookmark our site before you leave and click here to read the latest crime, justice and safety news from APBnews.com.



Test your sleuthing skills!
Look for the hidden line on this page that will take you to the story of Monsieur Eugène François Vidocq, the father of modern criminal investigation



WHO WHAT WHERE WHEN NEWS
LINKS TO OTHER SITES OF INTEREST

webdesign by webmaster
Bonnie Bucqueroux
policing.com

Ex. G

EX. G



# LABORATORY
## OF
# FORENSIC SCIENCE



HERBERT LEON MacDONELL, DIRECTOR
POST OFFICE BOX 1111
CORNING, NEW YORK 14830

TELEPHONE NO. (607) 962-6581
FAX (607) 936-6936

Please refer to Case No.

Dr. Robert H. Goldberg, Esq.
1600 Oakpointe Drive, Southwest, Suite D
Marietta, Georgia 30008

25 January 2001

Dear Dr. Goldberg:

You have requested me to comment on a former student, Warren Stuart Bennett, in the form of an affidavit. I shall do as requested and, in addition, I shall also attach a copy of a letter I sent to Mr. Christian A. Fasanick dated 2 February 1993. As the 1990 case is irrelevant to this affidavit I have deleted the comments I made regarding the transcript of Mr. Bennett's trial testimony.

*29*

### AFFIDAVIT

Herbert Leon MacDonell, the undersigned affiant, of lawful age, being duly sworn, states that he resides in the township of Corning, New York; that he was graduated from Alfred University in 1950 with the degree of Bachelor of Arts having majored in chemistry; that he was graduated from the University of Rhode Island in 1956 with the degree of Master of Science having a major in Analytical Chemistry; that he held the position of Graduate Assistant at both of these universities in Analytical Chemistry, Spectroscopy, Microscopy and Criminalistics; that he is a graduate of many training programs held in Rhode Island, New York and Pennsylvania; that in 1951 he was employed as Assistant Spectrographer for the New York State College of Ceramics; that he was Professor and Head of the Department of Chemistry at Milton College from 1951 to 1954; that he was a Research Analytical Chemist for the DuPont Company in Philadelphia from 1956 to 1957; that he was a Research Analytical Chemist for Corning Glass Works from 1957 to 1972 during which he measured physical properties and determined the chemical composition of numerous glass types; that he has been an Instructor in Police Science from 1960 to 1967 and Adjunct Professor of Criminalistics since 1972 at Corning Community College; that he also has been Adjunct Professor of Criminalistics at Elmira College from 1972 to 1983; that he has been the Director of the Laboratory of Forensic Science since 1970; that he has been retained hundreds of times as a consultant by law enforcement agencies, prosecutors and defense attorneys in criminal and civil cases in all 50 states, the District of Columbia and fifteen foreign countries since 1950.

*186*

 EX. C   *EX. G*

Affiant further states that as Instructor of Police Science, and later Adjunct Professor of Criminalistics, he taught Criminalistics to hundreds of law enforcement officers since 1960 at both Corning Community College and Elmira College.  Criminalistics deals with the application of science to the investigation of crime which is primarily concerned with the examination of physical evidence. Affiant further states that as Adjunct Professor of Criminalistics at Elmira College he taught several forensic subjects in addition to Basic Criminalistics.  These included: Personal Identification (90% fingerprints), Firearms Identification, Forensic Photography, Death Investigation, Forensic Microscopy, Investigation of Contemporary Homicide and Breathalyzer Operator Certification.

Affiant further states that he has presented over 600 lectures on the subject of scientific crime investigation before hundreds of technical societies, universities and police training academies in the United States and many foreign countries.  He has spoken before forensic meetings in Australia, Canada, England, Germany, Holland, Hungary, Iceland, Italy, New Zealand, Puerto Rico, Scotland, Switzerland, and Taiwan. He has conducted independent forensic research sponsored by the National Institute of Law Enforcement and Criminal Justice, United States Department of Justice, and has conducted and participated in many institutes for law enforcement officers under the sponsorship of the Law Enforcement Assistance Administration.

Professor MacDonell developed the Bloodstain Evidence Institute in March 1973.  To date he has instructed this one week program fifty-seven times in twelve states, the District of Columbia, Australia, Holland, England and Sweden.  Over thirteen hundred students from forty-six states and nineteen foreign countries have attended the Institute.  In addition, he has directed over sixty seminars of one to four days duration on bloodstain evidence and has given over six hundred lectures on the significance of bloodstain patterns in many countries.



Affiant was elected a Fellow in the American Academy of Forensic Science in 1964 after being a Past Secretary and Past Chairman of the Criminalistics Section of that society; Fellow and Past President of the Police-Law Society; the founder, Distinguished Member, and Historian of the International Association of Bloodstain Pattern Analysts; Life Member, Distinguished Member, and Past Chairman of the Science and Practice Committee of the International Association for Identification; Former Fellow of the Fingerprint Society (England); member of the Canadian Identification Society; one of the Founding Members of the Association of Firearm and Toolmark Examiners; member and former President of the New York State Division of the International Association for Identification; Life Member of the Canadian Society of Forensic Sciences; member of the Forensic Science Society (England), and member of the Northeastern Association of Forensic Scientists, the Midwest Association of Forensic Scientists, Life Member of the American Chemical Society, and member of Sigma Xi.

2



Affiant has been the author of over one hundred original papers on both analytical chemistry and forensic science. His articles have been published in England, Canada, Taiwan, and the United States. He is the author of *BLOODSTAIN PATTERN INTERPRETATION* (1983), a revision of his 1971 LEAA report *FLIGHT CHARACTERISTICS AND STAIN PATTERNS OF HUMAN BLOOD*, a study which was sponsored by the United States Department of Justice; *BLOODSTAIN PATTERNS* (1993); and its revision, *BLOODSTAIN PATTERNS – REVISED EDITION* (1997). Affiant is the subject and a co-author of the book, *THE EVIDENCE NEVER LIES* (1984). Affiant holds patents on chemical separation processes and methods of personal identification.

Affiant is the inventor of the MAGNA Brush, a propriety device for processing latent fingerprints. This device has been adopted by identification bureaus on a worldwide basis. In recognition of his contributions to the field of forensic science affiant has received the Dondaro award from the International Association for Identification in 1974, the first American Institute of Applied Science Award in 1979 and various other awards both foreign and domestic. Affiant was designated the first Distinguished Member of the International Association of Bloodstain Pattern Analysts in 1985.

Affiant has been accepted as an expert witness in many forensic disciplines and has testified in thirty-five states at all levels of jurisdiction including federal and military courts. Affiant has also presented expert testimony in various Canadian courts, and was asked to testify before the highest Appellate Court in Quebec. He has also given expert testimony in Australia, Bermuda, Germany, and Grand Cayman.

In July 1970 affiant was appointed by the then President of the International Association for Identification to serve on a select committee whose objective was "to review at length the principles upon which friction ridge identification is predicated and, based upon the result of its findings, submit a technical resolution setting forth such minimal requirements." Following their three year study, the committee's final report was presented to and adopted by the International Association for Identification during their 1973 annual conference. That report was subsequently accepted by every major identification bureau in the world, including the Federal Bureau of Investigation.

Affiant has been certified as a Senior Crime Scene Analyst by the International Association for Identification.

With regard to Warren Stuart Bennett, affiant states:

1) In 1978 and 1979 Mr. Warren Stuart Bennett took a total of six courses from me when he was a student at *Elmira College*. He did well in the four advanced courses but was only a B and B- student in the two basic semesters of Criminalistics.

3



2) In 1980 Mr. Bennett assisted me during the laboratory periods of the 1980 fall semester of Criminalistics I.  Since I have discussed the limit of his involvement with that class in my letter to Mr. Christian A. Fasanik dated 2 February 1993, page 2, C), 5), I shall write nothing further in that regard here.

3) I was in a courtroom in Pennsylvania and heard Mr. Bennett testify that he took a course in Forensic Microscopy from me at Elmira College.  He never did.  Again, review page 2, 4), b) of my letter to Mr. Fasanik dated 2 February 1993.

4) Over the past several years, but not too recently, I have had occasion to review the work, reports and transcripts of Mr. Bennett.  Unfortunately, all of these reflect the same basic problem; Mr. Bennett is not a scientist and certainly not a forensic scientist.  I would seriously question the accuracy of any examination that he has made of physical evidence or of a crime scene, or of any reports he has issued thereon.  I was present in a courtroom when Mr. Bennett testified that all of the bloodstains on a wall were the result of high velocity impact spatter (gunshot).  Such was not the case.  All were the result of expirated blood, blood blown out of the victim's nose and/or mouth as she continued to breath while her face was lying in a pool of blood.  Small air bubbles were clearly evident in the bloodstains and when the forensic pathologist had this pointed out to him he changed his mind from spattered blood to expirated blood.  Mr. Bennett missed an obvious and highly significant part of the physical evidence even though he had the wall removed and transported to his garage for his forensic examination.  He eventually testified he really had not looked too carefully at the bloodstains.  Had this not been corrected the defendant would surely have been convicted of his wife's suicide.

5) Possibly, the limited knowledge Mr. Bennett has of forensic science can be best demonstrated by his own testimony.  I gave a paper during the Canadian Society of Forensic Science Annual Meeting in Edmonton, Alberta in 1999.  My subject was on how bad some forensic testimony and reports of alleged experts actually were.  Mr. Bennett was included as case three.  A copy of that portion of my paper is attached.  I have copies of the transcript in the case I have included.

4

I regret having to prepare an affidavit which is so critical of a former student.  Nevertheless I feel that when a person's life or liberty is at stake the loyalty to anyone is superseded by the necessity to present the truth.  I read in a Chinese fortune cookie a few years ago that, "Time is precious, but truth is more precious than time."  This, undoubtedly, has special meaning for those who are serving time or those who are facing incarceration.

Respectfully submitted,

Herbert Leon MacDonell, Director
**LABORATORY OF FORENSIC SCIENCE**1

State of : New York
County: Steuben

Signed this 25th day of January, 2001

MARTHA L. FORCE
Notary Public, State of New York
Qualified In  Steuben  County
My Commission Expires May 16, 20_02_.
Registration # 4920775

33

190




# LABORATORY
## OF
# FORENSIC SCIENCE

HERBERT LEON MacDONELL, DIRECTOR
PAUL ERWIN KISH, RESEARCH ASSOCIATE
POST OFFICE BOX 1111
CORNING, NEW YORK 14830

TELEPHONE NO. (607) 962-6581
FAX (607) 936-6936

Please refer to Case No.

Mr. Christian A. Fisanick, Esq.
Chief Deputy, Appellate Division
Office of the District Attorney
Cambria County Courthouse
Ebensburg, Pennsylvania 15931

92-85

2 February 1993

--------------------------------------------------------------
Re: Commonwealth v. Donald Kelly (92-85)
--------------------------------------------------------------

I have received and reviewed the curriculum vita, trial transcript and the 30 May 1990 "Reconstruction and Analysis Report" of Warren Stuart Bennett. My comments on these documents are as follows:

A) <u>Curriculum vitae: Current Occupation</u>:

   1) He lists his current occupation as being that of a "Forensic Reconstruction Consultant." This interesting title is not a recognized discipline by any forensic organization of which I am aware. In fact, there are well over ten thousand different areas of forensic disciplines listed in the *FORENSIC SERVICES DIRECTORY*, but "Forensic Reconstruction Consultant" is not one of them. I shall enclose a copy of the page wherein this topic would appear if it were recognized as a specific discipline.

   2) On the bottom of his first page he lists "Forensic Pathology and Laboratory Services." Since this is <u>his</u> curriculum vitae it would be interesting to know what qualifications he has to act in the capacity of a forensic pathologist? If he consults with a pathologist on the subject of pathology then he should not include medical advertising on <u>his</u> curriculum vitae.

B) <u>Curriculum vitae: Academic - Experience and Educational Background, Educational</u>:

   3) On page two, the first line under "Academic-Experience and Educational Background", Mr. Bennett indicated that he has "Majored in Forensic Science." It was impossible for him to "major" in forensic science at Elmira College <u>because they have never had such a major</u>! It should also be noted that he never graduated from Elmira College.

4) There are several mistakes in the listing of courses that Mr. Bennett claims to have taken at Elmira College. Minor errors will be ignored, however, the following are significant:

   a) Under Forensic Photography he identifies two topics that were not part of that course. These headings, "Macro and Micro" photography reflect his lack of knowledge of the main subject. "Macro" photography is simply normal or, in forensic applications, crime scene photography. The term "Macro" is improper and was never used as a term to describe normal photography. Nevertheless, Mr. Bennett is <u>totally incorrect in suggesting "Micro"</u> photography.

   b) Although he had two opportunities to register for the course "Forensic Microscopy" or take an "Independent Study" on a topic of his choosing, he did not do so. The listing of "Forensic Microscopy" as a subject he took in June of 1982 is inaccurate. <u>This subject was not offered in June of 1982 and he never took it at Elmira College when it was offered.</u> I have a copy of his college transcript and the course "Forensic Microscopy" is not listed.

   c) There has never been a course offered at Elmira College titled, "Advanced Criminalistics, Personal Identification, Hairs, Fibers, Finger Prints." The course given in personal identification did not include a study of hairs and fibers. It did include fingerprints as the major topic of study. Mr. Bennett obviously did not learn this subject very well as "fingerprint" is one word, not two.

   d) He has listed several other "courses" under the heading of Elmira College that are no way associated with Elmira College. One, taken in Maryland regarding "Psychological Stress Testing," refers to a technique that has long since been discredited as a hoax by the American Academy of Forensic Science. I have a copy of that article.

C) <u>Curriculum vitae: Academic - Experience and Educational Background, Teaching:</u>

5) Mr. Bennett's first listing states that he was a "Professor's Assistance [sic]" under "Proffess [sic] H.L. MacDonell at Elmira College from 1980-1981. This is incorrect for two reasons. First, the only duty that Mr. Bennett performed was to occasionally assist me in the laboratory. He did no actual lecturing at all. Second, he was only acting in the capacity of a laboratory assistant on a part time basis for a single semester of fifteen weeks, not one or two years as his dates seem to suggest.

2

192

6) How many of Mr. Bennett's "Teaching" qualifications were more than a lecture given during a seminar or conference?  How many courses has he offered at recognized colleges or universities for academic credit?

D) The following heading was used in earlier CVs but in the current version it has been deleted.

(Curriculum vitae: Academic – Experience and Educational Background, Achievements:)

7) Mr. Bennett's listing of "Achievements" reflects his ignorance of the meaning of this term.  Letters from persons for whom he has provided a service are not "achievements."  These are awards.  Listing his membership in the International Association of Bloodstain Pattern Analysts as an "achievement" is incorrect.  This listing properly belongs under memberships in professional associations.  Incidentally, although he is a member of this association, he has never attended a meeting.  Three of these meetings were held in Corning, New York, well within easy driving distance of his home.

8) Although Mr. Bennett did not specifically mention letters from former professors under his "Achievements" category, I feel that I must comment on a letter of recommendation that he requested me to write for him in 1985.  Regarding that letter, which he has duplicated and displayed several times, it should be noted that:

*36*

a) This letter was written from the information provided by Mr. Bennett at the time.  He wanted the letter quickly and, unfortunately, I did not go back and check my class records or I would have discovered that he never studied forensic microscopy as he claims.  Elmira college records do not show him enrolled in this course nor are they on his transcript.  The listing of this course in my letter of 19 December 1985 is an error which was based upon what I believed to be accurate information provided to me by Mr. Bennett.  I should have checked it at that time but, in the interest of time, I did not.

b) In fairness to Mr. Bennett he could not have taken the course in Breathalyzer Operation as I did not offer this course while he was a student at Elmira College.  Had he wanted to study this subject it was available as a course in Independent Study, however.

c) It is interesting to note that Mr. Bennett did not remind me that he was a "Professor's Assistance [sic]" when he asked me to prepare my letter of recommendation.  Both he and I knew how insignificant this position really was.

3

*193*

d) Mr. Bennett did prepare photographic exhibits for me on more than one occasion.  He did so twice.

e) I feel it is important to realize the limitations that were placed in my letter of 19 December 1985.  I made it very clear that I was recommending him for, "whatever investigative task he may be required to undertake."  At that time he was, as far as I recall, still employed as a Deputy Sheriff in Tioga County, New York.  Knowing his limited understanding of science, I never anticipated that he would attempt to represent himself as anything other than a law enforcement investigator.  He should have known when to recommend a qualified forensic expert if one were needed.  My students were always taught that my courses did not make them experts, however, they were expected to learn what an expert could do for them.

f) The last line of paragraph four in my letter of recommendation dated 19 December 1985 reads, in part, as follows: "..and prepare it in an understandable report.."  At that time I did not include any reference to the possibility of Mr. Bennett presenting expert testimony.  I was very surprised when I learned that he had been allowed to give expert testimony.  Such testimony should only be accepted from well qualified forensic experts, something that Mr. Bennett is definitely not.

In addition to the above comments, which are directly related to what Mr. Bennett has listed on his Curriculum Vitae, it should be noted that he does not list membership in:

A) The American Academy of Forensic Sciences
B) The International Association for Identification
C) The Canadian Society of Forensic Science

It is unfortunate that Mr. Bennett considers himself qualified as a forensic scientist.  In reality, he does not qualify for even provisional membership status in any of the above organizations.

It has been my misfortune to have read several of Mr. Bennett's trial transcripts wherein he had made many serious errors.  I do not think it is necessary to elaborate on his complete lack of scientific knowledge after pointing out that in a trial transcript he stated, "For example, water itself does not have a viscosity to it."  Ask any physical scientist about the accuracy of that statement.  I could go on, but I think I have made my point.

*37*

Respectfully submitted,

Herbert Leon MacDonell, Director
**LABORATORY OF FORENSIC SCIENCE**

New York : State
Steuben : County
Signed this 25th day of January, 2001

MARTHA L. FORCE
Notary Public, State of New York
Qualified In Steuben County
My Commission Expires May 16, 2002
Registration # 4920775

*194*

# PAPERS & POSTERS

**CASE THREE:** Both the rules of evidence and common law are very specific regarding the admissibility of expert testimony. Both the subject of proposed testimony and the qualifications of the witness who is called to give such evidence should always be scrutinized and must pass whatever tests may be imposed. While perhaps a moot point regarding bloodstain evidence as such, credentials of a potential witness are another matter of significant legal concern. Who is qualified to give evidence of this type? The court must be satisfied that the witness is qualified and so rules after the witness has answered questions regarding his or her education and experience. Unfortunately, few judges refuse to accept a witness as an expert as the judges themselves do not have a good knowledge of many technical subjects. For example, consider the following questions asked and answers given during a 1990 Pennsylvania case[4] bearing in mind that the court accepted this witness as an "expert" and allowed him to give evidence far beyond his limited knowledge. Portions of his incredible testimony taken from an official transcript are as follows:

Q. Now Mr. Bennett, what exactly is bloodstain evidence and analysis?
A. The use of bloodstain identification and analysis is a study of the liquid ballistics of blood. Blood, other than other type of liquids, are consistent and only have its own characteristics. For example, water itself does not have a viscosity to it. When you take water and it drops from a faucet, you would think of it as a teardrop as it falls or like a raindrop, so it drops in an elongated formation. Blood, on the other hand, is just the opposite. Blood drops in spheres, circles, round balls. That is the viscosity of the blood itself, it wants to stick together in a ball........

It is obvious that this witness has no basic knowledge of physics. Throughout his testimony, as well as in his written report, this witness described cast-off patterns on a wall beside the victim. However, this was a single gunshot death and no cast-off patterns were present anywhere at the scene. This "expert's" testimony continued with the following excerpt from one of his lengthy answers:

Q. And did you conduct a further analysis of the bloodstain evidence in this particular case?
A. ...These stains were tested with leucomalachite chemistry, which is a positive test for blood.

The leucomalachite test is only a screening test for components in blood and, like the benzidine and phenolphthalin tests, it is not specific for blood. This witness' knowledge of chemistry seems about the same level as understanding of physics. In fairness to the education system, it should be stated that the individual who gave this testimony does not have any degree above his AAS. He is not a scientist. Nevertheless, this "expert" has been accepted by several courts on other occasions.

---

[4] Commonwealth v. Donald Kelly, Testimony given by Warren Stuart Bennett in Ebensburg, Pennsylvania on 7 June 1990.

Ex. H

EX. H

# ONONDAGA
# COUNTY
# BAR
# ASSOCIATION

## ASSIGNED COUNSEL PROGRAM

1006 STATE TOWER BLDG. • SYRACUSE, NEW YORK 13202 • (315) 476-2921

January 22, 1991

Mr. W. Stewart Bennett
P.O. Box 267
Montrose, PA 18801

Re: People v. Stewart, Robert Lawrence and Juan Moral.

Dear Mr. Bennett:

Kate Rosenthal has forwarded to me Judge Burke's authorization of a retainer for your services. A check in the amount of $2000.00 for said retainer is enclosed. It is my understanding that you will bill against this retainer in the amount of $75.00 per hour and will submit a detailed bill for said services detailing the time spent and types of services provided. According to New York State law expert services provided in Assigned Counsel cases must be approved in advance by the appropriate trial court judge and the final amount to be paid must likewise be approved by the judge. Your final bill should be submitted through the attorneys representing the defendants to this office and we will forward said bill to Judge Burke for his final approval. If your bill is less than $2000.00 we would expect that upon his final approval of an amount that any amounts over and above the amount approved would be promptly remitted to this office. Naturally, if the amount approved by Judge Burke is in excess of $2000.00 upon receiving his approval of any additional amounts we will forward that amount to you as may be appropriate.

Please contact me at your convenience if you have any questions.

Very truly yours,

John W. Parker
Executive Director

JWP/fm
Enc.
cc: Kate Rosenthal, Esq.
    James Restl, Esq.
    James McGinty, Esq.

*39*

*EX. H*

*196*

ONONDAGA COUNTY COURT
STATE OF NEW YORK ___ COUNTY OF ONONDAGA

THE PEOPLE OF THE STATE OF NEW YORK,

-vs-

GARY ANTHONY STEWART, ET AL.

:
:
:
:
:
:
:

**Sworn Statement Regarding
Expert Services Performed**

Index No.: 90-3036

---

STATE OF PENNSYLVANIA     )
COUNTY OF                 )

W. Stewart Bennett, being duly sworn, deposes and states:

That pursuant to Authorization of the County Court of the State of New York, made on the 16th day of January, 1991, in the above-entitled case, claim of $ _2904 — ₩_ is hereby made by deponent for the following (1) services performed on behalf of the above Defendant:

Gary A. Stewart

That said amount requested above in my opinion, represents the fair and reasonable value of said services:

*₩2000 already received, leaving ₩904 — owing*

That (2) the time expended for the above listed services was as follows:

*See attached*

That (3) the expenses incurred for the above listed services were as follows:

*See attached*

That (4) no reimbursement or compensation has been received for such services from any source and that no payment or promise of payment has been requested or accepted for said services except as follows:

That the services above specified were performed by me or under my direction.

W. STEWART BENNETT

Sworn to before me this
11 day of June, 1991

S/ Kate Rosenthal
Notary Public

197

## AFFIDAVIT

Kate Rosenthal, being duly sworn, deposes and states:

1.      I am an attorney duly admitted to practice before the Courts of the State of New York and the United States District Court for the Northern District of New York.  My law offices are located at 108 West Jefferson Street, Suite 500 - Loew Building, Syracuse, New York 13202.

2.      I have been asked to make this Affidavit by the office of Marie T. Watson & Associates, P.C. in Atlanta, Georgia.

3.      I make this Affidavit in connection with my representation of Gary Stewart in the matters of <u>People of New York v. Gary Stewart</u> and <u>United States of America v. Gary Stewart, et al</u>; both cases stem from events which occurred in October 1990 and the surrounding months.  Specifically Mr. Stewart and others were charged in State Court with, among other things, the felony murder of Officer Wally Howard and in Federal Court with conspiracy to distribute drugs.

4.      In connection with the State prosecution, the defense lawyers, myself included, hired a forensic expert, Stewart Bennett of Montrose, Pennsylvania.  I was the one to suggest Mr. Bennett as he had been retained by other defense lawyers and used successfully in their cases.  The Assigned Counsel Program of Onondaga County actually retained Mr. Bennett as I was an assigned counsel.

5.      Mr. Bennett reviewed all of the police reports and as I recall the forensics which were in the possession of the Syracuse Police Department.  Our authorization to obtain expert services was for the following reasons:  "Defendants require a forensic expert to examine and test the weapons and projectiles recovered to determine salient

factors such as identification of weapon and projectile, comparison of same, trajectory of projectiles and sequence of the events (shots) which led to the victim's death." In essence we wanted Mr. Bennett to reconstruct the scene.

6.    Ultimately Mr. Bennett rendered his opinion which was that his scene reconstruction corroborated that of the police version of events. I do not recall whether or not that opinion was ever given to us in writing. As almost a decade has passed and I have turned over my file to Angela Brown of the Youth Task Force in Atlanta, George, I do not have any documents to suggest that he submitted a written opinion. Nevertheless I certainly relied upon his opinion and did not challenge the forensics as a result of his findings.

7.    Finally, it must be noted that this case occurred almost ten years ago and during that interim no one has brought the issue of the qualifications of the forensic expert to my attention until very recently. I have reviewed very few documents in submitting this Affidavit and it is based primarily upon my independent recollection.

Dated:   February 24, 2000

_____
KATE ROSENTHAL

Sworn to before me this
24th day of February, 2000

_____
Notary Public

JOSEPH P. GORGONI
Notary Public, State of New York
No. 4977348
Qualified in Onondaga County
Commission Expires February 4, 19___
2001

KATE ROSENTHAL · ATTORNEY AT LAW
SUITE 500  106 WEST JEFFERSON STREET SYRACUSE NEW YORK 13202
(315) 471-0124

Ex. I

EX. I



# YOUTH TASK FORCE

### PO BOX 11078 · ATLANTA, GEORGIA 30310
### (404) 752-8275
### youthtaskforce@msn.com

**For Immediate Release**

Contact: Angela Brown (404) 314-4949
Jaime Davidson (803) 637-1500
Inmate Number: 37593-053

### Dr. Rigle Admits Problems in Wallie Howard Investigation:
### Judge McCurn Still Denies *Syracuse 5* Access to Courts

Atlanta, GA—After months of trying to litigate his case from beyond prison cells, Jaime Davidson, the alleged ringleader of the Syracuse 5, received an order from Judge McCurn today barring him from ever submitting anything else in the Northern District Court in Syracuse, New York. In fact, the Judge went so far as to refuse to allow tax paid clerks to even given him any information over the phone, which is readily available to anyone else—in prison or not.

Nevertheless, this most recent decision by Judge McCurn has left the Youth Task Force in a quandary. The Youth Task Force had submitted a letter to Judge McCurn requesting an in camera hearing to release information revealed by Dr. Rigle. However, with the recent Order given by the Judge, the door to justice seems to have closed. "We have fought fair and hard regarding the case of Jaime Davidson, says Angela Brown of the Youth Task Force, "But it is clear that Judge McCurn, like so many other local Syracusians, have to live in Syracuse and refuse to do anything to question the depth of the corruption that lead to the assassination of Officer Howard."

With top medical experts submitting to Judge McCurn sworn testimony that the gun fired by Robert Lawrence was not the bullet that killed Officer Howard; to the known false expert (now under a federal investigation) hired by the defense attorneys and paid by tax dollars; to the thousands of signatures collected around the world calling for a new trial; to Dr. Rigle's admission to being lied to by the police—and yet none of this new evidence did anything to sway Judge McCurn in his decision to grant Jaime Davidson his constitutional right to be heard.

Jaime Davison and Youth Task Force will continue to appeal this case unto the highest court in this land. In addition, Judge McCurn has not heard the last of the Syracuse 5 or the Youth Task Force. "We may have lost this round, but the battle is far from over," says Jaime Davidson. "I have a lot more fight left and this most recent decision just lets me know that freedom will be mine and the truth is what will set me free."

If you would like to assist with the case of the Syracuse 5 or contact Jaime Davidson directly for an interview, you may call him at (803) 637-1500, Inmate Number 37593-053 or write to him at Jaime Davidson, 37593-053, PO Box 724-FCI, Edgefield, SC 29824.

### ###

*EX. I*

TO: PUBLISHER/ EDITOR/ NEWS DESK/ – PRISON / LEGAL ISSUES - 2 page release
FR: Youth Task Force
DA: October 29, 2001
RE: For Immediate Release – Contact Youth Task Force – 404-752-8275 or Angela Brown – 404-314-4949

# Youth ~Task ~Force
## PO Box 11078 Atlanta, Georgia 30310
### (404) 752-8275 – office (404) 753-3646 – Fax
#### youthtaskforce@msn.com

## Judge Rosenthal Threatens to Kill Client if He Tells of Secret Meeting:
### Legal Issues Still Pending Surrounding the Death of Wallie Howard

October 30, 2001 marks the eleventh year that Officer Wallie Howard was killed during what some have called a routine "drug by-bust." For the Youth Task Force and those accused of killing the officer, justice still hangs in the balance as motions are pending before the US District Court and the US Appeals Court – Fourth and Second Circuit—as newly discovered evidence shows that Judge Kate Rosenthal may have to answer claims by her former client.

Judge Kate Rosenthal, fulfilling the request of her former client Gary Stewart, was asked to release all case files to the Youth Task Force. Readily, Judge Rosenthal gave the files to Angela Brown of the Youth Task Force in October of 1999. Over the course of six months, staff and volunteers from the organization spent countless hours combing through thousands of documents, only to discover a proffered statement taken by Assistant US Attorney John G. Duncan on March 26, 1991. When questioned about the statement, according to Stewart, Judge Rosenthal initially lied to him. The Judge informed Steward he would be meeting with a "jury consultant" who would help them with the case. Later, Stewart was informed that it was John Duncan, a federal prosecutor. In addition, Stewart also claims that Rosenthal threatened to kill him if he ever exposed that the meeting took place.

While none of this may mean much to the citizens of Syracuse, in the legal world, such behavior is not only unethical, but could have grave bearings on whether or not a new trial will be granted for Stewart and/or his co-defendants. Beyond the alleged trickery used by Judge Rosenthal, Stewart has submitted a handwritten, sworn affidavit regarding such claims. The affidavit which has been submitted to the courts, states, among other things, that in fact Judge Rosenthal threatened Stewart into not telling anyone about the meeting that she arranged between him and Duncan, "...Ms. Rosenthal did told me that we have a jury consultant who wanted to talk to me. That jury consultant turned out to be U.S. Attorney John Duncan. I was upset when I found out that he wasn't who he said he was. Ms. Rosenthal said that I better not tell anyone about the meeting or I wouldn't have to worry about the death penalty she would kill me herself...."

Shortly after discovering the proffered statement in the files, the Youth Task Force (YTF) was so concerned that a meeting was arranged between Stewart and YTF with a representative from Inmate Family Network (local Syracuse based organization working with YTF) at the Green Haven Correctional Facility to discuss why Stewart had never informed anyone about the secrete meeting. However, before meeting with Stewart, Brown felt it necessary to meet with Rosenthal first. A meeting was arranged in Kate's office to ask her about the proffer.

According to Brown, Judge Rosenthal claimed she did not remember such a statement and would need to see it in order to comment. "I left there knowing that something was not right. Maybe Judge Rosenthal was so caught-up into her campaign that she really did not remember arranging a meeting with Mr.

44

1

219

TO: PUBLISHER/ EDITOR/ NEWS DESK/ PRISON/ LEGAL ISSUES – 2 page release
FR: Youth Task Force
DA: October 29, 2001
RE: For Immediate Release – Contact Youth Task Force – 404-752-8275 or Angela Brown – 404-314-4949

Duncan. I do know that like Stewart, Kate also threatened me by reminding me that she had been 'good to me' and she was not going to let anything stand in her way of her being elected judge. She told me of a story of how Court TV and even the district attorney's office had recently crossed her and that 'I would not want to cross her.' I left knowing that the judgeship meant a lot to Kate and that if I was to get any answers, it would not come from her," recalls Brown.

Besides the alleged trickery used to get Stewart to meet with Duncan and the alleged threat to kill her client, other compelling legal issues must be addressed. If Judge Rosenthal had nothing to hide, why did she not inform the entire defense team about the statement being taken? Did she have an ethical or moral obligation to tell everyone? In addition, if she did inform the defense attorneys, why did the Youth Task Force have to inform the defendants that the statement existed? Did their trial attorneys happen not to inform them? If all trial attorneys knew and did not inform their clients, are they also ineffective in providing counsel? Would Robert Lawrence have taken the stand to testify knowing that a proffered statement had been given without knowing the content? All of these are compelling legal questions, but the damage does not stop with Judge Rosenthal.

Even more damaging is the fact that US Assistant District Attorney John Duncan also chose not to release the statement during discovery (the time when the government must turnover all material evidence). During pretrial arguments, Judge Neal P. McCurn stressed that since the federal prosecutors were trying all six defendants together, the defense must be putting on a "unified defense." By withholding material evidence, did Duncan and Judge Rosenthal allow for a credible defense or 'unified defense' to take place, respectively?

When Brown questioned the other defendants, they were shocked and surprised that such a meeting had taken place. According to them, they were never told about the proffered statement by their attorneys. What Judge Rosenthal did may simply be a question of unfair play, but the fact that Duncan also chose not to release the document during the discovery period may in fact be a *Brady* violation and could warrant an evidentiary hearing. To determine a Brady claim, a court would have to decide if the government suppressed material evidence favorable to an accused, and if so, would the material that was suppressed put the case in a different light as to undermine the verdict.

According the Brown, "When you add up the cumulative effect of all the material withheld by the government, the fraud that the committed upon the courts, the newly discovered forensic science, and the unwillingness for Judge McCurn to rule on issues without possibly being forced to by the US Appeals Court, it is beyond just a *Brady* violation. It is clearly a miscarriage of justice."

**You may request copies of following documents:**

1. Letter signed by District Attorney Robert Wildridge to Judge Kate Rosenthal (promising not to seek discover of any information revealed during proffer meeting for state proceedings)
2. Letter signed by Assistant US Attorney John Duncan, Judge Kate Rosenthal, and Anthony Gary Stewart (laying out the "ground rules" for the proffer)
3. Affidavits by Gary Steward (detailing his illiteracy, trickery and death threats by Judge Rosenthal)

### _Angela Brown_

By _Jacquelyn W. Marshall_
Notary Public, Dekalb County, Georgia
My Commission Expires Aug. 15, 2003
1-28-02

2

226

## Attn: Editor/Newsroom /News Desk/Announcer

For Immediate Release

Contact: Youth Task Force 404-752-8275
Angela Brown 404-314-4949

## National Black Youth Organization Sets Precedent in Seeking "Friend of Court" Status with US Appeals Court

Atlanta, Georgia—Eleven years ago, the most heinous acts of criminalization, discrimination, and corruption occurred in Syracuse, New York when Police Officer Wallie Howard was murdered during what should have been a routine drug buy-bust. Instead, Officer Howard's death remains a mystery because the surveillance team, consisting of 12 undercover officers, alleges they saw nothing that day. This, among others issues, is why the Youth Task Force (YTF)—an Atlanta-based youth and human rights organization working to reopen the case—will ask the US Court of Appeals to reconsider its motion to submit an Amicus Curiae (friend of the court) Brief, which details the organization's findings for the past four years regarding the death of Officer Howard. "As far as we can tell, we will be one of, if not the first, African American youth/human rights organizations seeking to testify before the US Court of Appeals, Second Circuit," says Angela Brown, the organization's co-founder and executive director.

The organization became familiar with Jaime Davidson's case in 1996 when Davidson, a Panamanian, Reggae, hip-hop artist who had just signed with Sony Records before his illegal incarceration, contacted the organization for assistance. Davidson, along with his co-defendants Robert Lawrence, Gary Stewart, Lenworth Parke and others, became some of the first causalities of the "War on Drugs" in 1990 when federal prosecutors brought an indictment nearly two years after the State of New York tried and convicted the above named codefendants (Davidson was not sought or charged in state proceeding). While Davidson has maintained his innocence throughout this fiasco, for YTF, the question of innocence is not the only factor that needs to be placed before the US Court of Appeals. For the organization, the case of the *Syracuse 5* (the grassroots name the case has taken on) is about larger issues of illegal and over zealousness prosecution of an insidious drug war that has left African American and Latino young people (Generation X) without a future. If given the chance, the organization will prove its claims.

Founded nearly ten years ago when the "War on Drugs" was first underway, YTF is one of the oldest African American youth founded and lead organizations in the country. With its record of accomplishment of working for justice, YTF believes that it has reached the capacity and authority to speak as a forensic expert regarding issues affecting the lives of young people. When the organization first received the call from Jaime Davidson, the story sounded all too familiar—an aspiring young artist hip-hop artist, arrested for drug dealing, serving a life sentence, claiming innocence for the crime of which he was convicted. Familiar nor not, a pattern was emerging that could not be ignored. Were American's youth of color being illegally targeted and carded off never to be heard of again? Was the war on drugs really a war on youth of color and hip-hop? How could the government have a 90% (+) conviction rate using legal methods to prosecute? These questions plagued the organization. Too many questions and not enough answers for YTF, that is when Jaime Davidson and the *Syracuse 5* became the "case" that would help YTF better understand how the government handled the drug war, won its convictions, and continued to maintain control of Generation X even from behind prison walls.

YTF has petitioned the US Court of Appeals to allow it to represent its findings. But if there was only one question the organization could raise before the court, it would be this one: *Does the United States Court of Appeals for the Second Circuit have the power to adjudicate claims of an American citizen against its own judicial system—that of US District Court Northern District of New York–Syracuse—when the judge, prosecutors, defense attorneys, and others, acting on behalf of that system, refuse defendants access to the courts, deny adequate legal counsel, lie and corrupt in order to cover-up the fraud that was committed on the court; withhold critical evidence from the jury, while leaving the entire African American community fearful of the "long-arm" of the federal government?*

Youth –Task –Force • PO Box 11078 Atlanta, Georgia 30310 • (404) 752-8275 – office (404) 753-3646 – fax
youthtaskforce@msn.com