IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

JAIME A. DAVIDSON,

    Petitioner, Pro-Se:

  -vs-

UNITED STATES OF AMERICA,

    Respondent:

Crim. No. 92-CR-35
Civil No. 5:00-CV-869(NRM)
Appeal No. 01-2370

U.S. DISTRICT COURT-N.D. OF N.Y.
FILED
SEP 26 2003
AT_____ O'CLOCK___
Lawrence K. Baerman, Clerk - Syracuse

SUPPLEMENTAL MOTION FOR RECONSIDERATION, TO REOPEN PETITIONER'S § 2255
MOTION DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL, IN LIGHT OF WIGGINS V.
SMITH, 156 L.Ed.2d 471 (2003), TO PREVENT ANY FURTHER  FUNDAMENTAL
MISCARRIAGE OF JUSTICE VIA, A SERIOUS FRAUD COMMITTED UPON THE COURT,
PREJUDICING ONE WHO'S ACTUALLY (FACTUALLY) INNOCENT

TO THE HONORABLE JUDGE OF SAID COURT;

MAY IT PLEASE THE COURT:

    COMES NOW, Petitioner, Jaime A. Davidson, pro-se, (and referred
to herein as Petitioner), bringing forth the instant motion in the
above styled cause.  Mr. Davidson respectfully requests that this
Honorable District Court reviews/considers on its full merits, the
present motion in its entirety, in conjunction and incorporate them--
all with Petitioner's pending "MOTION FOR NEW TRIAL"..., filed on
January 10, 2003, along with additional motions in support of same
and/or "GRANTS" the same as a whole.  In support thereof, Petitioner,
pro-se, to wit, states as follows:

    1.  The present motion has been properly prepared with extreme
due diligence and under good faith;

    2.  Mr. Davidson seeks liberal constraints pursuant to Haines v.
Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam);
Marmolejo v. United States, 196 F.3d 377, 378 (2nd Cir. 1999), espe-
cially when one is in prison, "pro-se, litigant's pleadings are to
be construed liberally and held to less stringent standards than for-

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

JAIME A. DAVIDSON,

       Petitioner, Pro-Se:

    -vs-             Crim. No. 92-CR-35
                         Civil No. 5:00-CV-869(NPM)
UNITED STATES OF AMERICA,    Appeal No. 01-2370

       Respondent:

SUPPLEMENTAL MOTION FOR RECONSIDERATION, TO REOPEN PETITIONER'S § 2255
MOTION DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL, IN LIGHT OF WIGGINS V.
SMITH, 156 L.Ed.2d 471 (2003), TO PREVENT ANY FURTHER  FUNDAMENTAL
MISCARRIAGE OF JUSTICE VIA, A SERIOUS FRAUD COMMITTED UPON THE COURT,
PREJUDICING ONE WHO'S ACTUALLY (FACTUALLY) INNOCENT

TO THE HONORABLE JUDGE OF SAID COURT;

MAY IT PLEASE THE COURT:

    COMES NOW, Petitioner, Jaime A. Davidson, pro-se,  (and referred
to herein as Petitioner), bringing forth the instant motion in the
above styled cause.  Mr. Davidson respectfully requests that this
Honorable District Court reviews/considers on its full merits, the
present motion in its entirety, in conjunction and incorporate them --
all with Petitioner's pending "MOTION FOR NEW TRIAL"..., filed on
January 10, 2003, along with additional motions in support of same
and/or "GRANTS" the same as a whole.  In support thereof, Petitioner,
pro-se, to wit, states as follows:

    1.  The present motion has been properly prepared with extreme
due diligence and under good faith;

    2.  Mr. Davidson seeks liberal constraints pursuant to Haines v.
Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam);
Marmolejo v. United States, 196 F.3d 377, 378 (2nd Cir. 1999), espe-
cially when one is in prison, "pro-se, litigant's pleadings are to
be construed liberally and hold to less stringent standards than for-

mal pleadings drafted by lawyers;  if the court can reasonably read pleadings to state valid claim on which litigant could prevail, it should do so despite failure to cite proper legal theories, poor syntax and sentence construction or litigant's unfamiliarity with pleading requirements." **Id.** This Honorable Court should also keep in mind that Petitioner is a layman in the science of law and especially in the litigation of major, voluminous and high profile, complex and intricate cases factually and/or legally;

3.  Petitioner hereby, respectfully requests that this Honorable Court entertains the present "Supplemental Motion For Reconsideration," in light of the principles set out by the Second Circuit in **Doe v. New York City Dept. of Soc. Servs.,** 709 F.2d 782, 789 (2nd Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), which held the following:

> "A court may justifiably reconsider its previous ruling if:
> (1) there is an intervening change in the controlling law;
> (2) new evidence not previously available comes to light;  or
> (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice."

**Id.** at 789. See also, **Delaney v. Selsky**, 899 F.Supp. 923, 925 (N.D.N.Y. 1995);

4.  In the case at bar, Mr. Davidson's instant "Supplemental Motion For Reconsideration...," relies on the first (1st) and third (3rd) prongs of this test, which are:  (1) There is an intervening change in the controlling law;  and (3) It becomes necessary to remedy a clear error of law or to prevent manifest injustice;

5.  Moreover, Mr. Davidson, pro-se, hereby submits for this Court's thorough consideration, the present "Supplemental Motion for Reconsideration...," in light of the U. S. Supreme Court's most recent decision, in **Wiggins v. Smith**, 156 L.Ed.2d 471 (Decided on June 26, 2003), holding in various excerpted areas that:

a.  "For purposes of determining whether an accused has received ineffective assistance of counsel within the meaning of the Federal Constitution's Sixth Amendment, a court, <u>'in assessing the reasonableness of counsel's investigation of potential mitigating evidence,</u> 'must consider not only the quantum of evidence <u>already known to counsel,</u>' but also, <u>'whether the known evidence would 'lead' a reasonable attorney to investigate further.</u>'"

b.  "Strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation.  A decision not to investigate thus must be directly assessed for reasonableness in all the circumstances."

c.  "In order for counsel's inadequate performance to have constituted a violation of the Federal Constitution's Sixth Amendment, an accused must show that counsel's failures prejudiced the accused's defense.  As to the principle that, to establish prejudice, an accused must show that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding in question would have been different, a reasonable probability is a probability sufficient to undermine confidence in the outcome.  Also, in assessing prejudice in the capital sentencing case at hand, the United States Supreme Court reweighed the evidence in aggravation against the totality of available mitigating evidence, both at trial and at habeas corpus proceedings."

<u>Id.</u> at 476. <u>See also</u>, (Attachment - 1; CRIMINAL LAW REPORTER);

6.  In order not to be redundant and relitigate all of Petitioner's claims presently pending before this Honorable Court -- Mr. Davidson respectfully requests that your Honor entertains Petitioner's overwhelming evidence as a whole [as stated in **Wiggins** at **supra**] and not in isolation to each other, and grant an immediate Evidentiary Hearing to inquire into Trial counsel's investigation as executed in **Wiggins**, where the Supreme Court found:

"The record as a whole does not support the conclusion that counsel conducted a more thorough investigation than the one we have described.  The dissent, like the State and the United States, <u>'relies primarily on Schlaich's</u> [Wiggins' trial counsel] <u>postconviction testimony to establish that counsel investigated more extensively.</u>'  But the questions put to Schlaich during his postconviction testimony all referred to what he knew from the social services records:  The line of questioning, after all, first directed him to his discovery of those documents."

Id. at 491.  <u>See</u>, <u>Wiggins</u> at Attachment - 1; CLR, Vol. 73, No. 14;

7.  Petitioner submits that the present Federal Trial record
as a whole, explicitly proves that Mr. John F. Laidlaw, Esquire,
and Mr. Bruce Brian, Esquire, failed to execute at a minimum, a
basic/cursory investigation and trial attorney(s) declined to adhere
to Mr. Davidson's investigation requests to prepare Petitioner's
trial defense (i.e., for Petitioner to testify on his own behalf,
support alibi defense with officers testimonies and decline self-
defense theory, et cetera] and, had trial counsels reviewed in its
entirety all the State Grand Jury and Trial Transcripts, that would
have prompted trial counsels to "<u>PURSUE SEVERAL LEADS</u>"(e.g.,  request
to review Investigator, Gary Pratt's alleged Ballistics Report;  hire
his own Ballistics Expert and conduct trial counsel's own independent
Ballistics Examination), based on Investigator Pratt's own testimonies
which in pertinent parts, explicitly reflect as follows:

Q.  "What could you tell about this projectile, other than
the lands and grooves, in terms of its weight or size?"

A.  "<u>Basically the total weight was about 116 grains, which
is consistent or close to the weight that you find .38
specials or .357 magnum cartridges in.</u>"

Q.  "Is it consistent with the type of ammunition that the
.357 revolver fires, or is it capable of firing?"

A.  "Yes.  '<u>Obviously this spent projectile that I received
from the Medical Examiner's Office was 'not complete', it
had been damaged badly,' but it is consistent in the realm
of .357 magnum cartridge.</u>"

<u>See</u>, (Exhibit - A.  Investigator, Gary Pratt's Onondaga County Grand
Jury Transcript Testimony);

**Cross Examination by Mr. McGinty:**

Q.  "Just a few questions.  You spoke of this "<u>comparison
microscope</u>?"

A.  'Yes, sir.'

Q.  "And essentially what it does is shows you two pictures

-4-

of different objects side by side.?"

A.   'That's correct.'

Q.   "<u>Are you able to photograph what is shown under this</u>
     <u>microscope?</u>"

A.   '<u>In some microscopes you are.  Mine, I am not.  I do not</u>
     <u>have the equipment to do it</u> ' [which proves and further
     confirms that in such major, high profile case, low level,
     inadequate machineries were utilized to examine critical
     material evidence(s) in Petitioner's case].

Q.   "<u>Okay.  So in other words you are unable to 'provide the</u>
     <u>jury' with any photographic evidence of what you saw in</u>
     <u>terms of comparison?</u>"

A.   'That's correct " [Raising the level as to why Mr. Hathaway
     should be allowed to conduct a Ballistics Examination.]

Id. at 664-65.  (Exhibit - B.  Investigator Pratt's testimony at Mr.

Robert Lawrence's State Trial);

Q.   "I'll ask you then whether in connection with this case,
     with the alleged shooting on October 30, there came a
     time when you received a .357 magnum projectile from some-
     one else in the police department?"

A.   'That is correct, sir, I did come into the evidence of a
     "<u>.38 caliber or a .357 magnum projectile.</u>"'

Q.   "Would you tell the jury what a Ballistics Examination
     involves?"

A.   'Yes.  When I get the projectile into the laboratory, I
     will examine it to determine what kind of a bullet it is.
     "<u>I determined it was .38 caliber exactly, .357 in diameter</u>,
     <u>which is the bullet used in .38 special ammunition</u> [which
     was issued on October 30, 1990, to all 14 officers who were
     on the scene conducting surveillance, whose service issued
     revolvers were also Smith and Wessons] <u>and also .357 magnum</u>
     <u>ammunition</u>." You use exactly the same type of bullet.  Once
     I made that determination, I looked at the design of the
     bullet.  What I mean by that is what it's shaped like, the
     material in that bullet.  It turned out to be a Remington
     in manufacture, a jacketed bullet, jacketed meaning it has
     a copper coating outside a lead core internal composition.
     Once I made the determination what kind of projectile I had
     and what the caliber was, I examined the base.  That's the
     bottom of the bullet.  And what I'm looking for is rifling
     impressions.  These are the impressions left on the bullet
     once it passes through a barrel.  I determined that there
     was five lands and five grooves with a right-hand twist
     and that was put on there by the rifling inside the barrel.
     "<u>That's configuration of five lands, five grooves, with the</u>
     <u>right hand twist is consistent with Smith and Wesson manu-</u>

facturer " [which "MUST BE NOTED" that again,
all of the officers on the scene possessed
their .38 caliber Smith and Wesson revolvers,
as the alleged .357 Smith and Wesson revolver].
So I knew I was dealing with possibly a Smith
and Wesson weapon   [which this statement by
Investigator Pratt, should have compelled trial
counsel(s) (as any reasonable attorney), to pur-
sue this material lead further, by hiring his
own Ballistics Expert, to examine all 14 officers'
.38 caliber special Smith and Wesson service re-
volvers to conduct said type of comparison and
"NOT" allow the Government to analyze "ONLY" the
alleged .357 caliber Smith and Wesson revolver].
Then I took that projectile and placed it under
a comparison microscope." A comparison microscope
is a microscope that allows me to look at two
objects simultaneously.  Basically it's two micro-
scopes put together with a bridge in between them.
Looking through that microscope, I saw unique
configurations, unique lines or striation marks
that are usual to a certain barrel.  And that's
how we make an examination between one barrel to
another barrel [where Mr. Davidson has already
proven inside his "Affidavit In Support of Peti-
tioner's Traverse Motion...," to be highly flawed
by the practices stated by the Forensic Science
Community].

. . . .
. . . .

"Once I was satisfied in my mind that I had these
unique marks in a good enough number and they were
reproducing themselves well enough on the test
fired bullet, I was able to say that this spent
projectile was fired in this barrel of this weapon
to the exclusion of all other weapons [But, for the
record, it must be stressed that said allegation is
highly misleading, unless all 14 officers .38 cali-
ber Smith and Wesson service revolvers were also
examined].  This is the weapon I recovered from the
Ford Station Wagon in the 100 Block of McClure Ave."

Q.   "And that's your opinion as a result of your analysis."

A.   'That is my opinion.'

**Cross Examination by Miss. Rosenthal:**

Q.   "Just one.  'Investigator, do you have a picture of the
comparison of what you saw under that microscope?'"

A.   'No, I do not ' [Which again, raises more compelling
reasons as to why a Ballistics Examination should be
granted].

**Id.** at 13 - 18.  (Exhibit - C.  Investigator, Gary Pratt's testimony

at Mr. Gary Stewart's state trial).

8.   Petitioner's aforementioned Grand Jury and State trial
transcripts highlights, explicitly proves in light of **Wiggins** at
**supra,** that trial counsel's ineffectiveness by failing to "PUR-
SUE SAID CRITICAL/VITAL LEADS" without conducting any investiga-
tion at all -- proves that counsel(s) failures prejudiced Mr.
Davidson's defense.   Had trial counsel(s) hired their own Ballis-
tics Expert... the result of Petitioner's Federal Trial proceedings
in question would have been totally different i.e., undermining
confidence in the outcome and gaining Mr. Davidson an acquittal;

9.   In the instant matter at hand, Petitioner, pro-se, hereby
"RE-SUBMITS BY REFERENCE TO BE INCORPORATED AND/OR ATTACHED" to the
present record at hand, Mr. Davidson's "WRIT OF MANDAMUS WITH
ATTACHED VOLUMINOUS EXHIBITS   A - F. 1 and I - XIX, hand delivered
by Ms. Angela E. Brown, M.Div. (Youth Task Force, Executive Direc-
tor) on or around May 4, 2001, to the Second Circuit Court of
Appeals, Clerk's Office, to be filed and later to be "RECONSTRUED
AS A CERTIFICATE OF APPEALABILITY" on or around June 14, 2001 and
thereafter said judgment was "VACATED AND REMANDED" back to the
District Court on August 30, 2001, with an Amended Order on October
15, 2001.  Petitioner's resubmission of said Exhibits, especially
all of Investigator, Gary Pratt's testimonies Transcripts, were
only placed on the record for future references to have the record/
issue preserved, based on the fact that Petitioner is not a Forensic
Science Expert (neither this Honorable Court);  but, Mr. Davidson
knew that in the near future, Investigator Pratt's alleged Ballistics
Examination and flawed procedures utilized, would have rose to the
forefront as the point of "MAIN ATTRACTION" [warranting another
Ballistics Examination with all the new types of sophisticated state
of the art equipment/machineries available today (e.g., the type

Mr. Hathaway utilized to execute the Ballistics Test/Examination in the Dr. Martin Luther King, Jr., high profile case). <u>See</u>, (Exhibit - D);

10.  Further, Mr. Davidson asserts that in light of **Wiggins** at **supra**, an "<u>EVIDENTIARY HEARING SHOULD BE GRANTED IMMEDIATELY</u>," to cross examine Mr. Laidlaw, Esq. and Mr. Brian, Esq. to factually inquire:  Why did they not pursue this lead?  If they executed any type of investigation?  If their failures to investigate, pursue these leads further and/or hire their own independent Forensic Scientists ... was reasonable under an attorney's trial strategies/ tactics under the **Strickland** reasonable standards?  As the Sixth Circuit found:

> "[W]hat investigation decisions are reasonable depends critically on [the information that the defendant sup-plies]... '<u>in short, inquiry into 'counsel's conversa-tions with the defendant' may be critical to a proper assessment of counsel's investigation decisions.</u>'"

**Id.** **Mason v. Mitchell**, 320 F.3d 604, 620 (6th Cir. 2003); **Strick-land v. Washington**, 466 U.S. at 690-91, 104 S.Ct. 2052.  <u>See</u> <u>also</u>, **Wiggins**, at 491;

11.  Petitioner further submits that, had Mr. Laidlaw, Esq., not withheld Mr. Davidson's discovery materials from appellate attorney, Mr. Louis M. Freeman, Esquire, the Statement of Affirma-tion submitted by Mr. Freeman, Esquire, clearly confirms that appellate counsel would have proceeded as any reasonable attorney by investigating further and hiring his own independent Forensic Scientists...;

12.  In the case at bar, Petitioner, <u>pro-se</u>, respectfully requests that this Honorable Court proceeds in said equitable manner it processed Mr. Lenworth Parke's 60(b) F.R.Civ.P. Motion in light of **Massaro**, by granting co-defendant, Mr. Parke a Show Cause

Order instructing the Government to respond.... Since Petitioner submitted his Motion For Reconsideration on May 20, 2003, in light of **Massaro**, this Honorable Court has yet to grant Mr. Davidson a Show Cause Order, instructing the Government to respond -- where said issues which were procedurally barred are equally relevant to Petitioner's issues pending before your Honor in Mr. Davidson's "MOTION FOR NEW TRIAL...", and additional motions in support of same (where it's crystal clear that both motions and proceedings should be incorporated into one).  See,(Exhibit - E);

     13.  Mr. Davidson asserts that, for the best interest of justice and to preserve judicial economy, this Honorable Court should consider the most appropriate and efficient resolution in Petitioner's case, by "GRANTING THE APPOINTMENT OF A SPECIALIZED HABEAS CORPUS COUNSEL TO OVERSEE MR. HATHAWAY'S BALLISTICS EXAMINATION" which would save this Honorable Court excessive amount of funds and time by holding an Evidentiary Hearing, which would turn out to be a mini-trial itself **i.e.**, now, in light of the major effect the ruling in **Massaro**, **Miller-El, and Wiggins**, has created in Petitioner's case.  Thus, even the **Wiggins** court proves where the lower court had to hold a hearing to hear what counsel had to offer as an explanation into all his failures..., and said inference can be acquired by the following statement:

>          "Not only would the phrase 'other people's reports'
>          have been an unusual way for counsel to refer to
>          conversations with his client, but the record con-
>          tains no evidence that counsel ever pursued this
>          line of questioning with Wiggins."

**Id.** at 491. **See, Wiggins** at 365-66 **i.e.,** at Attachment - 1;

     14.  In this Honorable Court's Denial Order, dated December 31,

2002, your Honor erred by alleging that, "An Expert was retained by defense counsel jointly [where this joint effort was executed in 1991 to hire Mr. Warren Stewart Bennett, and Mr. Laidlaw, Esq., was appointed to represent Mr. Davidson in February of 1992, 'EXPLICITLY EXCLUDING' trial counsel from acquiring any personal (FIRST HAND) information and/or knowledge, to make any conscious decision and/or reasonable trial strategy] and its to the credentials of that Expert and his alleged conclusions that Petitioner Davidson now seeks to attack in his numerous Post-Trial and Post-Appeal Motions." **Id. at 8.**  Since Petitioner's initial Habeas Corpus proceedings began to date, Mr. Laidlaw, Esq., has not been allowed/ordered to respond as to which alleged Forensic Expert he rested all his decisions and/or alleged trial strategy on, and how to proceed further in Petitioner's case;

15.   Therefore, Mr. Davidson submits that, the type of major Syracuse Police Department corruption cover-up, regarding the "ASSASSINATION OF OFFICER, WALLIE HOWARD, JR.,"is clearly "UNHEALTHY" for citizens and/or residents throughout the entire City of Syracuse, New York and all its surrounding counties [Based on a fraud committed upon the court which is equally a fraud committed upon all its citizens/residents]... especially viewing the fact made by former attorney, Ms. Kate Rosenthal (Now Judge in said city) where her affidavit asserted as follows:

> "4.   In connection with the state prosecution, the defense lawyers, myself included, hired a Forensic Expert [Excluding, Mr. John F. Laidlaw, Esquire and Mr. Bruce Brian, Esquire], Stewart Bennett of Montrose, Pennsylvania.  I was the one to suggest Mr. Bennett as he had been retained by other defense lawyers and used successfully in their cases. The Assigned Counsel Program of Onondaga County actually retained Mr. Bennett as I was an assigned counsel [now, proving where the State must have acquired numerous convictions of Syracusians via, the fraudulent trial testimony of Mr. Bennett].

<u>See</u>, (Exhibit - E, in support of "PETITIONER'S MOTION FOR NEW TRIAL");

16.   Petitioner further submits in support of the great injustice done to Syracusians and citizens nationwide by the fraud committed upon the court/people <u>i.e</u>., by Mr. Bennett's actions and being condemned by, Mr. Herbert Leon MacDonell [Mr. Bennett's former Professor], in the following excerpts which he stated in pertinent parts that:

> "It is unfortunate that Mr. Bennett considers himself qualified as a Forensic Scientist. In reality, he does not qualify for even provisional membership status in any of the above organizations."

> "It has been my misfortune to have read several of Mr. Bennett's Trial Transcripts wherein he had made many serious errors. I do not think it is necessary to elaborate on his complete lack of scientific knowledge after pointing out that in a Trial Transcript he stated; 'For example, water itself does not have a viscosity to it.' Ask any physical scientist about the accuracy of that statement. I could go on, but I think I have made my point."

<u>Id</u>. at 4. <u>See</u>, (Exhibit - E, of "PETITIONER'S MOTION FOR NEW TRIAL...," reflecting Affidavit of Mr. MacDonell);

> "All in all, I am very disappointed in you Stewart. It is really unfortunate that you simply do not know what you are doing. You should leave Forensic Investigations to those who are qualified as, in my opinion, you are not. The fact that you have been paid considerable money for your time is of no concern to me. "<u>THE FACT THAT YOUR INCOMPETENCE CAN HAVE HAD SUCH AN IMPACT ON INNOCENT PEOPLE</u> [As here, like, Mr. Davidson] <u>IS UNFORGIVABLE. THAT YOU ALMOST PUT FRANK ROBERTS IN PRISON BASED ON YOUR ERRORS IS, AGAIN IN MY OPINION, A CRIME ITSELF.</u>" [In the said criminal manner, Mr. Bennett has placed Mr. Davidson and divers  there in prison innocently, based on his Vitae Fraud...]. You must reflect back upon what you have done, and hopefully, you will find something to do in the future that does not involve the potential consequences of playing Forensic Scientist.'"

<u>Id</u>. at 2. (Letter to Mr. Bennett from Mr. MacDonell, dated January 17, 1995);

"I regret having to prepare an Affidavit which is so criti-
cal of a former student. 'NEVERTHELESS I FEEL THAT WHEN A
PERSON'S LIFE OR LIBERTY IS AT STAKE [as here, with Mr.
Davidson] THE LOYALTY TO ANYONE IS SUPERCEDED BY THE NECES-
SITY TO PRESENT THE TRUTH.' I read in a Chinese Fortune
Cookie a few years ago that, 'TIME IS PRECIOUS, BUT TRUTH
IS MORE PRECIOUS THAN TIME.'This, undoubtedly, has special
meaning for those who are serving time or those who are
facing incarceration."

**Id. at 97.** (PETITIONER'S SECOND URGENT MOTION/NOTICE FOR THE

RECORD TO REFLECT,...);

17. Petitioner hereby submits [an equitable situation directly

pointing as to how Mr. MacDonell views justice in America], for this

Court's consideration, how "EVIDENCE WITHHELD IN 70's MURDER TRIAL

FREES MAN FROM PENNSYLVANIA PRISON," for your Honor to take/make

some careful considerations into the severity of the present issue

at hand, where the Government has also indeed, withheld various

facts from Mr. Davidson.... See, (Exhibit - F, A JET MAGAZINE

ARTICLE DATED, JULY 15, 2002).

In the case at bar, Petitioner respectfully requests that your

Honor follow the principles of Due Process -- as executed in the

case of, Mr. Steven Crawford, where the article further asserted:

"After reviewing thousands of documents and interviewing
witnesses [Identically as to what Ms. Brown conducted in
Mr. Davidson's case] over the past two months, prosecu-
tors concluded that original notes by a retired Police
Chemist - found in a County Detective's briefcase after
he died - contradicted police testimony about blood par-
ticles on a handprint left in the garage."

"We've concluded that, potentially, his trial could have
been tainted by the failure to disclose these notes,
said District Attorney, Edward M. Marisco, Jr., who added
that he had not yet decided whether to retry Crawford,
who is scheduled to appear in court again on August 5."

See, (Exhibit - F);

18.   Now, Petitioner has just shown/proven in the aforementioned quotes by Mr. Herbert Leon MacDonell, that what your Honor has based/rested its holding to deny Mr. Davidson, <u>pro-se's</u> Habeas Motion on December 31, 2002, is moreso, giving weight under extraordinary circumstances and compelling reasons to "GRANT/ORDER" an immediate "BALLISTICS EXAMINATION" in the case at bar.   Thus, Mr. Davidson was denied his constitutional rights of the Fifth Amendment to Due Process and Equal Protection when trial and appellate counsels (including the remaining defense counsels representing Mr. Davidson's co-defendants under the "<u>PINKERTON DOCTRINE</u>"), "<u>WERE 'NOT' PRESENTED ANY ADEQUATE OR APPROPRIATE OPPORTUNITY FOR A BALLISTICS REVIEW</u>" i.e., due to Mr. Bennett's fraudulent actions;

19.   Nevertheless, Petitioner has hereby decided to furnish this Honorable Court for its thorough review/consideration on its full/ overall merits [just in case Mr. Davidson is left to seek relief from the Court of Appeals], in light of **Wiggins v. Smith** at <u>**supra**</u>, Investigator, Gary Pratt's testimonies during the State and Federal proceedings, with additional transcripts "<u>HIGHLIGHTING THE GOVERN-MENT'S CASE IN CHIEF</u>" in Petitioner's Trial, which proves and con-firms that Mr. Laidlaw's failures to pursue certain leads were not accredited to trial strategies, but counsel's ineffectiveness based on the discrepancies of the "<u>SMITH AND WESSON MANUFACTURER'S .38 CALIBER REVOLVERS AND .357 CALIBER REVOLVERS LANDS AND GROOVES WITH THEIR RIGHT HAND TWISTS</u>." <u>See</u>, (Exhibit - G, which consists of references from Exhibit - D at <u>supra</u>, from Mr. Davidson's "<u>PETITION FOR WRIT OF MANDAMUS - ADDENDUM AT A.1 - A.8</u>" and said Exhibits are all marked/underlined and are explicitly "<u>SELF-EXPLANA-TORY</u>," in line with the ruling in **<u>Wiggins</u>**...)**; at Attachment - 1;**

-13-

20.   In **Moreno-Morales v. United States**, 334 F.3d 140, 148 (1st Cir. 2003), the First Circuit held that, "It is true that Due Process is offended when a prosecutor knowingly suborns purjury to obtain a conviction" [which illicit acts are prohibited purusant to Title 18 U.S.C. §§ 1621 and 1622, reinforced by the Tenth Circuit's en banc decision in **Singleton**]. "Few rules are more central to an accurate determination of innocence or guilt than the requirement ... that one should not be convicted on false testimony" [as shown by Investigator, Gary Pratt's Federal Trial testimony quoted by Petitioner at Infra, in various exerpted areas for the record]. **Ortega v. Duncan**, 333 F.3d 102 (2nd Cir. 2003). See also, **Sanders v. Sullivan**, 900 F.2d 601, 607 (2nd Cir. 1990);

21.   In the instant matter at hand, this Honorable Court would continue causing great prejudice to Mr. Davidson and excessive degrees of manifest injustice, if your Honor declines to "INCORPORATE/ATTACH" the pending proceedings in "ONE," in regards to **Massaro** and **Miller-El** [filed on May 20, 2003], to Petitioner's Motion For New Trial (submitted on January 10, 2003), to the present "SUPPLEMENTAL MOTION FOR RECONSIDERATION, IN LIGHT OF WIGGINS...," which are all clearly related/relevant to Mr. Davidson's Sixth Amendment violations, based on ineffective assistance of counsel i.e., focusing all our attentions to the great need for a "BALLISTICS EXAMINATION/REVIEW." **United States v. Warren**, 335 F.3d 76 (2nd Cir. 2003), held that, "virtually every stage of the Federal Criminal Justice process is progressively tailored to further the goal of finality without foreclosing relief for miscarriage of justice [which manifest injustice would occur herein, if a Ballistics Review is denied]. A defendant's freedom to assert claims is

-14-

greatest in the trial court" [which is also equally applicable to the Habeas Corpus proceedings];

22.   Moreover, viewing the Government's representation of its case since day one, the record reflects where Mr. John G. Duncan, — Esquire, and Mr. Grant Jaquith, Esquire (AUSA's) have both presented false testimonies via the trial testimonies in pertinent part(s) of Mr. David A. Rigle, M.D., Chief of DEA Task Force, William R. Nelson (who intentionally lied and perjured himself, alleging that Investigator Howard, Jr., was "DEPUTIZED FOR LIFE", just to make the present case, a Federal case;  and, trial counsel failed to "FOLLOW THOSE LEADS FURTHER,"by acquiring the DEA Task Force manual on Rules, Procedures and/or Regulations, as Mr. Davidson executed and acquired by means of filing a "FOIA/PA" request to the DEA);  and, most importantly, Investigator, Gary Pratt;

23.   Nonetheless, the Second Circuit explicitly held that, "The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost;"  and, that, "convictions that depended on false testimony elicited by prosecutor [as done by the Government in the case at bar] were required to be set aside."  **SU v. Filion**, **335 F.3d 119 (2nd Cir. 2003)**;

24.   In the case at bar, had trial counsel followed the principles in **Strickland** being enforced today by **Wiggins** at **supra**, by hiring his own Ballistics Expert and consulted with said Expert, Mr. Laidlaw, Esquire would have known that the following allegation testified to by Investigator Pratt was completely false and misleading and it goes as follows:

-15-

A.   "....  In Smith and Wesson you have five of
these lands and five of these grooves, they
are actually mechanically put inside the barrel.
'AND THE REASON THEY PUT THIS INSIDE THE BARREL
IS TO 'MAKE THE BULLET FLY TRUER.'   IT GETS TO
THE INTENDED TARGET MORE ACCURATELY AND IN SOME
CASES MORE QUICKLY, 'THE VELOCITY ACTUALLY IN-
CREASES.'   IT ACTUALLY PUTS A SPIN ON THE BUL-
LET, TOO, EITHER TO THE RIGHT OR LEFT.'"

**Id.** at 1835 of **Exhibit - G.**  See also, (pages 1833 - 36);

25.  Petitioner, in further support of trial counsel(s) in-
effectiveness, refers back to **Wiggins,** where the Supreme Court
stressed that, "For its part, the United States 'emphasized
counsel's retention of the psychologist.' **Id.**'s at 51;  Brief
For United States As Amicus Curiae 27.  But again, counsel's
decision to hire a psychologist sheds no light on the extent of
their investigation [as in the case at bar, even attempting to
hold true, your Honor's erroneous allegation that defense counsel
jointly, did indeed hire a Forensic Scientist i.e., Mr. Warren
Stewart Bennett, and/or an undisclosed source (to allege that
counsel did conduct a tactical investigation), but the record does
not support any such Expert retention and/or any sort of investi-
gation]into Petitioner's  social background." **Id. Wiggins at 491;**

26.  Furthermore, trial counsel failed to even pose one (1)
question to Investigator Pratt, during the defense's time for
cross-examination, being reflected as follows:
**The Court:** "Do you have any cross examination of this witness?"
**Mr. Laidlaw, Esq.**  "I have none, your Honor."
**Id. at 1858.**  See, (Exhibit - G);

27.  Now, Mr. Davidson hereby submits for the record to reflect
"CRYSTAL CLEAR", a major discrepancy that should have and/or would

have led any reasonable attorney to pursue this issue further (as clarified by the Supreme Court in **Wiggins**, at **supra**) i.e., to conduct a "BALLISTICS EXAMINATION/REVIEW OF ALL 14 OFFICERS ON THE SURVEILLANCE TEAM" that also possessed .38 caliber Smith and Wesson service revolvers with "38 special ammunitions," for the jury to consider and it cannot be held today, to be any kind of defense counsels strategies not to execute such investigations; and, Investigator Pratt's testimony in support of Mr. Laidlaw, Esquire's acts of ineffectiveness for failing to pursue certain vital leads, goes as follows:

Q. "Well, were police ever -- any police agency and specifically the Syracuse Police Department, issued .38 caliber weapons at one time?"

A. "We were.  We were issued .38 revolvers.  They were .38 specials."

Q. 'What type of ammunition can be fired from a .38 or .38 special?'

A. "Just .38 special."

Q. 'What about a .357 round?'

A. "No.  If it's designed exclusively for the .38 special, like our weapons were prior to going to our semiautomatics recently, the only thing that could be fired was a .38 special.  .357 magnum round would not fit in it.  Only a specifically designed weapon would handle the .357 magnum such as the weapon turned in as an Exhibit."

Q. 'Now, the .357 that's in evidence, that can fire a .38 special or a .357 magnum?'

A. 'That's correct.'

Q. "Now, are there .38 caliber weapons that are designed to fire a .38 special and a .357 magnum?"

A. 'Yes, there is.'

Q. "That's not uncommon?"

A. 'That's not uncommon today at all.'

**Id.** at 1861 - 62, at Exhibit - G and Attachment - 1 at 366;

**Cross Examination by Mr. McGinty:**

Q. "Investigator Pratt, I'm showing you Government's Exhibit 80. You have looked at this and I thought I heard you say you identified it as a .38. That's the vial that contains -- the vial with the fragments received from the Medical Examiner's Office?"

A. 'The spent projectile from the Medical Examiner's.'

Q. "Yes. And you identified, you had looked at those, examined those and there was a .38?"

A. '.38 caliber, that's correct.'

Q. "Now, you had indicated that there was a spent cartridge that you found in the weapon that's 79-A, was a .357?"

A. 'That's correct.'

Q. "Are we talking about two different calibers here?"

A. 'No. You're talking about the exact same caliber. As I said before, the .38 caliber is in the special or in the magnum. "THE ACTUAL DIAMETER OF THE BULLET, WHICH IS EXACTLY THE SAME BULLET IS 3-5-7, .357 IN DIAMETER THE .38 SPECIAL AND THE .357 MAGNUM ACTUALLY FIRE THE SAME BULLET. IT CAN BE LOADED IN EITHER CARTRIDGE, MAKES NO DIFFERENCE."

Q. "I guess my confusion lies in the fact that you said when you examined 79, that would be the .357 magnum, you said you found a spent .357 and five .38's?"

A. 'That's correct.'

Q. "AND THEN YOU IDENTIFIED THOSE FRAGMENTS AS BEING FROM A .38?"

A. ".38 CALIBER. IF I MISSPOKE, IT'S .38 CALIBER PROJECTILE, FIRED FROM A .38 CALIBER WEAPON, WHICH COULD BE .357 OR IT COULD BE .38."

Q. "SO, IT COULD HAVE BEEN ONE OR THE OTHER?"

A. 'WELL, YEAH, IT COULD BE FIRED THROUGH A .357 MAGNUM CARTRIDGE OR A .38 SPECIAL CARTRIDGE, IT'S THE SAME BULLET."

Id. at 1865 - 66 of Exhibit - G;

**Recross Examination by Ms. Rosenthal:**

Q. "Investigator, with respect to this issue of ricochet, when you looked into that car, "DID YOU NOT NOTICE THE SEAT THAT WALLIE HOWARD WAS IN HAD A HEAD REST?"

-18-

**A.** 'THAT'S CORRECT.'

**Q.** "And it was obviously -- I shouldn't say it was obvious, I think it's made of fabric, isn't it?"

**A.** 'VINYL, I BELIEVE.'

**Q.** "VINYL?"

**A.** 'VINYL, IF I RECALL CORRECTLY.  VINYL, I BELIEVE.'

**Q.** "It's a soft substance?"

**A.** 'That's correct.'

**Q.** "NOW, IF THE BULLET HAD PASSED BY THAT OR TOUCHED IT IN SOME WAY AND THEN ENTERED MR. HOWARD'S HEAD, THERE MIGHT BE SOME FIBERS OR SOME SUBSTANCE OF RESIDUE FROM THAT FABRIC ON THE BULLET, CORRECT?"

**A.** 'THAT IS A POSSIBILITY.'

**Q.** "AND THEN WHEN IT'S REMOVED AND THEY CLEANED IT, THAT THAT EVIDENCE WOULD HAVE DISAPPEARED.  SO THAT BY THE TIME YOU LOOKED AT IT THERE MIGHT NOT BE ANY PROOF OF THAT?" [which Dr. Rigle has confirmed-- was never found].

**A.** 'THAT'S CORRECT.'

Id. at 1880-81, of Exhibit - G;

28.  Petitioner, pro-se, hereby submits that, in light of the aforementioned exerpts being highlighted herein from Investigator Gary Pratt's Testimony Transcripts at Mr. Davidson's Federal Trial, it clearly proves by the detailed and/or specific types of questions being raised via Petitioner's co-defendant's trial attorneys cross examinations, that said trial counsels had personal knowledge that Officer Howard, Jr. was indeed "ASSASSINATED" by his own partners/ co-law enforcement agents, but declined to delve behind the scenes to bring the truth to light.  Had Robert Lawrence's bullet allegedly hit Officer Howard, it is crystal clear that the record would have been flooded with facts relative to the "HEAD REST CONTAINING A HOLE...;"

29.  Thus, based on the severity and sensitivity of the case at bar, it is extremely imperative that this Honorable Court "INCORPO-RATES"the instant Supplemental Motion For Reconsideration To Reopen Petitioner's § 2255 Habeas Corpus Motion, denied on November 28, 2000, (and Vacate said Order -- Remaining Orders to date), in light of **Doe, and Delaney** at **supra,** due to the Supreme Court's most recent clarifications confirmed in **Wiggins at supra,** remedying a clear error of law i.e., in light of **Massaro** and **Miller-El** [Presently pending since May 20, 2003, awaiting your Honor to re-open said proceedings and Grant Mr. Davidson a "SHOW CAUSE ORDER"] and now, attached to Petitioner's Motion For New Trial, also presently pending before this Honorable Court -- to prevent any further serious case of manifest injustice, due to the fraud committed upon the Court (against a prisoner who is "ACTUALLY (FACTUALLY) INNOCENT"). See, (Exhibit - E);

30.  In light of all the grave discrepancies and flaws reflected on and off the record executed as a whole by:  Dr. David A. Rigle (e.g., Failing to take internal head wound photos and X-Rays); Investigator, Gary Pratt (e.g., Utilizing a flawed system of microscopic comparisons and "NOT" taking photos of said critical tests as a means of safeguarding physical evidentiary proof;  and, most importantly, "NOT"  conducting a Ballistics Examination of all 14 Officers Smith and Wesson service revolvers who were on the scene with .38 Special ammunitions);  and, Mr. Warren Stewart Bennett's fraud that spilled over to Mr. Davidson's Federal Trial, "PREJU-DICING PETITIONER'S TRIAL DEFENSE -- BY NOT BEING AFFORDED AN APPROPRIATE BALLISTICS REVIEW TO PROVE HIS INNOCENCE, ETC."); and

31.  In closing, Mr. Davidson humbly prays that this Honorable Court entertains all the Transcripts submitted in "EXHIBIT - G,"

-20-

PAGE-BY-PAGE AND LINE-BY-LINE, IN ORDER FOR YOUR HONOR TO CONSIDER AND ACKNOWLEDGE THE FACT THAT PETITIONER HAS PROVEN AND FURTHER SATISFIED ALL HIS "PREJUDICE FACTORS" (with facts on the record and off the record) i.e., highlighting critical areas where the "GOVERNMENT'S CASE IN CHIEF" has been factually contradicted as a whole, beyond a reasonable doubt with the Transcripts which reflect as follows:

I.   See, Exhibit - G, which reflects the Government's case in chief at various excerpted areas i.e., previously submitted in Petitioner's "PETITION FOR WRIT OF MAN-DAMUS - ADDENDUM AT A", which is reflected therein and indexed as follows:

   A.6 - The Government's Opening Statements at Petitioner's Federal Trial, Reflecting its Position Surrounding Their Case in Chief;

   A-7 - The Government's Rebuttal Summation at Petitioner's Federal Trial, Reflecting its Position Surrounding its Case in Chief;   and

   A.8 - The Honorable Court's "JURY INSTRUCTIONS" at Peti-tioner's Federal Trial, Reflecting What Type of Case, Events, and Alleged Facts, the Jury (who are the "SOLE FINDERS OF FACTS"), was instructed to find beyond a reasonable doubt, prior to rendering their final verdict.

Id. at 238 - 298. See No. at bottom-right, ( at Exhibit - G).

   WHEREFORE, Petitioner, Jaime A. Davidson, pro-se, humbly prays and respectfully requests that this Honorable Court thoroughly reviews and/or entertains on its full merits, Petitioner's instant motion herein as a whole, in conjunction with Mr. Davidson's Motion For Reconsideration In Light of **Massaro** and **Miller-El** (filed on May 20, 2003, and still pending) and Petitioner's Motion For New Trial...with additional motions in support of same and "INCORPO-RATES" all three (3) pleadings and proceedings presently pending into Mr. Davidson's Motion For New Trial proceedings [i.e., to alleviate  your Honor/the Appeals Court, from any future "PIECEMEAL

LITIGATIONS/APPEALS" ];  grants Petitioner's Request to Reopen Mr. Davidson's initial § 2255 Motion denied on 11/28/00 and issue the Government a "NEW SHOW CAUSE ORDER" in full details, ordering Mr. John G. Duncan, Esquire, to "RESPOND WITH FACTS, LAWS AND AFFIDAVITS" to all the pending pleadings submitted by Petitioner;  grants Mr. Davidson the right to conduct Petitioner's "BALLISTICS EXAMINATION/ REVIEW" with the Appointment of a Specialized Habeas Corpus Counsel, to safeguard the Government from wasting excessive Judicial Economy by holding an Evidentiary Hearing [where to resolve the issue in question, is only needed a Ballistics Review];  grants Petitioner an Evidentiary Hearing due to the rulings in **Massaro, Miller-El and Wiggins,** [if your Honor declines to order a Ballistics Review by Mr. Hathaway];  grants Mr. Davidson's requested Habeas relief, in light of **Wiggins, Massaro, and Miller-El** ;  and/or grants Petitioner, pro-se, whatever other relief this Honorable Court deems just, proper and/or necessary to prevent any further manifest injustice, in light of **Doe,** and **Delaney** at supra, and **Massaro, Miller-El,** and **Wiggins,** et cetera... any other relief the LAW DEMANDS.

SIGNED ON THIS  *9*  DAY OF *SEPTEMBER*  , 2003.

Respectfully submitted,

JAIME A. DAVIDSON, PRO-SE
REG.NO. 37593-053 (D-105)
U.S.P. - LEWISBURG
P. O. BOX 1000
LEWISBURG, PENNSYLVANIA 17837

-22-

# CERTIFICATE OF SERVICE

I, <u>Jaime A. Davidson, pro-se,</u> , hereby certify that I have served a true and correct copy of the foregoing:

**SUPPLEMENTAL MOTION FOR RECONSIDERATION, TO REOPEN PETITIONER'S § 2255 MOTION DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL, IN LIGHT OF WIGGINS V. SMITH, 156 L.Ed.2d 471 (2003), TO PREVENT ANY FURTHER FUNDAMENTAL MISCARRIAGE OF JUSTICE VIA, A SERIOUS FRAUD COMMITTED UPON THE COURT, PREJUDICING ONE WHO'S ACTUALLY (FACTUALLY) INNOCENT**

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the court, <u>Houston vs. Lack,</u> 101 L.Ed.2d 245 (1988), upon the court and parties to litigation and/or his/her attorney(s) of record, by placing same in a sealed, postage prepaid envelope addressed to:

MR. JOHN G. DUNCAN, ESQ.
EXEC. ASSISTANCT U.S. ATTORNEY
900 FEDERAL BUILDING
P.O. BOX - 7198
SYRACUSE, N.Y. 13261-7198

and deposited same in the United States Postal Mail at the United States Penitentiary,

Signed on this ____ *9* ____ day of *SEPTEMBER* , 2003.

Respectfully Submitted,

*Jaime A. Davidson*

JAIME A. DAVIDSON, PRO-SE.

REG. NO. <u>37593-053 (D-105)</u>
U.S.P. LEWISBURG
P.O. BOX - 1000
LEWISBURG, PA. 17837

ATTACHMENT-1
AND
EXHIBITS
A - F

U. S. V. JAIME A. DAVIDSON
5 : 00 - CV - 869 (NPM)

1

Amendment." And in *Romer v. Evans*, 517 U.S. 620 (1996), the court struck down legislation directed at homosexuals as a violation of the Equal Protection Clause.

The majority declined the invitation to strike down the Texas law on equal protection grounds. Although it found the argument tenable, it declared the need to overrule *Bowers* more pressing. Holding the statute invalid on equal protection grounds, it said, might lead some to "question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants."

For her part, O'Connor saw no need to overrule *Bowers*. Instead, she declared that "branding one class of persons as criminal solely based on the State's moral disapproval of that class and the conduct associated with that class runs contrary to the values of the Constitution and the Equal Protection Clause."

Justice Antonin Scalia, joined by Chief Justice William H. Rehnquist and Justice Clarence Thomas, dissented, arguing that the state's "prohibition of sodomy neither infringes a 'fundamental right' (which the Court does not dispute) nor is unsupported by a rational relation to what the Constitution considers a legitimate state interest, nor denies the equal protection of the laws."

Writing separately, Thomas expressed disdain for Texas statute but declared that the Constitution confers no general right of privacy.

Paul M. Smith, Jenner & Block, Washington, D.C., argued for the petitioners. Harris County District Attorney Charles A. Rosenthal Jr. argued for the state.

*Full text at http://pub.bna.com/lw/02102.pdf and 73 CrL 396*

⟶**Right to Counsel**

＊**Counsel Must Make Reasonable Inquiry Into Mitigating Evidence in Capital Case**

*Decision not to put on mitigation case is owed deference only if counsel conducted reasonable investigation of mitigating factors, U.S. Supreme Court rules.*

**A**ttorneys whose client faced the death penalty violated his Sixth Amendment right to effective assistance of counsel by failing to conduct a reasonable investigation of his childhood history before deciding not to present a mitigation case at the sentencing phase of his trial, a majority of the U.S. Supreme Court held June 26. Concluding that the evidence counsel failed to discover and present was "powerful," the majority held that the habeas corpus petitioner was prejudiced by the attorneys' poor performance. (*Wiggins v. Smith*, U.S., No. 02-311, 6/26/03)

The petitioner was convicted of murdering an elderly woman. The two public defenders who represented him moved to bifurcate the sentencing hearing. Their plan was to avoid introducing mitigating evidence unless they failed, in the first phase of a bifurcated hearing, to convince the jury that the petitioner did not kill the victim himself and thus was not eligible for a death sentence. However, the judge denied the bifurcation motion.

In their opening statement at the sentencing hearing, defense counsel told the jurors that they would hear

about the petitioner's "difficult life"; however, no evidence of his life history was presented. Instead, counsel focused on perceived weaknesses in the state's case.

Before closing arguments, defense counsel made a proffer to the court detailing the mitigation case that would have been made if the proceeding had been bifurcated. The proffer did not include any evidence of the petitioner's life history or background. He was sentenced to death.

New counsel raised the effective assistance issue in state post-conviction proceedings, supporting the claim with a social worker's testimony that the petitioner suffered severe childhood privation and abuse. The state's highest court concluded that the trial attorneys' decision not to argue mitigation was a tactical choice made in furtherance of a strategy focused on undercutting the state's case for death eligibility. The court credited trial counsel with knowledge of the petitioner's background, based on their possession of the presentence investigation report and records of the city social services department. On federal habeas review, the U.S. Court of Appeals for the Fourth Circuit concluded that counsel were sufficiently aware of some of the facts of the petitioner's background to make an informed strategic choice as to how to use them. 288 F.3d 629 (4th Cir. 2002).

⟶ **Reasonable Investigation Required.** Reversing the appellate court in a 7–2 decision, Justice Sandra Day O'Connor said the majority's principal concern was not whether counsel should have presented a mitigation case but whether they undertook a reasonable investigation of the mitigating facts before making their decision. The majority noted that in its seminal decision on the legal principles that govern claims of ineffective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668 (1984), the court defined the deference a court must pay counsel's strategic trial decisions in terms of the adequacy of the underlying investigation.

The attorneys' performance in this case was deficient under *Strickland*, the majority said, because they did not conduct a reasonable investigation before deciding against a mitigation case. The attorneys were in possession of a presentence investigation report that included a one-page personal history noting the petitioner's "disgusting," "miser[able]" youth, and records of the city Department of Social Services documenting the petitioner's various placements in the state's foster care system. The attorneys' decision not to expand their investigation beyond the PSI and DSS records fell short of prevailing professional standards, the majority said.

Standard practice in capital cases at the time included the preparation of a forensic social history report, but despite counsel's knowledge of the practice and the availability of funds from the public defender's office to pay for it, no social history report was prepared. Counsel's conduct similarly fell short of American Bar Association standards providing that investigations into mitigating evidence should include efforts to discover all reasonably available evidence, the majority said. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," the majority said.

ATTACHMENT - 1

**Failure to Pursue Leads.** Exacerbating the attorneys' failure to investigate was their failure to follow up leads clearly offered to them in the sparse evidence that they did gather, the majority said. The DSS records revealed that the petitioner's mother was a chronic alcoholic who left him and his siblings alone for days without food on at least one occasion, that he had frequent, lengthy absences from school, and that he was shunted from one foster home to another. "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses," the majority said. Because counsel uncovered no evidence to suggest a mitigation case would have been counterproductive or further investigation fruitless, the case is distinguishable from precedents, such as *Strickland*, in which the court has found limited investigations into mitigating evidence to be reasonable, the majority added.

The record of the actual proceedings underscored the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from "inattention, not reasoned strategic judgment," the majority said. Until the trial court denied their bifurcation motion, the attorneys should have continued to prepare the mitigation case they claimed to have. Yet they presented no evidence to the jury to follow up their opening statement that the jury would hear of the petitioner's unfortunate life, and their proffer to the court failed to include any of the petitioner's social history or family background. "[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing," the majority said.

**Prejudice.** Turning to *Strickland*'s prejudice prong, the majority said that the abuse the petitioner suffered at the hands of his mother and in numerous foster homes, as well as the years he spent homeless, is "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." The majority concluded that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."

The state high court misapplied *Strickland*'s principles, the majority ruled. The state court did not assess whether counsel's failure to follow leads in the DSS and PSI reports was reasonable; instead, it simply assumed that their investigation was adequate. However, in light of what those reports revealed, the attorneys' choice to abandon their investigation at that "unreasonable juncture" made it impossible for them to make a fully informed decision about trial strategy, the majority said. The Maryland court's assumption that the investigation was adequate was thus an unreasonable application of *Strickland*, and this made its deference to counsel's supposed strategic decision not to argue mitigation also objectively unreasonable. Moreover, the state court's decision was defective for being based, in part, on what turned out to be a clear factual error—the assumption that the DSS report recorded incidents of sexual abuse.

Justice Antonin Scalia, dissenting and joined by Justice Clarence Thomas, contended that the state court was not unreasonable in concluding that the attorneys had investigated and were aware of the mitigating fac-

tors in the petitioner's life history and family background and made a strategic decision not to focus on mitigation.

Donald B. Verrilli Jr., Washington, D.C., argued for the petitioner. Maryland Solicitor General Gary E. Bair argued for the state. Dan Himmelfarb, Assistant to the Solicitor General, Washington, D.C., argued for the United States as amicus curiae in support of the state.

*Full text at http://pub.bna.com/lw/02311.pdf and 73 CrL 410*

## Capital Punishment

## Fourth Circuit Establishes Test For Timeliness of Federal Death Notice

*Court rejects prejudice-based test for determining reasonableness of timing of death notice.*

A determination of whether the government has complied with the federal statutory requirement that it provide a defendant with notice of its intent to seek the death penalty "a reasonable time before the trial," 18 USC 3593(a), is to be made by conducting an objective analysis of the sufficiency of the time before the scheduled trial date for the defendant to prepare a defense—not by conducting a post-trial analysis of prejudice—a majority of the U.S. Court of Appeals for the Fourth Circuit held June 18. When interpreted in this way, the statute confers a right that may be the subject of an interlocutory appeal, the majority made clear. The case appears to be the first appellate court decision to directly address the issue. (*United States v. Ferebe*, 4th Cir., No. 01-22, 6/18/03)

In 1997, the defendant was charged with two murders in connection with drug trafficking activities. Initially, the attorney general authorized the death penalty for one of the charges. In December of 2000, the district judge scheduled trial for the following September.

In May 2001, after the Department of Justice came under new management, the prosecutors in the case asked the new administration to reconsider the decision not to authorize a death sentence for both murders. In June 2001, the parties had reached a plea agreement; however, a new DOJ policy required the attorney general's approval of plea agreements with death eligible defendants. While the parties awaited word from Washington, the court put off, indefinitely, the scheduled pretrial conferences and hearings. On July 6, the attorney general's office authorized the prosecutors to seek the death penalty as to both murders and, on July 26, disapproved the plea agreement. On August 1, prosecutors filed notice of their intent to seek the death penalty for both murders.

The defendant responded with a motion to dismiss the death notice as untimely under Section 3593(a). Denying the motion, the district judge decided that the defendant received actual, albeit not formal, notice of the government's intent to seek the death penalty as to the first count at least by the December 2000 hearing. The judge pointed out that preparation for the second death penalty count would not be substantially different than that for the first count.

COPYRIGHT © 2003 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C.   CRL   ISSN 0011-1341

so they're two totally different types of bullets.

Q    What could you tell about this projectile, other than the lands and grooves, in terms of its weight or size?

A    Basically the total weight was about 116 grains, which is consistent or close to the weight that you find .38 specials or .357 magnum cartridges in.

Q    Is it consistent with the type of ammunition that the .357 revolver fires, or is capable of firing?

A    Yes. Obviously this spent projectile that I received from the Medical Examiner's Office was not complete, it had been damaged badly, but it is consistent in the realm of .357 magnum cartridge.

Q    Is that type of projectile capable of being fired from the .22 that you recovered?

A    Absolutely not.

Q    Now, with respect to the Plymouth Horizon, did you recover any United States currency from that vehicle?

A    Yes, I did.

Q    And approximately how much money did you recover?

A    I recovered, in one-hundred dollar, fifty dollar, twenty dollar, and ten dollar denominations, $40,000

Q    And was that in anything in this vehicle?

A    They were wrapped in rubberbands, and the money was contained inside a brown, what I would call a cassette

*EX. A*



4

664

G. Pratt - Direct

A.   The window itself?

Q.   Yes.

A.   Yes, it is portrayed.

Q.   And could you tell us your observations regarding that window as you observed it on October the 30th, 1990?

A.   The driver's door window was shattered, there was glass on the inside driver's seat, floor, and there is glass also outside on the ground, directly in front of that door.

Q.   And, do you recall your observations of the windows of the Ford TLR 950, that license plate number, as you observed it on the one -- in the 100 block of McClure Avenue that day that's portrayed in Exhibit 4?

A.   Yes, I do.

Q.   And what was -- what were those observations?

A.   I found all the windows in that station wagon up except the driver's door window, and that window was down.

     MR. PLOCHOCKI:  All right.  I have no further

     questions, Judge

CROSS EXAMINATION

BY MR. MC GINTY:

Q.   Just a few questions.  You spoke of this comparison microscope?

A.   Yes, sir.

Q.   And essentially what it does is shows you two


EX. B

G. Pratt - Cross

pictures of different objects side by side?

A.   That's correct.

Q.   Are you able to photograph what is shown under this microscope?

A.   In some microscopes you are.  Mine; I am not.  I do not have the equipment to do it.

Q.   Okay.  So in other words you are unable to provide the jury with any photographic evidence of what you saw in terms of comparison.

A.   That's correct.

MR. MC GINTY:  I've nothing further thank you.

MR. PLOCHOCKI:  Nothing further, Judge.

THE COURT:  You stand down, officer, Pratt. Thank you.

MR. PLOCHOCKI:  Judge, I have no further witnesses today.

THE COURT:  Okay.  Let's stop then.  We'll stop and we'll take our weekend recess.  I don't know what the news accounts are going to be on Saturday or Sunday, but don't you read them, okay, listen to any accounts of it on the television, or on the radio.  You're hearing it firsthand, you don't need any help.  9:00 o'clock Monday morning. Have a nice weekend.

13

Direct - Pratt - by Wildridge

1

2      THE WITNESS:  Forty thousand dollars U.S.

3  currency.

4      MR. WILDRIDGE:  At this time, Your Honor,

5  I'm going to ask the record to show that I'm

6  handing Exhibit 30 to counsel for her

7  examination and I offer it into evidence at

8  this time.

9      MISS ROSENTHAL:  I have no objection.

10     THE COURT:  Receive 30.

11 Q   Officer Pratt, I'll ask you whether you have

12 received any special education and training in the area of

13 ballistics examination?

14 A   Yes, I have.

15 Q   Would you tell the jury what that is.

16     MISS ROSENTHAL:  Judge, I believe this

17 was already asked and answered previously.

18     THE COURT:  Yeah, I think his

19 qualifications are on the record and I'll

20 recall you to his earlier testimony when he

21 first indicated to you where he had his

22 training and what his work schedules are and

23 how long he's been with the police department.

24 Q   I'll ask you then whether in connection with this

25 case, with the alleged shooting on October 30, there came a



EX. C

Direct - Pratt - by Wildridge

time when you received a .357 Magnum projectile from someone else in the police department?

A   That is correct, sir, I did come into the evidence of a .38 caliber or a .357 Magnum projectile.   I recovered it from a locker in front of our evidence area of the crime laboratory.   It was turned in by Investigator Thomas Bailey, who recovered it from the medical examiner's office.

Q   And I'll ask you whether subsequent to your having obtained that projectile, you ran a ballistics examination on it?

A   I have run a ballistics examination on that recovered projectile from the medical examiner's office.

Q   Would you tell the jury what a ballistics examination involves.

A   Yes.   When I get the projectile into the laboratory, I will examine it to determine what kind of a bullet it is.   I determined it was .38 caliber exactly .357 in diameter, which is the bullet used in .38 special ammunition and also .357 Magnum ammunition.   You use exactly the same type of bullet.   Once I made that determination, I looked at the design of the bullet.   What I mean by that is what it's shaped like, the material in that bullet.   It turned out to be a Remington in manufacture, a jacketed bullet, jacketed meaning it has a copper coating outside a

Direct - Pratt - by Wildridge

lead core internal composition.  Once I made the
determination what kind of projectile I had and what the
caliber was, I examined the base.  That's the bottom of the
bullet.  And what I'm looking for is rifling impressions.
These are the impressions left on the bullet once it passes
through a barrel.  I determined that there was five lands
and five grooves with a right-hand twist and that was put on
there by the rifling inside the barrel.  That configuration
of five lands, five grooves with the right-hand twist is
consistent with Smith and Wesson manufacturer.  So I knew I
was dealing with possibly a Smith and Wesson weapon.  Then I
took that projectile and placed it under a comparison
microscope.  A comparison microscope is a microscope that
allows me to look at two objects simultaneously.  Basically
it's two microscopes put together with a bridge in between
them.  Looking through that microscope, I saw unique
configurations, unique lines or striation marks that are
unusual to a certain barrel.  And that's how we make an
examination between one barrel to another barrel.

Q    At this time, Investigator, I'm going to give you
Exhibit 5B for identification, pardon me, Exhibit 5B at this
time.

MISS ROSENTHAL:  Is that B as in boy or D
as in David?



Direct - Pratt - by Wildridge

MR. WILDRIDGE:  B as in baker, bravo.

Q    And I'm going to give you Exhibit 5B for examination, for identification, I'm sorry.  I'm going to ask you to open that exhibit at this time.

(Witness complies.)

Q    I will ask you to withdraw from it any packaging that you believe contains a .357 Magnum projectile.

(Witness complies.)

Q    I'll ask you to show that to the jury and ask whether you can identify that as a container which you yourself handled?

A    Yes, it is.  From the medical examiner's office, I had received a plastic jar like this with their evidence tape on the top of it.  Once breaking that seal from the medical examiner's office, I removed an envelope here and inside this envelope was three parts of a spent projectile. Two of them were lead and one of them was this copper jacket.  Once I removed it from the envelope, I eventually placed it in a smaller container for ease of handling. Contained within here are those three parts, two parts lead and one part of that copper jacket.  That copper jacket is what I examined underneath the microscope for these unusual striation marks or individual striation marks to a particular barrel.



Direct - Pratt - by Wildridge

Q    Now you said you had something under the other side
of the microscope to which you compared that.   Precisely,
what did you have that you compared it to?

A    Okay.  After seeing that there was individual
striation marks, something unique about marks on this jacket
material, I removed that from the microscope.  I had <u>test</u>
<u>fired</u> this <u>weapon</u> which is a <u>clear</u> and <u>safe weapon</u>, <u>5A</u>, and
I test fired it <u>twice</u>, firing the same type of ammunition
through it, <u>recovering</u> the <u>bullets</u>.  Once <u>I recovered</u> those
bullets, I placed them on this <u>comparison microscope</u> and I
<u>looked</u> at these <u>two bullets</u> <u>side</u> by <u>side</u> to <u>see</u> if there was
anything <u>unique</u> in these <u>two bullets</u>.  I <u>found</u> <u>unique</u>
<u>markings</u> <u>on it</u>.  I <u>removed one</u> of those <u>bullets</u> from this
microscope and put this <u>jacket recovered</u> from the <u>medical</u>
examiner's office on <u>one side</u> and the <u>test bullet</u> on the
other side.  And by <u>having</u> <u>both</u> of those on the <u>scope</u> and
being <u>able</u> to <u>overlap them</u>, these <u>unique striation marks</u>
started looking <u>identical</u> to <u>each other</u>.  And what I did is
actually <u>started</u> <u>rotating</u> and going from <u>each land</u> and <u>each</u>
<u>groove</u>, constantly <u>rotating it around</u> and <u>I found</u> these
unique marks to <u>match</u> all the way <u>around</u> the <u>whole</u>
circumference of the <u>bullet</u>.  Once I was <u>satisfied</u> in <u>my</u>
mind that I had these <u>unique marks</u> in a <u>good enough number</u>
and they were reproducing themselves <u>well enough</u> on the <u>test</u>

Direct - Pratt - by Wildridge

fired bullet, I was able to say that this spent projectile

was fired in this barrel of this weapon to the exclusion of

all other weapons.  This weapon is the weapon I recovered

from the Ford station wagon in the 100 block of McClure Ave.

Q    And that's your opinion as a result of your

analysis?

A    That is my opinion.

Q    Thank you.

        MR. WILDRIDGE:  No further questions,

Your Honor.

        THE COURT:  All right.

        CROSS-EXAMINATION BY MISS ROSENTHAL:

Q    Just one.  Investigator, do you have a picture of

the comparison of what you saw under that microscope?

A    No, I do not.

        MISS ROSENTHAL:  Thank you.  Nothing,

Judge.

        THE COURT:  Thank you, Gary.  You're all

set.

            (Witness was excused.)

        THE COURT: How are we doing, Joe?  Are

they done upstairs?

        MR. RAPPAZZO: No, he's waiting to go into

Judge Gorman's court, Your Honor.  The minutes



*12*

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

APPEAL No. _____

JAIME A. DAVIDSON,

APPELLANT/PETITIONER,

Vs.

UNITED STATES OF AMERICA,

APPELLEE/RESPONDENT.

PETITION FOR WRIT OF MANDAMUS

RELATED TO CRIM. NO. 92-CR-35
AND CIVIL No. 5:00-CV-00869(NPM)
UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

ON THE PETITION, AND PREPARED DONE

BY: _Jaime A. Davidson_____
JAIME A. DAVIDSON  PRO SE
REG No. 37593-053
FCI EDGEFIELD
P.O. BOX 724
EDGEFIELD, SC  29824

*EX. D*

"APPENDIX"

## PETITION FOR WRIT OF MANDAMUS-ADDENDUM AT A.

A.  Numerous tests conducted from acquired evidences
retrieved from the alleged suspects, Mr. Robert
Lawrence, Juan Anthony Morales, Anthony G. Stewart
and the victim, Officer Wallie Howard, Jr., executed
by the FBI Laboratory (Analyzation of the GSR test
kits submitted), Officer Gary Pratt (Ballistics
Examination) and Officer Thomas A. Borowicz (Latent
Finger Prints Examinations), etc.

A. 1-  Investigator Gary Pratt's State Grand Jury testimony
transcripts;

A. 2-  Investigator Gary Pratt's initial State Trial testimony
transcripts, at Mr. Gary Stewart's trial;

A. 3.  Investigator Gary Pratt being recalled to conclude his
testimony at Mr. Gary Stewart's State trial;

A. 4-  Investigator Gary Pratt's State trial testimony
transcripts, at Mr. Robert Lawrence's trial;

A. 5-  Investigator Gary Pratt's Federal trial testimony
transcripts, in the presence of Appellant and all
other co-defendants;

A. 6-  The Government's Opening Statements at Appellant's
Federal trial, reflecting its position surrounding
their case in chief;

A. 7.  The Government's Rebuttal summation at Appellant's

a

Federal trial, reflecting its position surrounding their case in chief;

A. 8- The Honorable Court's Jury instructions at Appellant's Federal trial, reflecting what type of case, events and alleged facts, the Jury (who are the "SOLE" finders of facts), was instructed to find Beyond a Reasonable Doubt, prior to rendering its final verdict.

B. - **Initial § 2255 Motion.**

B. 1- § 2255 Exhibits

B. 2- Bar Complaint(s) with supporting facts.

B. 3- Letter dated May 30th, 2000 to the Honorable Neal P. McCurn, S.J..

B. 4- Declaration of Michael O. DeVaughn, with attached § 2255 Motion, questnions presented and issues presented.

B. 5- Motion Requesting Leave to Proceed with Additional Pages.

B. 6- Motion for Appointment of Counsel.

B. 7- Motion and Citation of Law in Support of Motion for Appointment of Counsel.

B. 8- Motion for Evidentiary Hearing.

B. 9- Supplemental Motion for Appointment of Counsel.

b

C. -   Motion for Leave to Amend Petitioner's Initial
       Section 2255 Motion, pursuant to Rule 15(A) Fed.
       Rules of Civil Proc.

C. 1-  The 2nd Motion attached to C : Motion Requesting
       Leave to File Traverse Motion, after the Government's
       Response.

C. 2-  Motion for Clarification and Objection to the
       Government's Request for an  Extension of Time.

C. 3-  Motion for the Record to Reflect.

C. 4-  Notice of Motion Missed from Docket Sheet.

C. 5-  Notice of Delayed Exhibit by Forensic Pathologist.

C. 6-  Motion for Discovery and Expansion of the Record
       pursuant to Rules 6 and 7 governing Title 28
       United States Code Section 2255.


D. -   **Government's Memorandum of Law in Opposition to
       Defendant's Motion pursuant to 28 U.S.C. § 2255.**

D. 1-  Motion Requesting Leave to Submit Petitioner's
       Delayed Exhibit by Forensic Pathologist.

D. 2-  Motion Requesting Extension of Time.

D. 3-  District Court's Nov. 28, 2000 Memorandum-Decision
       and Order.


E. -   Motion Requesting Leave to Stay the Proceedings
       of Petitioner's Notice of Appeal and Request for
       Certificate of Appealability.

*16*

E. 1-  Motion for Reconsideration and Request for this
       Honorable Court to Take Judicial Notice, pursuant
       to Rule 201, Fed.R.Civ.P., that "Fraud Has Been
       Committed upon this Court."

E. 2-  Novel Formed Affidavit of Jaime A. Davidson, Sr.

E. 3-  Motion Requesting Chief Justice Intervention to
       Oversee the Instant Proceedings and Investigate
       the Fraud Perpetrated upon this Court.

E. 4-  Motion for Reconsideration Exhibits A - D. 15.

E. 5-  Motion for Reconsideration Exhibits E - Q. 2.

E. 6-  Prisoners Pro Se Status Filing Procedures.

E. 7-  Fraud Perpetrated upon the Court.


F. -   **Motion Requesting Leave For Issuance of Numerous
       Subpoenas pursuant to Rule 45 F.R.Civ.P., and
       Request for Renewal of Petitioner's Motion for
       Appointment of Counsel and Supplemental of Same,
       and Motion for Discovery and Expansion of the
       Record in light of Apprendi  v. New Jersey, 120
       S.Ct. 2347 (2000).**

F. 1-  Petitioner's Objections to this Court's
       No-Appearance Hearing and Unethical violation of
       Judicial Ex-Parte Communication with Petitioner's
       Witness(es), and Request For Writ of Habeas Corpus
       Ad Testificandum.

d

EXHIBITS ATTACHED TO APPELLANT'S AFFIDAVIT IN SUPPORT OF HIS
PETITION FOR WRIT OF MANDAMUS

I.   A letter from Mr. Fred Green, Esq. to Appellant, dated
     December 11, 1997 conveying where trial Counsel,
     Mr. John F. Laidlaw, Esq. confirmed to Mr. Green that
     he was in possession of some State Trial transcripts
     of Mr. Davidson's co-defendants.

II.  Various documentations from the Department of Justice
     (mainly, the U.S. Attorney General's Office), reflecting
     where in their files, there is no mention of any alleged
     Central New York Drug Enforcement Task Force ever
     existing, as testified to at Appellant's Federal Trial
     without any documentary proof.

III. An example of a Richmond, Virginia (Memorandum of
     Understanding) State, Local and Federal Task Force
     Agreement, covering its Functions and Rules and/or
     Regulations.

IV.  An example Appellant is offering to have the record
     reflect where/how in the case of Mr. Jorge Lorenzo
     Hernandez, Mr. Davidson's bilingual Legal Assistance
     aided Mr. Lorenzo go from 41 years to 11 years on his
     Appeal.

V.   Another example Appellant is offering in the case of
     Mr. Jorge Ivan Torres-Rodriguez, where/how Mr. Davidson's
     Legal Assistance has aided Mr. Torres-Rodriguez by-pass
     all his procedural hurdles since filing his Initial

f

18

1   "Out-of-time Notice of Appeal" and again, being Granted
2   his Certificate of Appealability as to: "Did the lower
3   Court either err or abuse its discretion in refusing to
4   hold an evidentiary hearing on Torres' claim that his
5   Attorney provided Ineffective Assistance in failing to
6   file a Notice of Appeal?

7   VI.  A copy of the Honorable Neal P. McCurn, S.J.  May 4th,
8   2000 "**ORDER**," on Appellant's co-defendant Mr. Lenworth
9   Parke's Motion for Reconsideration being reviewed in
10  light of **Delaney v. Selsky**, 899 F.Supp. 923, 925
11  (**N.D.N.Y.** 1995) (McAvoy, C.J.) (citing **Doe v. New York**
12  **City Dep't of Soc. Servs.**, 709 F.2d 782, 789 (2nd Cir.),
13  cert. denied, 464 U.S. 864 (1983)); and, it must be
14  noted, that said Motion for Reconsideration was not
15  Recharacterized as a 60(b) Motion and/or a Second or
16  Successive § 2255 Motion as presently being done in the
17  case at bar.

18  VII. A copy of the Honorable Neal P. McCurn, S.J. October 8th,
19  1998 "**DECISION AND ORDER**" in the case of Mr. Lenworth
20  Parke, reflecting where/how this said Honorable Judge
21  "**REVERSED**" itself Sua-Sponte, via, a Reconsideration
22  Motion utilizing as its vehicle(s) of authority,
23  **Delaney v. Selsky**, 899 F.Supp. 923, 925 (**N.D.N.Y.** 1995)
24  (McAvoy, C.J.) (citing **Doe v. New York City Dep't of**
25  **Soc. Servs.**, 709 F.2d 782, 789 (2nd Cir.), cert.denied,
26  464 U.S. 864 (1983)).

27
28

8

*19*

VIII.   Appellant cites as an example, Mr. Lenworth Parke's
        April 27, 1998 Memorandum-Decision & Order by Hon.
        Neal P. McCurn, S.J., Dismissing Mr. Parke's § 2255
        Motion as being filed untimely, and citing a barrage
        of cases of authority in support of his Order.

  IX.   Appellant cites as another example, Mr. Lenworth Parke's
        April 22nd, 1999 Memorandum-Decision and Order by the
        Hon. Neal P. McCurn, S.J., allowing the record to
        reflect how the Hon. McCurn considers individuals cases
        on their merits; placing them in their perspective
        category and again, utilizing a barrage of cases as
        "<u>Authority</u>," to further deny a Petitioner of his Habeas
        Relief requested.

   X.   Bar Complaint(s), Affidavits and supporting documentations;

  XI.   Forensic Science Analysis, Report, Affidavit and
        supporting documentations;

 XII.   Comparison of docket sheets from N.D.N.Y. District Court;

XIII.   Document rejection notice filed April 12, 2001 with
        rejected letters attached;

 XIV.   Press Releases, Newspaper articles and attached letter
        to Inv. Henry Brown;

  XV.   Police Reports reflecting news media video tapes being
        subpoenaed as evidence, eyewitnesses names and/or
        incident accounts, with Police Officers Crime Scene
        Reconstruction event sketches and surveillance group
        positions on October 30th, 1990;

h

XVI.  Mr. Davidson's both Memorandum - Decision and Orders from the Hon. Neal P. McCurn, S.J. denying his § 2255 Motion (to be analyzed thoroughly to detect the District Court's erroneous rulings), dated Nov. 28th, 2000 and April 6th, 2001;

XVII.  Post - Standard newspaper articles, highlighting critical Post-Jurors Statements, surrounding Appellant's guilt by association stemming from lack of evidence and Jury instructions confusion.

XVIII.  Testimony of Inv. Lyle Baxter, at Mr. Lawrence State Trial and he is also the investigator that removed the semi-automatic weapon out of officer Wallie Howard, Jr's right hand; also testified to this observations once he came in contact with Officer Howard, Jr.

XIX.  State Pre-Trial proceedings in regards to the KEL Tape Recorder, where the Hon. Judge Burke states that the tape "__NEVER__" shut off, and he heard two (2) low pops from far first and one (1) loud bang from close; these proceedings also mention the alleged defense team Expert, Mr. Warren Stuart Bennett.

i

N.D.N.Y.
00-cv-00869
McCurn, J.

21



# MANDATE

## United States Court of Appeals

FOR THE
### SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the 14th day of June two thousand one,

Present:

Hon. Joseph M. McLaughlin,
Hon. Rosemary S. Pooler,
*Circuit Judges,*
Hon. John G. Koeltl,*
*District Judge.*



In Re: Jaime A. Davidson,
              Petitioner.

01-3035

Petitioner has filed a petition for a writ of mandamus and a motion for leave to file an amicus curiae brief. Upon due consideration, it is ORDERED that the mandamus petition is denied because petitioner has not shown the inadequacy of other available remedies. *See In re United States,* 10 F.3d 931, 933 (2d Cir. 1993). It is further ORDERED that the mandamus petition is construed as a motion for a certificate of appealability in which petitioner challenges the district court's orders denying his motion pursuant to 28 U.S.C. § 2255 and his motion for reconsideration. It is further construed as a notice of appeal in which the petitioner challenges the order directing the clerk of the court to reject any further motions submitted by the petitioner pertaining to this matter.

The clerk is directed to establish a docket number for petitioner's appeal, and the district court is directed to transmit the record on appeal to this Court. This Court will stay consideration of petitioner's action pending this Court's decisions in *Rodriguez v. Mitchell,* No. 99-2170, and *Rodriguez v. Spitzer,* No. 99-3507, or another case that addresses whether a motion pursuant to Fed.

---

* Hon. John G. Koeltl, Judge, United States District Court for the Southern District of New York, sitting by designation.

220

R. Civ. P. 60(b) in a habeas corpus action must be treated as a second or successive habeas motion. The motion for leave to file an amicus curiae brief is denied without prejudice to renewal upon this Court's issuance of a scheduling order.

FOR THE COURT:
Roseann B. MacKechnie, Clerk

By: *Lucille Carr*

23

Proceedings include all events.                                    CLOSED
5:97cv526 Parke v. USA

4/9/01    --    Record on appeal returned from U.S. Court of Appeals:
                [45-1] appeal  by Lenworth Parke (dmf)

4/9/01    --    Certified and transmitted record on appeal to U.S. Court of
                Appeals: [45-1] appeal by Lenworth Parke (Note: File was
                mistakenly sent back to District Court) (dmf)

4/27/01   46    NOTICE of receipt of index to the record on appeal by the
                Second Circuit Court of Appeals, dated 4/13/01. (dmf)
                [Entry date 05/02/01]

2/27/02   47    MANDATE OF USCA (certified copy dated 2/5/02) Re: [45-1]
                appeal by Lenworth Parke; the judgment of said District
                Court be and hereby is AFFIRMED. (dmf) [Entry date 03/05/02]

4/24/02   --    Record on appeal returned from U.S. Court of Appeals:
                [45-1] appeal by Lenworth Parke (dmf)

5/27/03   48    MOTION by Lenworth Parke, Pro Se to Reopen the 2255 Motion
                decision on the issue of ineffective counsel, pursuant to
                FRCvP 60(b), in light of the Supreme Court's Clarifying
                Decision in Massaro v. United States, certificate of
                service and exhibits A and B attached, Motion returnable
                before Senior Judge: McCurn (jmb) [Entry date 06/02/03]

6/10/03   49    LETTER/SCHEDULING NOTICE: dtd 6/10/03 from Senior Judge
                McCurn to AUSA Duncan. The court is in receipt of Mr.
                Parke's "Motion to Reopen Section 2255 Motion..." filed May
                27, 2003 (dkt. 48) and requests that the Govt. file a
                response to same on or before July 10, 2003 (dmf)
                [Entry date 06/17/03]

7/21/03   50    LETTER REQUEST & ORDER: dated 7/18/03 by John G. Duncan,
                AUSA on behalf of the USA, requesting an adjournment of the
                response deadline, request granted, Response to Motion
                reset to 8/1/03 for [48-1] Motion to Reopen the 2255 Motion
                decision on the issue of ineffective counsel, pursuant to
                FRCvP 60(b) (Signed by Senior Judge Neal P. McCurn) (jmb)
                [Entry date 07/24/03]

7/24/03   51    MEMORANDUM OF LAW: by John G. Duncan, AUSA on behalf of the
                USA in opposition to [48-1] Motion to Reopen the 2255
                Motion decision on the issue of ineffective counsel,
                pursuant to FRCvP 60(b), w/attached certificate of service.
                (jmb) [Entry date 07/29/03]

8/1/03    52    Mail returned undeliverable: Sent to petitioner Lenworth
                Parke, Re: Service of [50-1] Request & Order, sent to last
                known address information of FCI Edgefield, P.O. Box 724,
                Edgefield, SC 29824, ID # 04432-052, Envelope marked
                "Return to Sender - Forwarding Order Expired" (jmb)
                [Entry date 08/07/03]

Docket as of August 28, 2003 11:40 am                  Page 7

EX. E

24

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

JAIME A. DAVIDSON,
       Petitioner,

  -Vs-

UNITED STATES OF AMERICA,
       Respondent.

)
)
)
)
)
)
)
)
)
/

CIVIL NO. 5:00-CV-869(NPM)
CRIM. NO. 92-CR-35
APPEAL NO. 01-2370

PETITIONER'S MOTION FOR RECONSIDERATION, IN LIGHT
OF <u>MASSARO V. UNITED STATES</u>, U.S., NO. 01-1559 AND
<u>MILLER-EL V. COCKRELL</u>, 154 L.ED. 2D 931 (2003), TO
PREVENT A FUNDAMENTAL MISCARRIAGE OF JUSTICE VIA,
A SERIOUS FRAUD COMMITTED UPON THE COURT, PREJUDICING
ONE WHO'S ACTUALLY (FACTUALLY) INNOCENT

TO THE HONORABLE JUDGE OF SAID COURT;

MAY IT PLEASE THE COURT:

      COMES NOW, Petitioner, Jaime A. Davidson, <u>pro-se</u>, (and
referred to herein as Petitioner), bringing forth the instant motion
in the above styled cause.  Mr. Davidson respectfully requests that
this Honorable District Court reviews/entertains the present motion
in its entirety, "in conjunction with Petitioner's pending 'Motion
For New Trial...,' filed January 10th, 2003", and/or Grants the same
as a whole.  In support thereof, Petitioner, to wit, states as
follows:

      1.  The present motion has been properly prepared with extreme
due diligence and under good-faith;

      2.  Petitioner respectfully requests that this Honorable Court
utilizes its reasonable good-will discretion by reviewing the present
motion under the standards set forth by the Supreme Court in <u>Haines
v. Kerner</u>, 92 S. Ct. 594 (1972) (per curiam) (allegations of <u>pro-se</u>

Proceedings include all events.
5:00cv869 Davidson v. United States

5/6/03    138    LETTER/NOTICE dtd 5/5/03 by Angela Brown, Executive
                 Director for Youth Task Force with attached cassette tape
                 and transcript of interview with Dr. Rigle re: [115-1] New
                 Trial and [129-2] Evidentiary Hearing. The attached should
                 be received as Exhibit J. (dmf) [Entry date 06/09/03]

5/8/03    134    LETTER REQUEST & ORDER: Letter dated 4/29/03 by Jaime A.
                 Davidson, Pro Se to Chief Judge Scullin, requesting
                 reconsideration of the November 5, 2002 Denial Order, to
                 his request to have Judge Neal P. McCurn respond to his
                 affidavit of recusal, w/various attachments in support,
                 Motion for reconsideration denied. (Signed by Chief Judge
                 F. J. Scullin Jr.) (jmb) [Entry date 05/09/03]

5/9/03    135    RESPONSE MEMORANDUM OF LAW by John Duncan, AUSA for United
                 States to [115-1] motion for New Trial (kcl)
                 [Entry date 05/12/03]

5/15/03   139    LETTER/NOTICE dtd 5/11/03 by Jaime A. Davidson, Pro Se re:
                 the cassette tape and transcript of interview with Dr.
                 Rigle filed by the Youth Task Force. (dmf)
                 [Entry date 06/09/03]

5/20/03   136    MOTION by Jaime A. Davidson, Pro Se for Reconsideration of
                 all previous denial orders, and grant petitioner: a Show
                 Cause Order, the appointment of a Specialized Habeas Corpus
                 Counsel, an Immediate Evidentiary Hearing, and grant a New
                 Trial, w/attached certificate of service and supporting
                 attachments, Motion before Senior Judge: McCurn (jmb)
                 [Entry date 05/23/03]

5/20/03   137    URGENT NOTICE: dated 5/15/03 by Jaime A. Davidson, Pro Se,
                 that the Court thoroughly review and consider on its
                 merits all of Mr. Davidson's factual claims being raised
                 and grant the same, filed in support of [136-1] Motion for
                 Reconsideration. (jmb) [Entry date 05/23/03]

5/23/03   140    OPEN LETTER TO THE HON. NEAL P. McCURN, S.J. dtd 5/17/03 by
                 Jaime A. Davidson received in Clerk's Office on 5/23/03
                 concerning alleged materials, i.e., telephone tape
                 recording interview with David A. Digle, M.D. (dmf)
                 [Entry date 06/09/03]

6/2/03    141    NOTICE to the Hon. Neal P. McCurn, S.J. dtd 5/29/03 by
                 Jaime A. Davidson requesting an equitable court order based
                 on newly discovered evidence; certificate of service
                 attached. (dmf) [Entry date 06/09/03]

6/6/03    142    CHANGE OF ADDRESS for Jaime A. Davidson, Pro Se (dmf)
                 [Entry date 06/10/03]

**NEWSMAKERS**



▶ *Waving to supporters, Steven Crawford (shown with his sister Linda Thompson), walks out of the Dauphin County Prison near Harrisburg, PA, after he served 28 years for a murder he says he didn't commit. Convicted three times for allegedly killing a 13-year-old friend 30 years ago when he was 14, Crawford was granted another trial recently and ordered released on $1 bail. A new trial is set for August.*

EX. F

## Evidence Withheld In '70s Murder Trial Frees Man From Pennsylvania Prison

After nearly 30 years of imprisonment, Pennsylvania authorities recently released a Black man who had been convicted three times for allegedly killing a boyhood friend, in light of new evidence that vital information was left out of his original trial.

The order by Common Pleas Court Judge Joseph Kleinfelter followed the discovery of documents that contradicted police testimony about a bloody handprint in the 1970 slaying of 13-year-old John Eddie Mitchell.

After reviewing thousands of documents and interviewing witnesses over the past two months, prosecutors concluded that original notes by a retired police chemist—found in a county detective's briefcase after he died—contradicted police testimony about blood particles on a handprint left in the garage.

"We've concluded that, potentially, his trial could have been tainted by the failure to disclose these notes," said District Attorney Edward M. Marisco Jr., who added that he had

not yet decided whether to retry Crawford, who is scheduled to appear in court again on August 5.

"It feels great and I'm thankful to everyone who helped me. It's been a long time," said Crawford who was released on $1 bail, but was subjected to electronic monitoring.

Police found Mitchell's body under a car in a blood-spattered garage behind Crawford's home. The teenager had been beaten in the skull with a sledgehammer, which was found in an adjoining garage, and robbed of $32 he collected on his paper route that day, police said.

In 1974, Crawford, who was 14 at the time, was convicted of homicide in the death of Mitchell and sentenced to life in prison. He insisted he did not

commit the crime, and turned down deals that would have set him free in exchange for a guilty plea to a lesser charge. The Pennsylvania Supreme Court later overturned his conviction on the grounds the lead detective testified beyond his scope of expertise when he told jurors that Crawford's palm print was placed at the scene on the day of the murder and not some point earlier.

He was retried and convicted in 1977. The following year, a Dauphin County judge granted a second retrial on procedural grounds and Crawford was convicted of first-degree murder for a third time. Crawford maintained his innocence throughout the trials, all of which ended in convictions on first-degree murder.

## President Bush Announces Medals Of Freedom For Nelson Mandela, Hank Aaron, Bill Cosby

  

◀ *Among recipients for this year's Medal of Freedom are (l-r) former South African President Nelson Mandela, baseball legend Hank Aaron and comedian-actor-educator Bill Cosby.*

The first Black president of South Africa, Nelson Mandela, who won the Nobel Peace Prize for his nonviolent effort to bring freedom to his people, is one of 10 champions who will be honored next month at the White House.

In a special ceremony, Nelson Mandela and two distinguished U.S.

Blacks, former baseball star Henry Aaron and entertainer Bill Cosby, will be in the group to receive this country's highest civilian honor.

President Bush announced the winners to whom he personally will present the nation's top award honoring distinguished civilian service.

JULY 15, 2002
JET MAGAZINE

N6